# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO on )
the relation of the State Engineer, )
                              )
            Plaintiff,        )
                              )
-v-                           )
                              )
EDUARDO ABEYTA, et al., and   )
CELSO ARELLANO, et al.,       )
                              )
            Defendants.       )
                              )
                              )

No. 69cv7896-JEC-ACE
RIO PUEBLO DE TAOS
ADJUDICATION

No. 69cv7939-JEC-ACE
RIO HONDO ADJUDICATION
Consolidated

Supplement A – Mutual Domestic
    Water Consumer Associations

### THE STATE NEW MEXICO'S
### PROPOSED FINDINGS OF FACT AND
### CONCLUSIONS OF LAW,
### OBJECTIONS TO EVIDENTIARY RULINGS,
### and
### MEMORANDUM BRIEF IN SUPPORT

October 22, 2002

STATE OF NEW MEXICO on the
relation of the STATE ENGINEER

DL Sanders, General Counsel
Gregory C. Ridgley
Edward Bagley
Stacey J. Goodwin
Special Assistant Attorneys General
New Mexico Office of the State Engineer
Post Office Box 25102
Santa Fe, New Mexico 87504-5102
(505) 827-6150

**Counsel for Plaintiff, State of New
Mexico ex rel. State Engineer**

*3054*

# TABLE OF CONTENTS

**I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW RESULTING FROM RE-QUANTIFICATION OF WATER RIGHT AMOUNTS TRANSFERRED INTO THE MDWCAS' SYSTEMS** ........................................... 4

**A.    THE BURDEN RESTS WITH EACH MDWCA TO PROVE THE WATER RIGHT AMOUNT CLAIMED** ........................................................................ 4

**B.    THE THREE MDWCAS WITH PRE-BASIN WELLS FAILED TO PROVE THEIR CLAIMED WATER RIGHT AMOUNTS** ..................................................... 7

    *1.    LLANO QUEMADO HAS NOT PROVEN THROUGH SUBSTANTIAL EVIDENCE IN THE RECORD THAT IT HAS PLACED TO BENEFICIAL USE 96.99 AFY OF WATER* ........................................................................................ 8

    *2.    TALPA MDWCA HAS NOT PROVEN THROUGH SUBSTANTIAL EVIDENCE IN THE RECORD THAT IT HAS PLACED TO BENEFICIAL USE 80.66 AFY OF WATER* ........................................................................................ 10

    *3.    CAÑON MDWCA HAS NOT PROVEN THROUGH SUBSTANTIAL EVIDENCE IN THE RECORD HAT IT HAS PLACED TO BENEFICIAL USE 71.4 AFY OF WATER* ........................................................................................ 12

**C.    THE NINE POST-BASIN MDWCAS FAILED TO MEET THE STATUTORY REQUIREMENTS TO ESTABLISH A WATER RIGHT IN THE AMOUNTS CLAIMED** 13

    *1.    THE MDWCAS FAILED TO PROVE THAT THE ENTIRE WATER RIGHT AMOUNTS HELD BY INDIVIUAL MEMBERS WERE TRANSFERRED INTO THEIR SYSTEMS* ............................................................................. 14

    *2.    THE NINE POST-BASIN MDWCAS FAILED TO PROVE THAT INDIVIDUAL WATER RIGHT HOLDERS TRANSFERRED INTO THEIR SYSTEMS THE SPECIFIC AMOUNTS OF WATER CLAIMED BY THE MDWCAS* .......................... 18

**D.    SUBSTANTIAL EVIDENCE IN THE RECORD SUPPORTS QUANTIFYING THE AMOUNTS OF THE WATER RIGHTS UNDERLYING THE NINE POST-BASIN MDWCAS' CLAIMS IN AMOUNTS SUBSTANTIALLY LESS THAN WERE CLAIMED** ................................................................................................. 20

    *1.    THE WATER RIGHT AMOUNTS TRANSFERRED TO THE MDWCAS SHOULD BE QUANTIFIED USING A REASONABLE ESTIMATE OF THE AMOUNTS OF WATER USED FOR DOMESTIC PURPOSES* ........................... 22

    *2.    THE MDWCAS' PROPOSED ESTIMATE OF 150 GPD FROM SURFACE WATER AND 3 AFY PER HOUSEHOLD FROM DOMESTIC WELLS DOES NOT ACCURATELY REFLECT THE LIMITED DOMESTIC USES TRANSFERRED INTO THEIR SYSTEMS* ..................................................................... 23

3.  SUBSTANTIAL EVIDENCE IN THE RECORDS SUPPORTS THE STATE ENGINEER'S LONG-STANDING ESTIMATES OF DOMESTIC WATER USE AMOUNTS ............................................................................... 26

i)   The Amount of the Underlying Water Rights Transferred to Arroyo Seco MDWCA Should be 4.93 to 5.38 AFY Rather Than 120 AFY ....................................................................................... 28

ii)  The Amount of the Underlying Water Rights Transferred to Ranchos De Taos MDWCA Should be 4.7 AFY Rather Than 105 AFY ....................................................................................... 29

iii) The Amount of the Underlying Water Rights Transferred to Valdez MDWCA Should be 1.4 to 5.51 AFY Rather than 21 AFY.... 31

iv)  The Amount of the Underlying Water Rights Transferred to Upper Des Montes MDWCA Should be 0.92 to 3.69 AFY Rather Than 31.42 AFY ................................................................................ 33

v)   The Amount of the Underlying Water Rights Transferred to Upper Ranchitos MDWCA Should be 14.52 AFY Rather than 129 AFY ..... 34

vi)  The Amount of the Underlying Water Rights Transferred to Lower Des Montes MDWCA Should be 5.26-17.6 AFY Rather than 53.14 AFY ....................................................................................... 36

vii) The Amount of the Underlying Water Rights Transferred to Lower Arroyo Hondo MDWCA Should be 17.14 AFY Rather Than 177 AFY ....................................................................................... 37

viii) The Amount of the Underlying Water Rights Transferred to El Salto MDWCA Should be 6.97-7.52 AFY Rather Than 49.08 AFY... 38

ix)  The Amount of the Underlying Water Rights Transferred to Upper Arroyo Hondo MDWCA Should be 3.79 to 13.37 AFY Rather Than 26.6 AFY ................................................................................ 41

II.  THE STATE OFFERS THE COURT TWO ALTERNATIVES FOR ITS CONSIDERATION.............................................................................. 42

A.   IN THE ALTERNATIVE, THE COURT COULD REINSTATE THE WATER RIGHTS AMOUNTS ADJUDICATED BY THE COURT'S PREVIOUS ORDERS AND APPLY THE SAME UNDERLYING TREATMENT TO THE MDWCAS WITH UNADUDICATED AMOUNTS............................................................................... 43

B.   THE COURT MIGHT CONSIDER RE-INSTATING THE ADJUDICATION ORDERS FOR SIX MDWCAS, RE-ADJUDICATING THE WATER RIGHTS FOR THE THREE PRE-BASIN MDWCAS BASED ON ACTUAL DIVERSIONS, AND RE-ADJUDICATING THE WATER RIGHTS OF THREE MDWCAS BASED ON ACTUAL DIVERSIONS WITHIN THEIR PERMITTED AMOUNTS......................................................... 46

III. ARGUMENT ON EVIDENTIARY OBJECTIONS ........................................... 55

**A.**   **THE SPECIAL MASTER'S LAST MINUTE EXCLUSION OF THE MEYER REPORT WAS REVERSIBLE ERROR** ................................................................................ 56

   *1.*   *THE EXPERT REPORT OF DR. MICHAEL MEYER IS ADMISSIBLE.*...................... 60

   *2.*   *THE SPECIAL MASTER'S ELEVENTH-HOUR REVERSAL ON THE ADMISSIBILITY OF THE MEYER REPORT SO PREJUDICED THE STATE THAT A NEW TRIAL IS WARRANTED* .............................................................. 63

**B.**   **IT WAS ERROR TO ALLOW THE ADMISSION INTO EVIDENCE OF THE MDWCAS' POST-TRIAL TENDER OF EXHIBITS** ............................................................... 65

   *1.*   *THE PROCESS FOR POST-TRIAL TENDER OF EXHIBITS ESTABLISHED BY THE SPECIAL MASTER'S ORDERS DEPRIVED THE STATE OF THE FUNDAMENTAL OPPORTUNITY TO EVALUATE AND OBJECT TO TENDERED EVIDENCE* ............................................................................. 67

   *2.*   *THE EXHIBITS TENDERED BY THE MDWCAS POST-TRIAL HAVE NOT BEEN AUTHENTICATED, VIOLATE THE BEST EVIDENCE RULE, CONTAIN INADMISSIBLE HEARSAY, AND ARE NOT RELEVANT* ...................... 68

*IV.*   *CONCLUSION* ................................................................................................ 75

Pursuant to the Special Master's Scheduling Order for Post-Trial Briefs filed July 17, 2002 (Docket No. 3037), State of New Mexico on the relation of the State Engineer files its proposed findings of fact and conclusions of law, objections to evidentiary rulings, and brief in support thereof.  In accordance with the extension of time granted by the Special Master on September 18, 2002 (Docket No. 3049), the proposed findings and conclusions, objections and brief are timely if filed on or before October 22, 2002.

The purpose of this evidentiary proceeding for the twelve Mutual Domestic Water Consumer Associations[1] ("MDWCA") is to adjudicate the amount of water each MDWCA has the right to divert and place to beneficial use under the laws of the State of New Mexico, based on actual historical beneficial use.  Initially, the Court adjudicated water right amounts for ten of the MDWCAs based on several different, inconsistent methods contained in their underlying declarations of rights and permits on file with the Office of the State Engineer.  *See* Response by State of New Mexico in Opposition to Llano Quemado, Des Montes, Talpa, Upper Ranchitos and Valdez MDWCAS' Motion for Order to Re-Open Previously Adjudicated Water Quantities (August 5, 1998) (Docket No. 2547); New Mexico's Motion to Re-Open Previous Adjudications of Ranchos de Taos, Arroyo Seco, Upper Arroyo Hondo, Lower Des Montes, and Cañon Mutual Domestic Water Consumer Associations (November 16, 1998) (Docket No. 2599).

---

[1] The twelve MDWCAs are Llano Quemado, Ranchos de Taos, Arroyo Seco, Lower Arroyo Hondo, Upper Arroyo Hondo, Lower Des Montes, Upper Des Montes, Upper Ranchitos (also referred to as Upper Ranchito), El Salto, Talpa, Valdez and Cañon MDWCA.  All but Lower Arroyo Hondo and El Salto MDWCAs were originally adjudicated water right amounts by the Court in the 1970s.

1

If the Court were to carry the logic of the MDWCAs' claims to its conclusion, the Court could, having re-opened those adjudications, go behind the permits and sworn statements of the MDWCAs' original officers and members to reach a consistent result in the quantification of these water right amounts. Based on the cross-motions of the State and the MDWCAs, the Court granted the motions to reopen the ten MDWCAs' previously adjudicated water rights to re-quantify the water right amounts in a manner consistent with the quantification of the water right amounts for two MDWCAs (Lower Arroyo Hondo and El Salto MDWCA) whose rights remain to be adjudicated. In accordance with the purpose of this proceeding to re-adjudicate the amount of water for the water rights of the twelve MDWCAs in a consistent manner, the Court could go behind the permits and declarations underlying the MDWCAs' water right claims and, applying the laws governing the appropriation of groundwater, quantify the amounts of the underlying water rights transferred into the systems of each MDWCA. In Part I below, the State sets out the results of such an approach if consistent standards for similarly situated MDWCAs are applied to the substantial evidence in the record.

The State does not believe that the results of such an approach would be satisfactory to the State, the MDWCAs, or the Court. In Part II, therefore, the State proposes two alternative approaches to quantifying the amounts of the Mutual Domestics' water rights for the Court's consideration. One alternative to be considered is that, the Court having conducted this proceeding for the purpose of examining the fairness and equity of the original consent orders, the Court could confirm in this proceeding the MDWCA orders that were re-opened, based on the reasons set forth in the State's Response in Opposition to Llano Quemado, Des Montes, Talpa, Upper Ranchitos

2

and Valdez MDWCAS' Motion for Order To Re-Open Previously Adjudicated Water Quantities (August 5, 1998) (Docket No. 2574). The two remaining MDWCAs could be adjudicated based on the amounts of water contained in the permits approved by the State Engineer, as actually placed to beneficial use.

Second, the Court might consider whether the adjudication of the water right amounts could be consistently and fairly accomplished by either reinstating the adjudicated amounts or adjudicating the amounts of the water rights in accordance with their declarations and permits issued by the State Engineer, as actually placed to beneficial use. Arguably, the best evidence of the MDWCAs' water rights in this proceeding would be the permits and the meter records filed with the State Engineer and submitted as evidence in the record.

**I.   FINDINGS OF FACT AND CONCLUSIONS OF LAW RESULTING FROM RE-QUANTIFICATION OF WATER RIGHT AMOUNTS TRANSFERRED INTO THE MDWCAS' SYSTEMS**

If the Court were to adjudicate the water rights of the MDWCAs by going behind the permits and declarations filed by the MDWCAs, then the underlying water right amounts transferred into the MDWCAs' system should be re-quantified in accordance with the laws governing groundwater appropriations and the substantial evidence in the record. If such an approach is adopted, the State would propose dividing the MDWCAs into two similarly situated groups and applying the same method of quantification to each groups. In the discussion in this Part I, the State has grouped the MDWCAs according to two categories: 1) those MDWCAs with "pre-basin" wells, and 2) those MDWCAs with "post-basin" wells. If the laws governing the appropriation of groundwater are applied, the substantial evidence in the record dictates that the claimed water rights of the three pre-basin MDWCAs be limited to the amount of water actually diverted and placed to beneficial use; and the claimed water rights of most if not all of the nine post-basin MDWCAs stand to be reduced by significant amounts.

**A.   THE BURDEN RESTS WITH EACH MDWCA TO PROVE THE WATER RIGHT AMOUNT CLAIMED**

Each of the MDWCAs "has the burden of pleading and providing all elements of its water right." Prehearing Order for Hearings on Disputed Supplement A Groundwater Rights Claims (May 7, 1998) (Docket No. 2565) at 3. This proceeding was limited to the determination of the amount water for the water rights claimed by the MDWCAs. See, e.g., Order Concerning MDWCAS' Exhibits 192-193, (August 23, 2001) (Docket No. 28**) 1-2. In response to the Special Master's requirement that each party affirmatively set forth its claimed amount of water, the MDWCAs filed formal Statements of Claims.

4

*See* Response by Cañon MDWCA to Pre-Hearing Order for Litigation of Water Rights Claims (Docket No. 2622); Response by Arroyo Hondo MDWCA in Compliance with Pre-hearing Order, (Docket No. 2624); Statements of Claims for Ten Mutual Domestic Water Consumer Associations (Docket No. 2625). The Special Master has required each MDWCA to prove by substantial evidence in the record the elements of their claims. *See, e.g.,* Pre-Hearing Order for Hearings on Disputed Supplement A Groundwater Rights Claims (May 7, 1998) (Docket No. 2565) (each mutual domestic objecting to offer of judgment has burden of pleading and proving all elements of its water right). Therefore, each MDWCA must provide substantial evidence of the amount of water actually developed and lawfully diverted and applied to a beneficial use. *See State ex rel. Erickson v. McLean*, 62 N.M. 264, 270-273, 308 P.2d 983, 987-988 (1957).

It has been long established in New Mexico that to obtain a water right, water must be actually applied to a beneficial use. *Millheiser v. Long*, 10 N.M. 99, 61 P. 111 (1900); *State ex rel. Martinez v. McDermett*, 120 N.M. 327, 330, 901 P.2d 745, 748 (Ct. App. 1995). Beneficial use is the basis, the measure and the limit to the right to the use of underground waters. NMSA 1978, Section 72-12-2 (1931); N.M. Const., Art. XVI § 3. An intended future use is not sufficient to establish beneficial use if the water is not put to actual use within a reasonable span of time. *State ex rel.Reynolds v. Crider*, 78 N.M. 312, 315-316, 431 P.2d 45, 48-49 (1967); *Abousleman, supra* at 8-9.

The evidence necessary to prove the amount of water which each MDWCA has a right to divert depends in part upon whether the MDWCA's water right is claimed to stem from an appropriation that was initiated prior to, or after, the State Engineer exercised his administrative control over the underground water basin. After the State

5

Engineer declares an underground basin to have reasonably ascertainable boundaries, a permit and license to appropriate water is required prior to placing water to beneficial use unless the water user has initiated the development of a water right prior to the declaration of the basin.  NMSA 1978, Sections 72-12-5 (1931) and 72-12-20 (1983). Rights to beneficially use underground waters that were initiated prior to the State Engineer's declaration of the groundwater basin are expressly recognized by the groundwater code.  NMSA 1978, Section 72-12-18 (****).  Upon the State Engineer's declaration of and jurisdiction over the underground waters of the Rio Grande Underground Basin on November 29, 1956, the groundwater code became the governing law for new groundwater appropriations and changes to pre-basin groundwater rights. Accordingly, both new groundwater appropriations and changes to pre-basin groundwater rights are subject to the State Engineer permitting.  NMSA 1978, Section 72-12-7 (1985).

Because the ability to develop, and place to beneficial use, water from a pre-basin well relates back to the time when the appropriation was initiated, the analysis of those water rights claims, often referred to as *Mendenhall* rights, differs from the analysis for water rights claims initiated in accordance with the State Engineer's administration of the basin.  Three of the MDWCAs - Llano Quemado, Talpa, and Cañon - have water right claims that are based on the drilling of a community well that predates the declaration of the basin in November 1956.  State Exhibit No. 83.

The other nine MDWCAs - Ranchos de Taos, Arroyo Seco, Lower Arroyo Hondo, Upper Arroyo Hondo, Lower Des Montes, Upper Des Montes, Upper Ranchitos, El Salto, and Valdez – drilled their community wells after the State Engineer had declared the basin.  State Exhibit No. 83.  Therefore the post-basin MDWCAs were

required to obtain a permit to appropriate groundwater prior to the diversion and beneficial use of any groundwater.   Section 72-12-20.   The differences in the law governing pre- and post-basin groundwater appropriations and the application of the law to the MDWCAs are addressed separately below for the pre-basin MDWCAs and the post-basin MDWCAs.

## B.   THE THREE MDWCAS WITH PRE-BASIN WELLS FAILED TO PROVE THEIR CLAIMED WATER RIGHT AMOUNTS

The so-called *Mendenhall* doctrine stems from a dispute over an irrigator's claim that he had the legal right to complete the development of a groundwater right that was initiated prior to the State Engineer's declaration of, and administrative authority over, a groundwater basin.   The Supreme Court held that the doctrine of prior appropriation recognizes the date of priority as that when the completed appropriation was initiated. *State ex. rel. Reynolds v. Mendenhall*, 68 N.M. 467, 362 P.2d 998 (1961).   Therefore, the State Engineer's declaration of the basin did not interrupt the claimant's appropriation as it was legally initiated.   However, the Supreme Court held that the time within which to complete the appropriation was limited by the reasonable time of four years.   *Id.* at 473. Hence, the water right was limited to the amount of beneficial use within four years from initiation.   The fundamental purpose of the *Mendenhall* doctrine is to allow a water right owner the ability to claim a priority date that relates back to the pre-basin initiation of development of the right for the full amount of water placed to beneficial use where actual completion and beneficial use of water occurs within a reasonable amount of time after a basin is administratively declared.

To establish a groundwater right under the *Mendenhall* doctrine, the water right claimant must show: 1) the pre-basin initiation of the appropriation; 2) due diligence in

7

the development of the appropriation; 3) completion of the appropriation; and 4) that the application of water to actual beneficial use was within a reasonable time. *United States v. Abousleman*, No. CIV 83-1041 JEC, slip op. at 6, 8 (D.N.M. May 4, 1999); *see also Mendenhall*, 68 N.M. at 470, 362 P.2d at 1001; *McDermett*, 120 N.M. at 330, 901 P.2d at 748. A claim under the *Mendenhall* doctrine is defeated by the failure to actually beneficially use the water within a reasonable amount of time. In *Abousleman*, the District Court found as a matter of law that the continued non-use of water after periods of 26 and 19 years was unreasonable. The Court, therefore, rejected the assertion that an intended future use of water thereafter could confer a water right under the *Mendenhall* doctrine. *Abousleman* at 7, 17. Thus, the three MDWCAs with pre-basin wells must prove each of the four elements above through substantial evidence in the record. Each has failed to do so.

### I.    LLANO QUEMADO HAS NOT PROVEN THROUGH SUBSTANTIAL EVIDENCE IN THE RECORD THAT IT HAS PLACED TO BENEFICIAL USE 96.99 AFY OF WATER

With regard to the amount of water Llano Quemado MDWCA claims, it has asserted the right to divert 96.99 AFY ("AFY") based on its Well No. RG-3894, drilled in September 1953. Statement of Claims (Docket No. 2625), at 2. In response, the State asserted that Llano Quemado's right must be adjudicated based on the quantity of water actually put to beneficial use by the MDWCA, the best evidence of which is available pumping records. New Mexico's Response to the Claims of the Mutual Domestic Water Consumer Associations (December 4, 2000) (Docket No. 2701) at 2.

At hearing, Llano Quemado presented testimony and evidence that the MDWCA originally claimed or declared an amount of water based on a pumping capacity of 20 gallons per minute. Transcript of Proceedings of August 14, 2001 ("Tr. 8/14/01") at 103-

104.  The original declaration of ownership filed in October 1959 claimed an average pumping capacity of 20 gallons per minute (without stating an actual amount of water) for the purpose of supplying domestic water to 75 members.  Thereafter in 1972, Llano Quemado filed an amended declaration of ownership, again claiming a pumping capacity of 20 gallons per minute and an amount of 19.36 AFY of water to serve 80 members.

Llano Quemado, however, failed to introduce any evidence regarding the amount of water actually placed to beneficial use.  The only evidence in the record regarding the amount of water actually placed to beneficial use is a compilation of meter records introduced by the State.  The compilation of recorded water use, based on meter records submitted by the MDWCA to the State Engineer for a 25 year period, indicates the greatest amount of water either actually diverted by Llano Quemado MDWCA was reported by Llano Quemado as 42.11 AFY in 1995. Tr. 8/22/01 at 164; State Ex. 95. Llano Quemado did not introduce evidence that demonstrated its reported meter readings were inaccurate, nor did it introduce evidence that demonstrated it had actually recorded higher annual diversions than those relied upon by the State.

A witness for Llano Quemado testified that he did not dispute the accuracy of past State Engineer Office assertions that Llano Quemado diverted water in excess of its originally adjudicated water right to divert 19.36 AFY.  Tr. 8/16/01 at 186.  Further, the evidence in the record demonstrates that commencing in 1984, Llano Quemado acquired 22.308 AFY from water rights transferred to its system from new members.  State Exhibit 83.  Llano Quemado's witness also testified that when Llano Quemado MDWCA was formed and for several years thereafter, a water right of 39.643 AFY was sufficient.  Tr.

9

8/17/01 at 35. The witness also testified that Llano Quemado does not have a waiting list for new members. Tr. 8/17/01 at 45.

As a matter of law, Llano Quemado failed to meet its burden of proof that it has established a water right in the amount of 96.99 AFY. Even allowing a span of over forty-seven years to develop to the fullest extent its pre-basin well, Llano Quemado has not placed 96.99 AFY to beneficial use. The *Abousleman* court found as a matter of law that a *Mendenhall* claim to appropriate water must be lost if it has not actually been put to beneficial use within a seventeen year period. *Abousleman*, at 13. Based on the only evidence in the record that can be interpreted to support any actual quantity of water placed to beneficial use by Llano Quemado MDWCA, the amount of its water right should be adjudicated as the right to divert and place to beneficial consumptive use an amount of groundwater not to exceed 42.11 AFY.[2]

### 2. TALPA MDWCA HAS NOT PROVEN THROUGH SUBSTANTIAL EVIDENCE IN THE RECORD THAT IT HAS PLACED TO BENEFICIAL USE 80.66 AFY OF WATER

Talpa MDWCA has asserted the right to divert 80.66 AFY from its Well Nos. RG-9655 and RG-9655-S based on a *Mendenhall* claim for its well drilled in March 1955. Statements of Claims (Docket No. 2625) at 2. At hearing, however, Talpa MDWCA affirmatively claimed a right to divert water in a substantially lesser amount. Because Talpa MDWCA failed to introduce any evidence at hearing that proved Talpa

---

[2] After the declaration of the groundwater basin by the State Engineer, Llano Quemado acquired 22.308 AFY of water rights through State Engineer-approved transfers of other existing water rights. The validity of these subsequently acquired rights must be based on continued beneficial use and is governed by statute. *See* NMSA 1978, Section 72-5-28 (2002).

had diverted and placed to actual use 80.66 AFY of water, no valid water right in that amount can be adjudicated to the MDWCA as a matter of law.

At hearing, Talpa MDWCA's witness testified that Talpa MDWCA claims a total of 46 AFY, based on a water right of 36 AFY from its formation and an additional 10 AFY that belongs to the local school system. Tr. 8/21/01 at 195. The declaration of ownership filed by Talpa MDWCA claims 46.23 AFY, and the same amount was applied for and approved by the State Engineer in subsequent applications by Talpa for supplemental wells. State Exhibit No. 83 at 18. Talpa, however, failed to introduce evidence demonstrating an actual and specific amount of water placed to beneficial use.

The State presented evidence that, within a compilation of meter records submitted by Talpa MDWCA, over seventeen-year period, the greatest amount of water actually diverted by Talpa was reported as 64.48 AFY in 1994. Tr. 8/22/01 at 154-155; State Exhibit No. 95. At hearing, Talpa MDWCA verified that its meter reading reports to the State Engineer regarding water usage are accurate. Tr. 8/21/01 at 219. Talpa's witness also testified that, in 2001, when the MDWCA had already diverted 46 AFY during the first eight months of the year, it discovered a major leak in its system which would cause the MDWCA to approach and exceed its claimed water right prior to the end of the year. Tr. 8/21/01 at 199-200.

Talpa has not developed and placed to beneficial use within a reasonable amount of time the claimed amount of water of 80.66 AFY as is required under the *Mendenhall* doctrine. As a matter of law, failure to actually use the claimed amount of water during a span of more than 45 years is unreasonable. *Abousleman, supra.* Therefore, based on the only evidence in the record that can be interpreted to quantify any actual beneficial use

11

by Talpa MDWCA, it should be adjudicated the right to divert and place to consumptive

beneficial use an amount of groundwater not to exceed 64.48 AFY.

### 3.   *CAÑON   MDWCA   HAS   NOT   PROVEN   THROUGH SUBSTANTIAL EVIDENCE IN THE RECORD HAT IT HAS PLACED TO BENEFICIAL USE 71.4 AFY OF WATER*

Cañon MDWCA has asserted a claim to divert a total of 71.4 AFY of

groundwater in order to consumptively use its previously adjudicated right in the amount

of 42 AFY. Cañon MDWCA Response to Pre-Hearing Order (October 8, 1999) at 1-2.

Cañon MDWCA's community well was drilled on November 14, 1956, prior to the

declaration of the basin by the State Engineer on November 29, 1956. Therefore, the

State has analyzed Cañon's claim in accordance with the principles of the *Mendenhall*

doctrine. However, Cañon MDWCA provided no evidence during this proceeding to

support the right to divert groundwater in an amount of up to 71.4 AFY.

At hearing, Cañon MDWCA's witness testified that the number of hookups for

the MDWCA had not increased since 1996, and that 42 AFY is a reasonable amount of

water for Cañon's current needs. Tr. 8/20/01 at 75, 81. Cañon's witness testified that the

MDWCA stopped adding new memberships when it began approaching 42 AFY, but

admitted that existing members had purchased multiple memberships in order to prove

potential future beneficial use based solely on the number of memberships issued rather

than on actual water use. Tr. 8/20/01 at 47, 53, 55. Cañon did not present evidence of an

actual and specific amount of water that the MDWCA has developed and placed to

beneficial use.

The only evidence regarding the amount of water diverted by Cañon is found in

State Exhibit No. 95. Based on the compilation of Cañon's reported meter readings

contained in Exhibit No. 95, the greatest amount of water actually diverted by Cañon

MDWCA was reported as 58.34 AFY in 2000. Tr. 8/22/01 at 155-156. Non-use of water under a pre-basin claim to appropriate groundwater for more than 40 years is unreasonable. *Abousleman, supra*. Therefore, Cañon MDWCA should be adjudicated the right to divert and place to consumptive beneficial use an amount of groundwater not to exceed 58.34 AFY.

## C.   THE NINE POST-BASIN MDWCAS FAILED TO MEET THE STATUTORY REQUIREMENTS TO ESTABLISH A WATER RIGHT IN THE AMOUNTS CLAIMED

The remaining nine MDWCAs[3] were formed after the State Engineer's recognition and administrative control of the Rio Grande Underground Water Basin on November 29, 1956. At the time of formation, each MDWCA applied for a permit to drill its well pursuant to the requirements of the Groundwater Code now codified as NMSA 1978, Chapter 72, Article 12. In conjunction with the drilling of these post-basin wells, each MDWCA applied, pursuant to statutory and administrative requirements, for transfers of water rights to change the location and place and purpose of use of existing water rights acquired from individual members for the newly formed systems. *See, e.g.,* NMSA 1978, Section 72-12-7 (1985).

In order to support the amount of water they are entitled to appropriate as asserted in their Statements of Claims, the post-basin MDWCAs must prove that the previous water right holders actually transferred the entirety of their water right into the MDWCAs' system, as claimed by the MDWCAs. The post-basin MDWCAs must also

---

[3]  Arroyo Seco, Ranchos de Taos, Valdez, Upper Des Montes, Upper Ranchitos, Lower Des Montes, Lower Arroyo Hondo, El Salto, and Upper Arroyo Hondo MDWCA.

13

prove that the amount of water actually diverted and placed to beneficial use for each of the underlying water rights equals the amounts of water that they claim were transferred into their systems. The water right amounts to be quantified for each MDWCA through this adjudication must be based on the amounts of water actually placed to beneficial use for the purposes stated, and subsequently transferred from individual water right holders to the MDWCAs in accordance with groundwater use statutes and the State Engineer's administrative procedures. Thereafter, the applicant is required to actually place the permitted amount of water under the transferred right to beneficial use within a reasonable period of time. *Cf.* NMSA 1978, Section 72-5-14 (1941) (State Engineer may grant extensions of time in which to apply water to beneficial use under State Engineer permits upon showing of due diligence by permit applicant).

**1.    *THE MDWCAS FAILED TO PROVE THAT THE ENTIRE WATER RIGHT AMOUNTS HELD BY INDIVIUAL MEMBERS WERE TRANSFERRED INTO THEIR SYSTEMS***

As a means of claiming the largest amount of water possible for their water rights, the nine post-basin MDWCAs have asserted that they are entitled to the entirety of the domestic water rights, including outdoor uses, of the original individual members who transferred water rights to the MDWCAs, regardless of any conditions placed on their applications by the State Engineer. The majority of the MDWCAs have asserted claims based on quantifying the water right amounts initially transferred into their systems by assuming 3 AFY was transferred from domestic wells and 150 gallons per person per day were transferred from surface sources. *See*  Statements of Claims, Docket No. 2625.

Where there is a requirement that an individual well is to be abandoned after the transfer of that right to a community system, that requirement has always been expressly included as a written condition of transfer. Tr. 8/13/01 at 146; MD Ex. 204-E. There is

14

no presumption that a transferor has transferred outdoor uses where a domestic well has been abandoned or capped unless capping or plugging the well was an express written condition of the transfer. Tr. 8/13/01 at 208-210. There is no evidence in the record that the State Engineer expressly required capping or plugging any of the wells covered by the original transfers to the MDWCAs. Tr. 8/14/01 at 187. Mr. Richard Deubel, an Office of the State Engineer employee called as a direct witness by the MDWCAs, testified that domestic well owners transferring domestic water rights to an MDWCA in the Taos area were not required to cap or plug their wells and were permitted to continue to use those wells for outdoor uses. Tr. 8/14/01 at 195. Transfers to the MDWCAs that were approved by the State Engineer recognized that only a domestic, indoor use was being transferred and that the water users retained a water right for other additional purposes such as outdoor uses. Tr. 8/22/01 at 273-277.

That evidence is consistent with the practice of the State Engineer to recognize an ongoing right to use a domestic well or ditch for outdoor uses when permitting the transfer of a limited domestic right. Tr. 8/14/01 at 33, 34. Mr. Paul Saavedra, an Office of the State Engineer employee called as a direct witness by the MDWCAs, testified that a holder of a domestic well permit may transfer to a Mutual Domestic a water right for indoor use only and can retain a domestic well water right for outdoor uses, because there is no condition that use of the domestic well be discontinued. Tr. 8/13/01 at 72-74, 82; Tr. 8/16/01 at 23.

The evidence presented supports the conclusion that none of the wells from which water rights were transferred were required by the State Engineer to be abandoned or capped. There was express testimony that water users who transferred water rights for

15

indoor uses from wells (as well as acequias, springs or streams) could continue to use those sources for outdoor uses. Tr. 8/22/01 at 199.

Furthermore, many of the owners expressly retained the remaining amount for other purposes of use. For example, the individual water rights transferred to the Upper Ranchitos MDWCA did not include the transfer of the entire amount of water declared as their pre-basin domestic right, but were limited to domestic uses recognized under the 1957 Sanitary Projects Act. Tr. 8/13/01 at 197-198. The El Salto MDCWA declaration recorded a water right for domestic uses only, which were separate from and in addition to irrigation rights from the same community ditches. Tr. 8/13/01 198-199. In 1974, the Office of the State Engineer informed El Salto that the households originally belonging to the Arroyo Seco MDWCA (which had originally quantified the transferred rights at 3 AFY) had only agreed to transfer 60 gallons per person per day of their domestic well water rights and had chosen not to cap their wells. Tr. 8/16/01 at 113-116; Tr. 8/22/01 at 211-214; State Exhibit No. 2. In filing its declaration of ownership of underground water rights, Upper Ranchitos MDWCA expressly stated that the water rights being declared came from sources of supply whereby the water had been placed to beneficial use for irrigation purposes, domestic and livestock purposes, and that the MDWCA was only declaring and transferring the domestic uses from those sources of supply. Tr. 8/17/01 at 208-210. Not all of the water rights holders listed in Upper Ranchitos MDWCA's original declaration were willing to, or agreed, to transfer their water rights to the system. Tr. 8/17/01 at 238-239. Ranchos de Taos MDWCA's declaration of ownership specifically states that only part of the domestic use of existing water rights was transferred into its system. Tr. 8/22/01 at 40-41.

16

Throughout the course of the trial, witnesses for all the MDWCAs testified that their members continued to use their individual surface water rights for outdoor purposes after joining the MDWCAs.[4] Members of the Arroyo Seco MDWCA still use irrigation ditches for outdoor uses such as gardens. Tr. 8/15/01 at 68. Members of El Salto MDWCA still use surface water diversions for outdoor uses. Tr. 8/16/01 at 105-106; Tr. 8/17/01 at 76-77. Members of Upper Ranchitos MDWCA have retained their acequia rights for their irrigated lands. Tr. 8/17/01 at 224; Tr. 8/20/01 at 8. Members of the Upper Des Montes MDWCA still use acequia rights for outdoor watering of gardens, orchards and lawns. Tr. 8/20/01 at 146, 165. Lower Des Montes members still have irrigation rights and use their cisterns for water storage. Tr. 8/21/01 at 57, 79-80. Members of the Valdez MDWCA still rely on the river and ditches for water supply, and still use their retained irrigation and ditch rights for outside purposes. Tr. 8/21/01 at 103-104; Tr. 8/21/01 at 126. Members of the Upper Arroyo Hondo MDWCA have ditch rights for outdoor uses and at least one member intends to drill a domestic well for additional outdoor watering of existing trees and lawns to supplement ditch rights. Tr. 8/21/01 at , 154, 174. Members of the Talpa MDWCA use MDWCA water for outside uses such as gardens despite having retained ditch rights for irrigation purposes. Tr. 8/21/01 at 215-216. Members of Ranchos de Taos MDWCA have retained ditch rights for outdoor uses, have retained individual wells, and continue to use springs, ditches and wells as originally used by individuals prior to the MDWCA's formation. Tr. 8/22/01 at 25, 41-42, 65, 67.

---

[4] In fact, the evidence presented could reasonably lead to the conclusion that there were no reductions of the diversions of water by the individuals who transferred rights to the MDWCAs.

17

Similarly, the record is replete with evidence that domestic well owners who transferred water rights to MDWCAs retained the right to use their well for outdoor uses. For example, El Salto MDWCA members retained their domestic wells, or simply abandoned them after joining the MDWCA, because they no longer used them, and the MDWCA by-laws did not allow cross-connections.   Tr. 8/17/01 at 74-78.  El Salto MDWCA transferred water rights into its system pursuant to an application approved by the State Engineer, which specifically stated that the well would not be plugged and would be retained for stock and outside gardening purposes.  Tr. 8/22/01 at 209-210. Upper Ranchitos MDWCA members still have domestic wells which have not been capped or plugged, and still use or could use their domestic wells for outside uses.  Tr. 8/17/01 at 183-184, 222-223. Some of the members of the Upper Ranchitos MDWCA who plugged their hand dug wells did so because the homesites were no longer in existence or because replacement wells were drilled.  Tr. 8/17/01 at 184.

2.    *THE NINE POST-BASIN MDWCAS FAILED TO PROVE THAT INDIVIDUAL WATER RIGHT HOLDERS TRANSFERRED INTO THEIR SYSTEMS THE SPECIFIC AMOUNTS OF WATER CLAIMED BY THE MDWCAS*

Section 72-12-4 of the Groundwater Code expressly states, "[e]xisting water rights *based upon application to beneficial use* are hereby recognized."  NMSA 1978, Section 72-12-4 (1931) (emphasis added).  The term "based upon" includes the entire procedure necessary to accomplish beneficial use all the way to the completion of the appropriation through actual beneficial use of the water.  *Mendenhall, supra, 68 N.M. at* 473.   Beneficial use "is the basis, the measure and the limit to the right to the use" of underground waters. NMSA 1978, Section 72-12-2.   The amount of water actually applied to beneficial use is the measure of the amount of an appropriation.  *McLean*, 62

18

N.M. 264, 308 P.2d 983.  At hearing, the MDWCAs' direct witness, Mr. Deubel, testified
that, for purposes of water rights administration, there is a clear distinction between a
reasonable amount of water for a use and the amount of water actually put to beneficial
use.  Tr. 8/14/01 at 170.  The MDWCAs neither produced evidence of what a reasonable
amount of water would be for each of the traditional domestic uses testified to, nor
provided evidence regarding the amount of water actually used.

The witnesses called by the MDWCAs were unable to provide specific
measurements of the amounts of water used by the individuals who originally transferred
water rights to the MDWCAs.  As a substitute for evidence of actual use, the MDWCAs
presented several days worth of testimony enumerating different domestic activities that
historically used water from shallow wells, community acequias, streams and springs.
These uses included bathing, laundry, food preparation and butchering, household
cleaning, home maintenance and repair, and gardening.  Despite the voluminous record in
this regard, however, the MDWCAs did not present any testimony that provides a method
to measure the amount of water actually associated with these uses.  The descriptions by
the MDWCAs' witnesses of the sizes of containers used for various domestic activities
were vague and provide insufficient detail to even attempt to calculate an approximate
overall domestic water use for the individuals who transferred portions of their water
rights to the MDWCAs.  One of the State's experts, Dr. John Baxter, testified that many
of the historical domestic water uses described by MDWCA witnesses are low
consumption uses of water.  Tr. 8/23/01 at 209-210.  In fact, with the exception of a
dispute over whether irrigation of gardening and watering of livestock should be included
in the domestic uses for which water rights were transferred to the MDWCAs, Dr. Baxter

largely concurred with the opinion of the MDWCAs' own expert, who quantified domestic water uses in considerably lesser amounts than those alleged by the MDWCAs at hearing. State Exhibit No. 80.

Where the amount of an appropriation is measured by the amount of water actually applied to beneficial use (*McLean, supra*), it is incumbent upon the water right claimant to prove the amount of water placed to beneficial use.  At most, the MDWCAs put on evidence that demonstrated that traditional water uses from surface diversions and wells reasonably included domestic uses.  This is a long way from evidence of specific amounts of water put to beneficial use for the enumerated purposes. The MDWCAs failed to adduce a means for the Court to either determine with specificity the amounts for water transferred by individual users to each MDWCA or to apply a consistent standard for measuring those uses on a uniform basis.

**D.     SUBSTANTIAL EVIDENCE IN THE RECORD SUPPORTS QUANTIFYING THE AMOUNTS OF THE WATER RIGHTS UNDERLYING THE NINE POST-BASIN MDWCAS' CLAIMS IN AMOUNTS SUBSTANTIALLY LESS THAN WERE CLAIMED**

Since the MDWCAs have failed to prove the specific amounts of water transferred into the MDWCAs, substantial evidence in the record supports quantifying those water right amounts as set forth in this Section, *infra.* First, the domestic amounts must be estimated. The methods proposed by the MDWCAs for estimating usage, however, are not supported by the record.  In contrast, the State Engineer's long-standing estimate of 60 gallons per person per day for indoor uses is supported by substantial evidence in the record.

The MDWCAs elicited testimony from OSE employee Richard Deubel that it is up to a water rights holder to quantify the amount and uses of the water right being

transferred, otherwise the State Engineer must calculate the amount of water being transferred. Tr. 8/14/01 at 37-38. For the nine post-basin MDWCA that have implicitly or explicitly based their original water rights on the transfer of water rights into its system, the record evidence must substantially support the findings relating to the specific amounts of water being transferred. Where there is evidence that less than an entire right was transferred, the amount actually transferred must be proven, or a reasonable method of estimating usage that is relevant to the uses being transferred (*i.e.,* indoor versus outdoor uses) should be applied.

In making their argument at trial, the post-basin MDWCAs ignored the tenets of the prior appropriation doctrine requiring beneficial use within a reasonable period of time and continued use thereafter. Non-use of all or a portion of a water right for four or more years may result in abandonment or forfeiture of the unused right, as a matter of law. *Tweedy*, 34 N.M. 611, 286 P.2d 970; *South Springs Co.*, 80 N.M. 144, 452 P.2d 478; NMSA 1978, Section 72-5-28 (2002). Conversely, a diversion of water in excess of, or contrary to, a valid water right or permit to appropriate, as well as the wasting of water, are non-beneficial uses of water that cannot be used as a means of increasing the quantity of a water right. NMSA 1978, Section 72-12-11 (1947); *McLean*, 62 N.M. 264, 308 P.2d 983. Because the post-basin MDWCAs' record fails to support their water rights claims, these two tenets need no further elaboration.

21

1.    **THE WATER RIGHT AMOUNTS TRANSFERRED TO THE MDWCAS SHOULD BE QUANTIFIED USING A REASONABLE ESTIMATE OF THE AMOUNTS OF WATER USED FOR DOMESTIC PURPOSES**

If a well is not metered, it is necessary to estimate the amount of water used in evaluating a request to transfer a domestic water right. Tr. 8/14/01 at 195. The failure of the MDWCAs to prove that individual water right holders transferred into their systems the specific amounts of water claimed by the MDWCAs means that on the record before the Court those water right amounts can only be quantified by using a reasonable estimate of the amounts of water used for domestic purposes by the transferors. Calculations of usage based on an estimated number of gallons per person per day are designed to reflect actual beneficial use when metered measurements of water use are not available. Tr. 8/22/01 at 266.

The State Engineer has maintained a long-standing policy to calculate the amount of water to be transferred from a permitted or declared domestic well to a Mutual Domestic using a gallons per capita per day estimate, without requiring a further showing by the applicant proving actual or historical beneficial use. Tr. 8/13/01 at 84-85, 92, 99; MD Ex. 197-35. The State Engineer applies the gallons per person per day calculation to determine the amount of water to be transferred from a domestic well to a Mutual Domestic when it is determined that there is a valid right for the domestic well and where the amount of water beneficially used has not been determined or measured by the applicant. Tr. 8/14/01 at 32. Although the Office of the State Engineer has, for decades, applied estimated gallons per capita per day for indoor use in quantifying historically non-metered domestic water rights, if an individual can demonstrate actual indoor use of

22

water for beneficial purposes of a greater amount, the State Engineer would permit a transfer of the amount actually proven. Tr. 8/13/01 at 195-196.

>    **2.     THE MDWCAS' PROPOSED ESTIMATE OF 150 GPD FROM SURFACE WATER AND 3 AFY PER HOUSEHOLD FROM DOMESTIC WELLS DOES NOT ACCURATELY REFLECT THE LIMITED DOMESTIC USES TRANSFERRED INTO THEIR SYSTEMS**

The MDWCAs claim that transfers from individuals who have relied on acequias, springs or streams for domestic water should be quantified at 150 gallons per person per day, and that such an amount most accurately reflects the amounts of water used historically by the Taos area communities for domestic uses, which were thereafter transferred to the MDWCAs. This assertion is unsupported by the substantial evidence in the record. Rather, the record shows that some of the water uses described as domestic, specifically livestock watering and gardening, are still accomplished by means of diversions through individual water rights in streams, acequias and wells which were not relinquished to the MDWCAs. *See, e.g.,* Tr. 8/23/01 at 173-174. The MDWCAs presented witnesses who testified that water users were generally conservative in the use of water for domestic purposes. The MDWCAs also elicited testimony from Mr. Saavedra on direct examination that indoor cleaning uses of water are *de minimus*. Tr. 8/13/01 at 107. An expert for the State, Mr. Brian Wilson, testified that pre-basin domestic water uses, prior to electricity being introduced to the Taos area, would have used considerably less water than current domestic uses. Tr. 8/24/01 at 135. It is fair to conclude from the evidence presented that water uses were the same or similar throughout each of the communities prior to the formation of the MDWCAs. Tr. 8/20/01 at 213, 219 Tr. 8/21/01 at 23, 98.

The assumption of the MDWCAs that their water right amounts should be quantified at 3 AFY per domestic well right transferred in is wrong both on the law and on the evidence in the record. [5] First, as a matter of law, a domestic groundwater right is not automatically quantified at 3 AFY. Rather, all domestic groundwater rights – whether pre-basin or permitted under Section 72-12-1 – are quantified based on the amount of water placed to actual beneficial use. N.M. Const. Art. XVI §3; NMSA 1978, Section 72-12-1. Second, even if 3 AFY were the proper amount for the domestic groundwater rights owned by the MDWCA members who initially transferred water rights into the MDWCAs, the use of that figure to quantify the water right amounts of the MDWCAs is based on the faulty assumption that the entirety of the domestic groundwater rights were transferred by the original MDWCA members to the community systems. Substantial evidence in the record refutes this assumption.

Although prior to the early 1970s, the State Engineer on occasion permitted transfers of domestic water rights using calculations ranging from 75 gallons to 125 gallons per person per day, the trial record does not support the application of these larger estimates to the MDWCAs. Estimates of historical water uses for livestock watering, butchering, drinking, food preparation and preservation, dish washing, bathing, laundry,

---

[5] Pursuant to NMSA 1978, Section 72-12-1 and <u>New Mexico State Engineer, Rules and Regulations Governing Drilling of Wells and Appropriation and Use of Groundwater,</u> , §1-15.2 (1995), the State Engineer issues permits in amounts not to exceed three AFY of water for watering livestock; irrigation of not to exceed one acre of noncommercial trees, lawn or garden; and household or other domestic use. The 3 AFY amount of water authorized by Section 72-12-1 permits merely allows the permittee to place up to 3 AFY of water to beneficial use. As with any other State Engineer permit, a water right is established under a Section 72-12-1 permit only in the amount of water the permittee actually places to beneficial use. N.M. Const. Art. XVI §3; NMSA 1978, Section 72-12-1.

medicinal and household goods preparations, home maintenance and repair and house cleaning range from approximately 35.1 gallons per person per day to approximately 53.5 gallons per person per day.  Tr. 8/23/01 at 190-199; State Ex. Nos. 80 and 85.

Water use surveys, based on water use data from the Environment Department, questionnaires and surveys, meter records and meter readings, and interviews with community water suppliers demonstrate a tremendous range of water use on a per capita basis throughout the State, with urban areas tending to have higher per capita uses, particularly where the data reflects both indoor and outdoor residential uses. Tr. 8/24/01 at 48-52.  Where outdoor and indoor uses are considered together, outdoor uses account for 50-70% of total residential use. Tr. 8/24/01 at 137.  Communities such as Las Cruces, having a higher per capita use than Taos, used more water due to evaporative cooling uses in the southern and warmer sections of the State.  Tr. 8/24/01 at 53-56.  A study conducted between 1971 and 1973 in Las Cruces, New Mexico showed an average per capita indoor use of 79 gallons a day, with the higher than average use attributed to prevalent use of water for indoor evaporative cooling, a use not prevalent in the Taos area.  Tr. 8/24/01 at 72.  Many of the high per capita results come from studies of municipal uses which include industrial, commercial, municipal and other uses as well as residential uses.

Based on substantial evidence in the record, the Court should reject the MDWCAs' proposal to quantify unmeasured water uses at 150 gallons per person per day.

### 3.   SUBSTANTIAL EVIDENCE IN THE RECORDS SUPPORTS THE STATE ENGINEER'S LONG-STANDING ESTIMATES OF DOMESTIC WATER USE AMOUNTS

From the 1970s through the present day, the State Engineer has limited transfers of individual water users' rights into a Mutual Domestic system based on calculating indoor use in the amount of 60 gallons per person per day for water rights transferred from domestic wells, and 15 gallons per person per day for water rights transferred by a person who hauled water from a stream or an acequia, exclusive of any outside uses.[6] Tr. 8/13/01 at 210; Tr. 8/22/01 at 198-199, 205-207, 213-214; State Exhibits Nos. 77, 78, 79. The State Engineer consistently has estimated the amount of domestic or indoor use to be transferred from a 72-12-1 well into a Mutual Domestic to be 60 gallons per person per day, while allowing the water user to continue to use the 72-12-1 well for outdoor purposes. Tr. 8/22/01 at 277-278.   Thirty gallons per person per day for indoor use only was considered to be an adequate amount, although not generous, based on the knowledge and experience of the State employee who appeared as a direct witness for the MDWCAs. Tr. 8/14/01 at 18-20.  The State Engineer uses 15 gallons per capita per day to calculate the amount of water to be transferred from a ditch water right, based on the difficulty of hauling water and the resulting conservation efforts of water haulers.  Tr. 8/13/01 at 84, 92; MD Ex. 197-35. Fifteen gallons per person per day is a reasonable estimate of indoor use for water that is hauled from a ditch, well or other source.  Tr. 8/16/01 at 19-20, 35-36.

---

[6] The application of the standard of 60 gallons per person per day for transfers from domestic wells has not been limited to Mutual Domestics and has been applied to transfers to municipal systems. Tr. 8/14/01 at 67.

In limiting a domestic water rights transfer to 60 gallons per person per day from a domestic well or 15 gallons per person per day from a ditch, the State Engineer recognizes an ongoing right to use the domestic well or ditch for outdoor uses.   Tr. 8/14/01 at 33, 34.   Allowing a transfer of 60 gallons per person per day for indoor use and allowing the individual well owner to continue to use a domestic well for outdoor purposes is consistent with allowing a transfer of 75 gallons per person per day for both indoor and outdoor use and requiring the domestic well to be capped or plugged.   Tr. 8/13/01 at 187-188.

The reasonableness of the estimated 60 gallons per capita per day for indoor water use in the 1960s is based on, and supported by, expert investigations of water use.   Tr. 8/24/01 at 44-47.   The figure of 60 gallons per person per day was based on a 1967 expert report published by Johns Hopkins University ("Linaweaver report"), based on a study conducted in 1960 which entailed substantial investigation into scientifically based quantification of use.[7]   Tr. 8/24/01 at 70.   The Linaweaver report found that water use varied in relation to economic levels from a high of 127 gallons per person per day in "high-valued" areas to 39 gallons per person per day in lower valued areas, based on surveys of homes in the western United States.   High-valued areas were more urban while rural areas were lower-valued areas.   Homes with septic tanks, generally found in rural communities, averaged 47 gallons per person per day. Tr. 8/24/01 at 71, 131-132.

---

[7] If a consumption amount is assumed and thereafter a more correct consumption amount is determined from expert studies, the more current and more accurate number should be used.   Tr. 8/22/01 at 273.   The State Engineer may alter policies when it acquires a better understanding of water use, to better reflect actual uses.   Tr. 8/22/01 at 271

Based on the substantial evidence in the record, the Court should apply the State Engineer's methodology of quantifying the amounts of water used by the MDWCAs, that is, at 60 gallons per person per day for domestic well transfers and 15 gallons per person per day from domestic surface rights. As a matter of both equity and convenience, the Court could also simplify the quantification process by applying 60 gallons per person per day for each transfer from an individual water right holder regardless of the source of the original diversion (groundwater or surface flows) because of the similarity of uses by all users. The consequence of applying a consistent standard for similar uses, however, is that substantial evidence in the record dictates quantifying the amounts of water for the nine post-basin MDWCAs' water rights at substantially reduced amounts from the amounts asserted in the MDWCAs' pre-trial Statements of Claims.

> **i)  The Amount of the Underlying Water Rights Transferred to Arroyo Seco MDWCA Should be 4.93 to 5.38 AFY Rather Than 120 AFY**

In the Statements of Claims (Docket No. 2625), Arroyo Seco MDWCA claims a right to divert 120 AFY from Well RG-1850, based on the right to the use of water for domestic purposes transferred to Arroyo Seco from 80 families at the time the MDWCA was formed. *Ibid* at 2. At trial, however, Arroyo Seco neither proved that the original water right holders beneficially used the amounts claimed for domestic purposes, nor proved that they transferred into the MDWCA all the amounts claimed by Arroyo Seco. The amount of Arroyo Seco MDWCA's claim derives from the transfers into its system of pre-basin water rights from 25 wells, claimed in the amounts of 3 AFY for 24 wells and 6 AFY for one well, together with the transfer of domestic water rights from surface sources for 8 users. *See* State Exhibit No. 83 at 2-6.

28

Of those wells, however, the unrefuted testimony of the El Salto MDWCA witness was that the water rights associated with six of the wells, in the amount of approximately 23.62 AFY, were subsequently transferred from Arroyo Seco to El Salto MDWCA because Arroyo Seco was not able to provide water from its community system to those families. Tr. 8/16/01 at 56-58. Further, the uncontroverted testimony of the Arroyo Seco MDWCA witness demonstrated that there were ongoing uses from domestic wells and irrigation ditches by households hooked up to the Arroyo Seco MDWCA. Tr. 8/15/01 at 67-68. Thus, the MDWCAs put on put on an affirmative case that individuals transferring water rights to Arroyo Seco MDWCA did not transfer their entire rights.

Based on the State's method of quantification, the Court should initially quantify Arroyo Seco's underlying claims in the amount of 0.13 AFY for 8 individuals transferring water rights from surface diversions at 15 gallons per person per day, and 4.8 AFY for 72 individuals transferring water rights from wells at 60 gallons per person per day, for a total right of 4.93 AFY. If the Court determined that all transfers should be quantified using 60 gallons per person per day, regardless of whether the original diversions were from wells or were from acequias, streams or springs, the transferred water right amounts underlying Arroyo Seco MDWCA's water right could be quantified in the amount of 5.38 AFY.

### ii)    *The Amount of the Underlying Water Rights Transferred to Ranchos De Taos MDWCA Should be 4.7 AFY Rather Than 105 AFY*

Ranchos de Taos MDWCA asserts a claim to divert 105 AFY from Well No. RG-1756, based on the use of water for domestic purposes by 70 families, from 34 individual wells, and ditches, springs and river. Docket No. 2625, at 3 State Exhibit No. 83 at 37-43. The Application for Permit to Change Location of Wells filed by Ranchos de Taos

29

for permission to transfer rights from the individual wells to the MDWCA's well specifically limits the change to the domestic use of 70 users for the domestic uses set out in the Sanitary Projects Act of 1957. The purpose of the Sanitary Projects Act, now codified as NMSA 1978, Section 3-29-1 et seq., was to provide sanitary drinking water. As a matter of law, Ranchos de Taos has failed to meet its burden of proof that the actual amounts of water transferred to its system can be quantified at 105 AFY of water.

At hearing, Ranchos de Taos failed to put on evidence regarding the actual amounts of water originally placed to beneficial use by the 70 individuals who thereafter transferred rights to the MDWCA. *See* Tr. 8/22/01 at 9-73. Indeed, Ranchos de Taos provided record evidence that the springs, ditches and wells continue to be used by Ranchos de Taos community members and that members of Ranchos de Taos MDWCA have retained ditch rights for outdoor uses and have retained individual wells. Tr. 8/22/01 at 25, 41-42, 65, 67. This evidence supports the language restricting the amount and purposes of the transferred water rights that is found in Ranchos de Taos MDWCA's application for change of location of wells. The application to transfer individual water rights expressly stated that only the domestic uses associated with sanitary drinking water were transferred to the MDWCA. Based on its own evidence, Ranchos de Taos MDWCA cannot demonstrate that the entire supply of the individual domestic wells (assuming that each is entitled to divert an amount not to exceed three AFY as is permitted under Section 72-12-1) was transferred to its system. Therefore, there is no basis for quantifying these rights at 3 AFY.

Because Ranchos de Taos failed to provide evidence of the actual amounts of water used by the 70 individuals and transferred to the MDWCA, the Court should apply

the State Engineer's long-standing method of quantification of 60 gallons per person per day.[8]  Therefore the Court should quantify the transferred amounts based on 60 gallons per person per day for 70 individuals, for a total of 4.7 AFY.

> ### iii)   The Amount of the Underlying Water Rights Transferred to Valdez MDWCA Should be 1.4 to 5.51 AFY Rather than 21 AFY

Valdez MDWCA initially asserted a claim to divert 21 AFY from Well No. RG-4077, based on domestic water use by 30 households with a total of 125 individuals, estimated at 0.168 AFY, or 150 gallons per day, for each individual.  Docket No. 2625, at 3.  The record is devoid of any evidence to support a claim for 21 AFY.  There is no evidence in the record to support Valdez MDWCA's claim that the underlying water rights transferred to its system can be quantified in the amount of 150 gallons per person per day.

Contrary to its pre-trial Statement of Claims, at hearing Valdez presented testimony that it claimed a water right to 11.5 AFY, which can be calculated as 82 people using 125 gallons per day.  Tr. 8/21/01 at 88-89, 124.  Its initial application to change point of diversion from surface to groundwater for the declared water rights of its members listed 82 persons in 18 families (State Exhibit No. 83 at 15), and Valdez presented evidence that it was formed with 18 members, rather than 30 households, a number that the record demonstrates is the current number of members rather than the number of members who transferred existing water rights to the system.  Tr. 8/21/01 at 90-91, 116.  In addition, Valdez presented testimony that the MDWCA has not required

---

[8]  Although Ranchos de Taos MDWCA's application references the transfer of 70 individuals' water rights from all "wells, ditches, springs and river," the underlying declarations are all for diversion of underground waters from wells.  State Ex. No. 83 at 42.

new members to transfer water rights to the system, but instead has stayed within its "allocated" amount of water. Tr. 8/21/01 at 118. Valdez MDWCA further contradicted its Statement of Claims by indicating that no more than 20 acre feet of water rights was needed to provide for future growth well beyond its initial size. Tr. 8/21/01 at 125. The record does not contain substantial evidence to support Valdez MDWCA's implicit claim that 125 individuals transferred water rights to its system. Therefore, the underlying water rights claims transferred to Valdez MDWCA should be based on 82 individuals.

The evidence in the record also demonstrates that only a portion of the water rights of the individual members were transferred to the Valdez system. The witness on behalf of Valdez testified specifically that members of the MDWCA still rely on the river and ditches for water supply and still use their retained irrigation and ditch rights for outside purposes. Tr. 8/21/01 at 103-104,126. The record therefore does not support Valdez MDWCA's proposed method of calculating the transferred amounts of water using 150 gallons per person per day. Substantial evidence in the record supports the use of 15 to 60 gallons per person per day for the 82 individuals who transferred rights from the community ditch to the MDWCA.[9] Depending on whether the Court determines that the rights transferred from the original members of Valdez MDWCA should be calculated using 15 gallons per person per day for transferred surface diversion rights or an average of 60 gallons per person per day regardless of source, the transferred water rights should be quantified in the amount of 1.4 AFY or 5.51 AFY.

_____

[9] Although Valdez does not limit its members water use, the MDWCA uses the formula of 60 gallons per person per day as a guideline for its members to follow. Tr. 8/21/01 at 101-102.

32

> iv)     *The Amount of the Underlying Water Rights Transferred*
>         *to Upper Des Montes MDWCA Should be 0.92 to 3.69*
>         *AFY Rather Than 31.42 AFY*

Upper Des Montes MDWCA asserts a claim to divert 31.42 AFY from Well No. RG-8387, based on domestic water use by 48 households with a total of 187 individuals, estimated at 0.168 AFY, or 150 gallons per day, for each individual. Statements of Claims (Docket No. 2625) at 3. The evidence at hearing contradicts Upper Des Montes MDWCA's claim that 48 households originally transferred pre-basin domestic water rights into the system. Originally, an attempt was made to organize several small communities such as the Upper and Lower Des Montes and Valdez communities, into a single MDWCA. Initially the underlying water rights for what are now Upper and Lower Des Montes MDWCAs were declared under one declaration in the amount 29.74 AFY of water by 206 persons in 37 families. Tr. 8/20/01 at 151-152, 179-180. As a result of splitting the communities into separate MDWCAs, a subsequent application for permit to change partial point of diversion was filed by Des Montes MDWC and Mutual Sewage Works (now referred to as Upper Des Montes MDWCA). When Upper Des Montes MDWCA organized separately, the members were not the same as those that originally organized as Des Montes Mutual Domestic. Tr. 8/20/01 at 157-158. The application for Upper Des Montes covers the transfers of ditch rights from 55 persons from 12 families. State Exhibit No. 83 at 23. That application, which was acted upon by the State Engineer, stated that the amount of water to be used from all combined sources for domestic purposes was 7.70 acre feet. Tr. 8/20/01 at 154.

The evidence also supports a conclusion that only a portion of the underlying surface water rights were transferred to Upper Des Montes. Members of the Upper Des Montes MDWCA still use rights to water from their acequias that divert from the Rio

33

Lucero and Arroyo Seco for their outdoor purposes of water use. Tr. 8/20/01 at 146, 150. Members of the Upper Des Montes MDWCA use irrigation water from the ditch, not domestic water, for outside gardens, orchards and lawns. Tr. 8/20/01 at 165. Based on the record, therefore, the underlying water rights transferred to the Upper Des Montes MDWCA should be quantified at 15 gallons per person per day for 55 persons, for a total of 0.92 AFY. Using 60 gallons per person per day results in an amount of water not to exceed 3.69 AFY.

> **v)** **The Amount of the Underlying Water Rights Transferred to Upper Ranchitos MDWCA Should be 14.52 AFY Rather than 129 AFY**

Upper Ranchitos MDWCA[10] asserts a claim to divert 129 AFY from Well No. RG-12138, based on the transfer of water for domestic purposes from 43 individual domestic wells used by 216 persons at the rate of 3 AFY for each well. Docket No. 2625, at 4. Upper Ranchitos has failed to meet its burden of proof that the underlying water rights transferred to its system can be quantified in the amount of 3 AFY of water per well. At hearing, Upper Ranchitos MDWCA failed to present any evidence that the individuals transferring their pre-basin domestic well rights to the MDWCA had actually placed 3 AFY to beneficial use.

Instead, Upper Ranchitos presented testimony that members of the MDWCA still have domestic wells which have not been capped or plugged (Tr. 8/17/01 at 183); that members of the Upper Ranchitos MDWCA still use, or could use, their domestic wells for outside uses (Tr. 8/17/01 at 184, 222-223); and that some of the members of the

---

[10] The Declaration and application is in the name of Upper Ranchito Mutual Domestic Water Consumers & Mutual Sewage Works Association; other documentary evidence and witness at trial variously refer to the Upper Ranchitos MDWCA.

Upper Ranchitos MDWCA who plugged their hand dug wells did so because homesites were no longer in existence or because replacement wells were drilled (Tr. 8/17/01 at 184).

In filing its declaration of ownership of underground water rights, Upper Ranchitos MDWCA expressly stated that the water right being declared came from sources of supply whereby the water had been placed to beneficial use for irrigation purposes, domestic and livestock purposes, and that the MDWCA was only declaring and transferring a part of the domestic use to which the wells had been put. Tr. 8/17/01 at 208-210; MD Exhibit 198. Members of Upper Ranchitos MDWCA have also retained acequia rights for their irrigated lands. Tr. 8/17/01 at 224; Tr. 8/20/01 at 8. In fact, the Upper Ranchitos witness testified that not all of the water rights holders listed in Upper Ranchitos MDWCA's original declaration were willing to, or agreed to, transfer their water rights to the system. Tr. 8/17/01 at 238-239. It is unreasonable to conclude that the members of Upper Ranchitos MDWCA actually placed 3 AFY of water to beneficial domestic uses prior to transferring their water rights to the MDWCA. Even allowing such an assumption for the purposes of argument, it is contrary to the substantial evidence in the record to conclude that those members transferred the entirety of their domestic well water rights to the MDWCA.

Because Upper Ranchitos MDWCA did not present testimony regarding the amount of water actually used by its individual members prior to joining the MDWCA, and presented evidence that only a portion of domestic well water rights that were transferred to its system, the Court should quantify the amount of water rights transferred to the Upper Ranchitos MDWCA on a gallons per person per day basis. Based on the

35

evidence in the record in support of the State Engineer's standard for calculating domestic water usage, it is reasonable to apply the average of 60 gallons per person per day to the 216 individuals declared to be using the domestic wells, for a total of 14.52 AFY.

### vi)   The Amount of the Underlying Water Rights Transferred to Lower Des Montes MDWCA Should be 5.26-17.6 AFY Rather than 53.14 AFY

Lower Des Montes MDWCA asserts a claim to divert 53.14 AFY from Well No. RG-16107, based on the transfer of 12 AFY of water for domestic purposes from 4 individual pre-basin domestic wells at the rate of 3 AFY for each well, and on domestic water use transferred from surface water rights totaling 41.17 AFY by 62 households with a total of 245 individuals, estimated at 0.168 AFY, or 150 gallons per day, for each individual. Statements of Claims (Docket No. 2625) at 4. Lower Des Montes MDWCA did not provide any evidence to support its methods of quantifying the amount of water rights transferred to its system. In fact, at trial, Lower Des Montes MDWCA asserted a water right in quantities less than those set forth in its Statement of Claims. Lower Des Montes' witness testified that the MDWCA's water right was 20.58 AFY. Tr. 8/21/01 at 54-55; 83. This evidence contradicts a claim of 41.17 AFY.

In addition, the evidence supports the conclusion that only limited portions of the underlying water rights were transferred to the MDWCA's system. For example, the Association's witness testified that Lower Des Montes community members still have their irrigation rights and use their cisterns for water storage, washing clothes, outdoor watering, and other uses. Tr. 8/21/01 at 57, 79-80. In fact, the witness for Lower Des Montes testified that his community did not have any wells, only cisterns which were

filled from surface flows.  Tr. 8/21/01 at 57.  This contradicts the statements in the MDWCA's Application that it was seeking a permit to change the location of wells.

Lower Des Montes presented no evidence to support its methods of quantifying its water rights and did not present evidence of actual quantities placed to beneficial use in the amounts claimed prior to transfer.  Therefore, the Court should quantify the underlying rights based on the State Engineer's long-standing policy of applying 60 gallons per person per day to the transfer from a domestic water well, and 15 gallons per person per day to the transfer from a surface source of diversion.  The evidence in the record shows that there were initially 245 persons in 62 families who transferred ditch rights, and 17 persons who transferred rights from four wells.  State Exhibit No. 83 at 27-28.  Based on the State Engineer's method of quantification, Lower Des Montes MDWCA's claim should be initially quantified as 4.12 AFY from surface rights and 1.14 AFY from domestic wells, for a total water right of 5.26 AFY.  Quantifying all the transfers using 60 gallons per person per day results in an amount of water for the transferred water right amounts underlying Lower Des Montes MDWCA's water right of 17.6 AFY.

### vii)   The Amount of the Underlying Water Rights Transferred to Lower Arroyo Hondo MDWCA Should be 17.14 AFY Rather Than 177 AFY

Lower Arroyo Hondo MDWCA asserts a claim to divert 177 AFY from Well No. RG-16502, based on the transfer of water for domestic purposes from 59 individual domestic wells at the rate of 3 AFY for each well.  Docket No. 2625 at 5.  The record shows that Lower Arroyo Hondo applied to transfer water rights from 255 persons in 66 families from individual hand dug and drilled wells, based on declarations of ownership for 246 persons in 66 families.  State Exhibit No. 83 at 21.  Consistent with Lower

37

Arroyo Hondo MDWCA's application and underlying declaration and in conflict with its Statement of Claim, the MDWCA witnesses presented varying testimony that the MDWCA's water right is 20.67, 22.42, or 23.86 AFY. Tr. 8/20/01 at 224; Tr. 8/21/01 at 17.

Lower Arroyo Hondo did not present evidence that demonstrates actual beneficial use in the amounts claimed from the domestic wells transferred to the Association. Its witness was unable to even estimate the amount of water associated with historical uses. Tr. 8/20/01 at 230-236. As a matter of law, Lower Arroyo Hondo failed to meet its burden of proof regarding the actual quantity of the underlying water rights. Nor did Lower Arroyo Hondo present evidence that the entirety of those rights were transferred. In fact, its application to transfer rights from individual wells was limited to the transfer of rights for domestic purposes set out in the Sanitation Projects Act of 1957. State Exhibit 83 at 21. Because the domestic uses described by Lower Arroyo Hondo's witness are consistent with the uses contemplated in the State Engineer's calculation of per capita domestic uses from wells, the Court should quantify the transferred water right amounts underlying Lower Arroyo Hondo's original water right based on 255 persons using 60 gallons per person per day, for a total amount of water not to exceed 17.14 AFY.

### viii)    The Amount of the Underlying Water Rights Transferred to El Salto MDWCA Should be 6.97-7.52 AFY Rather Than 49.08 AFY

El Salto MDWCA asserts a claim to divert 49.08 AFY from Well No. RG-24251, based on the transfer of 39 AFY of water for domestic purposes from 13 individual domestic wells at the rate of 3 AFY for each well, and on the domestic water use totaling 10.8 AFY by 60 individuals, estimated at 0.168 AFY, or 150 gallons per day, for each individual. Docket No. 2625 at 5. The evidence in the record contradicts El Salto's

38

Statement of Claims.   There is no evidence to support a finding that individuals who transferred their rights actually placed to beneficial use the amounts of water asserted for domestic purposes, and there is no evidence that those individuals intended to transfer the entirety of their rights to the Association.  El Salto MDWCA has failed to meet its burden of proof in support of its proposed quantity of water right.

El Salto MDWCA did not present any evidence that its initial members actually diverted 3 AFY from their wells for domestic purposes prior to joining the Association. Nor did El Salto MDWCA present evidence that individuals using surface diversions for domestic purposes either actually used or transferred 0.186 AFY of water for those limited purposes, an amount equal to the amount of water used for the irrigation of a quarter acre of land.[11]  Members of El Salto MDWCA still use individual surface water diversions for outdoor uses. Tr. 8/16/01 at 105-106.  All the testimony submitted by El Salto MDWCA supports the conclusion that only limited portions of existing water rights were transferred to the Association by original members.

The declaration of rights underlying El Salto's application to change location of wells recorded water rights for domestic uses only, which were separate from, and in addition to, irrigation rights from the community.  Tr. 8/13/01  198-199.  Based on the underlying declarations, El Salto MDWCA applied to the State Engineer to transfer those rights to its system using three methods of calculating the amount of water: 60 gallons per person per day for the number of individuals (81) transferring rights from wells, 15

---

[11] In the 1980s, El Salto required new members to transfer 0.186 AFY of irrigation water rights associated with actual acreage to be retired in the amount of 0.25 acres. There is no evidence, however, that any of the original transfers from surface diversions were accompanied by an actual reduction in the use or diversion of surface flows by any individuals or any decrease in acreage irrigation.

gallons per person per day for 11 persons without wells who used ditch or spring water, and 6 additional households from the Arroyo Seco MDWCA (which had claimed 3 AFY per household), for a total of 23.62 AFY (thereafter, the MDWCA left out 0.18 acre feet in applying for an application with the State Engineer). Tr. 8/16/01 at 56-58.

However, El Salto MDWCA questioned that Arroyo Seco MDWCA was allegedly allowed three AFY per household. Tr. 8/16/01 at 97. Further, the members who transferred from the Arroyo Seco system expressly limited their transfers to 60 gallons per person per day, rather than the entirety of the claimed water rights for their wells. El Salto knew that the households originally belonging to the Arroyo Seco MDWCA agreed to transfer only 60 gallons per person per day (for 20 individuals) of their domestic well water rights and chose not to cap their wells. Tr. 8/16/01 at 113-116; Tr. 8/22/01 at 211-214; State Ex. No. 2; State Exhibit 83 at 32. Some of the members of El Salto MDWCA discontinued using their wells not because they transferred the entirety of their water right to the system, but because the MDWCA wanted to prevent cross-connections between individual wells and the community system. Tr. 8/16/01 at 65.

In accordance with the evidence presented by El Salto MDWCA, the Court should quantify El Salto's claim using the State Engineer's calculations for domestic transfers at 60 gallons per person per day (for 101 individuals) from wells and 15 gallons per person per day (from 11 individuals) from surface diversions. The transferred water right amounts underlying El Salto's claimed water right should be quantified in the amount of 6.79 AFY from wells and a total of 0.184 AFY from surface diversions, for a total of 6.97 AFY. Using 60 gallons per person per day would result in an amount of water not to exceed 7.52 AFY.

ix)    **The Amount of the Underlying Water Rights Transferred**
       **to Upper Arroyo Hondo MDWCA Should be 3.79 to 13.37**
       **AFY Rather Than 26.6 AFY**

In its Statement of Claims, Upper Arroyo Hondo MDWCA states, "[i]n 1961 the Upper Arroyo Hondo MDWCA was allowed 26.6 ac. Ft per annum, with each person limited to 125 gallons per day.... At present, 125 gallons/person/day for the Upper Arroyo Hondo MDWCA is not unreasonable for household uses." Upper Arroyo Hondo Mutual Domestic Water Consumers Association's Statement of Claims (October 25, 1999) (Docket No. 2624) at 7. This claim is consistent with the MDWCA's application to change location of declared water rights for 26.6 AFY. Tr. 8/21/01 at 137; State Exhibit No. 83 at 16. Based on State Exhibit No. 83, Upper Arroyo Hondo MDWCA's claim of water rights derives from the transfer of water rights from surface diversions for 190 persons in 44 families, and subsequent transfers of domestic well rights from two wells. *Ibid.* at 16-17.

Arroyo Hondo MDWCA presented no evidence that would support its claim that its members transferred to the MDWCA, and thereafter reduced their total use of, surface diversions in the amount of 125 gallons per person per day. Upper Arroyo Hondo presented testimony that the members of the MDWCA have retained ditch rights for outdoor uses, even though the Association plans to allow its members to use system water for outdoor uses. Tr. 8/21/01 at 154, 158. Some members of the Upper Arroyo Hondo MDWCA also intend to drill individual wells for additional outdoor watering of existing trees and lawns, to supplement their surface ditch rights. Tr. 8/21/01 at 174. The Application to transfer expressly limits the rights transferred to those water uses for domestic purposes only, as set out in the Sanitation Projects Act of 1957. State Exhibit No. 83, at 16. Substantial evidence in the record demonstrates that 125 gallons per

41

person per day is consistent with both outdoor and indoor uses of water not merely indoor domestic purposes, and such an amount exceeds average indoor uses. *See e.g.,* Tr. 8/20/01 at 197-198; Tr. 8/24/01 at 71-72, 131-132.

Based on the substantial evidence in the record, the Court should quantify Upper Arroyo Hondo's initial water rights claim based on 15 gallons per person per day for 190 individuals from 44 families for surface rights transfers in the amount of 3.19 AFY and 60 gallons per person per day for 9 individuals from two families (based on the "average" of 4.3 members of each family transferring surface rights) in the amount of 0.6 AFY, for a total of 3.79 AFY. Using 60 gallons per person per day for all individuals transferring rights, regardless of the source, would result in an amount of water not to exceed 13.37 AFY for the transferred water right amounts underlying Upper Arroyo Hondo MDWCA's water right.

## II.   THE STATE OFFERS THE COURT TWO ALTERNATIVES FOR ITS CONSIDERATION

The purpose of this proceeding was, in part, to ensure that the MDWCAs were treated equitably during previous adjudication proceedings. The examination of the actual water rights underlying the MDWCAs claims demonstrates that none of the MDWCAs originally adjudicated a quantity of water was treated inequitably. Because application of the law governing water rights to the substantial evidence in the record would result in significant reductions in the amounts of water that the MDWCAs were permitted or adjudicated, the Court may wish instead to evaluate alternative approaches to this adjudication. Without forgoing its position above that the quantification of water right amounts must be based on substantial evidence in the record, the State proposes that

the Court consider two options, as follows, for quantifying the amounts of the MDWCAs' water rights.

**A.    IN THE ALTERNATIVE, THE COURT COULD REINSTATE THE WATER RIGHTS AMOUNTS ADJUDICATED BY THE COURT'S PREVIOUS ORDERS AND APPLY THE SAME UNDERLYING TREATMENT TO THE MDWCAS WITH UNADUDICATED AMOUNTS**

One of the purposes of this proceeding was to give the MDWCAs the opportunity to demonstrate whether the originally adjudicated amounts for their water rights were inequitable or unfair.  The evidence in the record, however, does not support a finding that the original orders were inequitable or unfair.  For the ten MDWCAs[12] whose orders were re-opened, the Court might determine that it would not be equitable to re-adjudicate their water right amounts in the uniform manner, based on the evidence in the record as described by the State in Part 1 above.  As the MDWCAs neither met their burden of proof that their previously adjudicated water right amounts should be re-quantified nor established substantial evidence on which their water rights could be re-adjudicated, and for the reasons set forth in the State's Response in Opposition to Motion to Re-Open (Docket No. 2574), the Court could instead reinstate the prior orders of the Court and adjudicate the water right amounts of all ten MDWCAs as set forth therein.  Because the ten MDWCAs were adjudicated water rights in an amount equal to their permitted rights, the remaining two MDWCAs could have their water right amounts adjudicated in the same manner.

---

[12] The ten MDWCAs whose water right quantifications were re-opened in this proceeding are the Llano Quemado, Ranchos de Taos, Arroyo Seco, Upper Arroyo Hondo, Lower Des Montes, Upper Des Montes, Upper Ranchito, Talpa, Valdez, and Cañon MDWCAs.

During the trial conducted before the Special Master on the claims of all twelve MDWCAs, the ten re-opened MDWCAs were afforded a full opportunity to present testimony and other evidence justifying their request to re-adjudicate their water rights in the amounts they asserted in their Statements of Claims. As set forth in Part I.C. above, none of these MDWCAs met their burden of proof to support the re-adjudication of their water rights in the full amounts they claimed. To the contrary, if the Court goes behind the permits and declarations of the ten re-opened MDWCAs and uniformly applies the laws governing the appropriation of groundwater to adjudicate the water right amounts initially transferred into each MDWCA, the substantial evidence in the record supports a consistent standard for the quantification of the MDWCAs' water rights in amounts that not only are less than both the amounts claimed by the MDWCAs and the amounts they were previously adjudicated (*See* Part I.D. above), but also in some cases are less than the MDWCA's current level of metered diversions.

The State acknowledges that it is apparent that the methods used to quantify the water rights transferred into the MDWCAs varied. There is no evidence, however, that the basis for doing so was unconstitutional as initially alleged by the MDWCAs. Thereafter, the water rights of the ten MDWCAs were originally quantified based on the MDWCAs' transfer permits. Seven out of the ten original orders that were entered and re-opened in this adjudication were consent orders.[13] The consent orders reflect that there

---

[13] The Court entered orders adjudicating the water rights of Llano Quemado, Ranchos de Taos, Upper Arroyo Hondo, Upper Des Montes, Upper Ranchito, Valdez, and Cañon MDWCAs after the State and each MDWCA agreed to the elements of the MDWCA's water right through a negotiated offer of judgment. The water rights of Arroyo Seco, Lower Des Montes, and Talpa were adjudicated by default order. It should be noted, however, that even though the orders for Arroyo Seco and Lower Des Montes were

was agreement between the State and each MDWCA on the amount of the water rights that were adjudicated. Settlements of this nature are not necessarily uniform, nor is there any requirement that they be uniform.

This Court has recognized that the interests of the Court and the parties in resolving disputed water right claims and expediting the prosecution of water right adjudications may lead the State to compromise on elements of disputed claims that in other circumstances the State might insist upon litigating. *See United States v. Abousleman*, No. 83cv1041 JEC (D.N.M. May 4, 1999), slip opinion at pp. 15-16. In that decision, this Court explained that an offer of judgment represents an agreement between the State and a water right claimant, and concluded: "[t]he State cannot be expected to choose to litigate every issue in an adjudication, and may have, as it claims, adopted a liberal stance with respect to these wells." *Id.* at 15. The absence of complete uniformity among the original orders entered in this adjudication for the ten re-opened MDWCAs therefore should not operate as a bar to the Court reinstating the water right amounts that were adjudicated by those orders.

While seven of these ten MDWCAs were previously adjudicated by consent order, and three MDWCAs were adjudicated by default order, the same basis was used to adjudicate all ten – that is, the amounts of water as set forth in their respective permits. Absent evidence that their respective amounts of use exceeded the adjudicated amounts

---

entered by default, the water right amounts adjudicated in those orders (120.00 AFY for Arroyo Seco, 22.59 for Lower Des Montes) exceed the amounts that result from the quantification of the water rights amounts transferred into the MDWCAs by the application of a consistent standard to the substantial evidence in the record in this proceeding (up to 5.38 AFY for Arroyo Seco, up to 17.6 AFY for Lower Des Montes). *See* Parts I.D.3.i. and I.D.3.iv. above.

and that the excess amounts were legally and beneficially diverted, the State sees no benefit in going behind the previously adjudicated amounts.

The previously entered consent orders that adjudicated the water rights of the ten re-opened MDWCAs reflected the quantities of water that the State and each MDWCA agreed, at that time, as being the best evidence available of the amount of water the MDWCAs had placed to beneficial use. As a result, if the Court decides to reinstate the re-opened orders, the adjudicated water rights for the ten MDWCAs would serve the interests of all parties by serving as the consistent basis for adjudicating all ten MDWCAs as well as serving as the basis for the remaining two MDWCAs. Given the disparity between the uniformly re-quantified amounts of water based on the evidence in the record and the amounts of water previously adjudicated, the Court might determine that equity requires a finding that it is not appropriate to re-adjudicate the water rights of the MDWCAs in this instance. Under the circumstances, State would not oppose a decision by the Court to reinstate its prior orders for each of the ten MDWCAs and to adjudicate the water right amounts as set forth therein.

**B.    THE COURT MIGHT CONSIDER RE-INSTATING THE ADJUDICATION ORDERS FOR SIX MDWCAS, RE-ADJUDICATING THE WATER RIGHTS FOR THE THREE PRE-BASIN MDWCAS BASED ON ACTUAL DIVERSIONS, AND RE-ADJUDICATING THE WATER RIGHTS OF THREE MDWCAS BASED ON ACTUAL DIVERSIONS WITHIN THEIR PERMITTED AMOUNTS**

The Court might determine that the most appropriate method by which to adjudicate the water right amounts of all twelve MDWCAs would be to adjudicate the twelve in four separate groups, as follows. First, for six of the MDWCAs (Arroyo Seco, Ranchos de Taos, Valdez, Lower Des Monte, Upper Arroyo Hondo, and Ranchitos), the Court could reinstate the previous adjudication orders and water right amounts set forth

46

therein.  For five of these six MDWCAs (Arroyo Seco, Ranchos de Taos, Valdez, Lower Des Monte and Upper Arroyo Hondo), the water rights adjudicated would far exceed their maximum diversions reported to the State Engineer.  Although the sixth, Upper Ranchitos, would need to acquire additional water rights, it would be the only one so situated.

Arroyo Seco was issued a permit to divert and place to beneficial use an amount of groundwater not to exceed 120 AFY, and was adjudicated the same amount. Although so permitted, Arroyo Seco MDWCA has never placed to beneficial use 120 AFY.  Based on meter records for a fourteen year period, the greatest amount of water actually diverted by Arroyo Seco MDWCA was reported as 33.76 AFY in 1987.  Tr. 8/22/01 at 153-154.

Ranchos de Taos was issued a permit to divert and place to beneficial use an amount of groundwater not to exceed 105 AFY, and was adjudicated the same amount. Although so permitted, Ranchos de Taos MDWCA has never placed to beneficial use 105 AFY.  Ranchos de Taos did not provide evidence of actual water use by the MDWCA, but did provide testimony that it rarely has trouble with its household or well meters malfunctioning and replaces malfunctioning meters as soon as possible (Tr. 8/22/01 at 32, 57-58); that it has a certified system operator (Tr. 8/22/01 at 33); and further, that its diversions include the inadvertent waste of water because it has had major water leaks in its system.  Tr. 8/22/01 at 34.  The State provided evidence, based on the compilation of meter records for a thirty-four year period, that the greatest amount of water actually reported by Ranchos de Taos MDWCA as diverted was 49.08 AFY in 2000.  Tr. 8/22/01 at 163-164.

47

Valdez MDWCA was permitted 11.5 AFY of water and was adjudicated the same amount. Valdez presented no evidence of the amount of water actually diverted through its system. *Cf.* Tr. 8/21/01 at 125. The only evidence in the record as to the actual water use by Valdez MDWCA was presented by the State. Based on meter records for a twenty-four year period, the greatest amount of water actually diverted by Valdez MDWCA was reported as 5.78 AFY in 2000. Tr. 8/22/01 at 162. However, Valdez presented testimony that it has had leaks and other problems with its system infrastructure and equipment over the years, which is evidence that some of the diversions were inadvertent waste rather than beneficially used. Tr. 8/21/01 at 106-107. The MDWCA's witness also testified that its system operator trained to run the system and read and record meter readings. Tr. 8/21/01 at 108-109.

Lower Des Montes was originally granted a permit to beneficially use water in an amount not to exceed 21.59 AFY, and was adjudicated the same amount. State Ex. No. 83 at 27. Based on a review of meter records for a two year period, the greatest amount of water actually diverted by Lower Des Montes MDWCA was reported as 17.87 AFY in 1990. Tr. 8/22/01 at 161. Lower Des Montes MDWCA's witness testified that it has meters on its household connections which are accurate, but admitted that members complain that the meters overstate their use. Tr. 8/21/01 at 58,65-67. The MDWCA's witness further testified that every six months the Association empties and flushes its 20,000 gallon storage tank and that it periodically has breaks in its lines. Tr. 8/21/01 at 59, 61.

Upper Arroyo Hondo MDWCA's original permit was for a groundwater right an amount not to exceed 26.6 AFY, and it was adjudicated the same amount. State Exhibit

48

83.  Based on meter records for a eighteen year period, the greatest amount of water actually diverted by Upper Arroyo Hondo MDWCA was reported as 14.85 AFY in 1987. Tr. 8/22/01 at 160-161.  Although Upper Arroyo Hondo MDWCA has increased it membership by 22% to 56 members, the Association has not required new members to transfer water rights into the system because people are reluctant to transfer surface water rights. Tr. 8/21/01 at 169-170.  Upper Arroyo Hondo MDWCA's witness testified that at one point the Association lost an estimated 15,000 gallons a day (or 16.8 AFY) from its system for two years as a result of a leak in its line - the property owner believed the leak was a natural spring.  Tr. 8/21/01 at 172.  Upper Arroyo Hondo MDWCA also had a significant leak from a broken valve that went undetected for an undetermined amount of time. Tr. 8/21/01 at 173.

Upper Ranchitos MDWCA has a permit to divert in the amount of 18.15 AFY of water, which is the same amount the MDWCA was originally adjudicated.  Based on meter records for a fourteen year period, the greatest amount of water actually diverted by Upper Ranchitos MDWCA was reported as 23.68 AFY in 1989.  Tr. 8/22/01 at 156. Upper Ranchitos MDWCA's water right legally cannot exceed the quantity proven to have been transferred or a reasonable equivalent.  Any diversions in excess of that amount are unlawful and cannot form the basis of an additional water right.  At hearing, Upper Ranchitos MDWCA's over-diversions were attributed to leakages within its lines. Tr. 8/17/01 at 180-181, 219-220, Tr. 8/20/01 at 13, 15-16.  The witness for Upper Ranchitos acknowledged that there is no limit on the amount of water that a member of the MDWCA can use.  Tr. 8/20/01 at 20-21. Although Upper Ranchitos MDWCA's witness testified that the MDWCA requires new members to provide 0.25 acre feet of

water rights per connection to the MDWCA in order to join, he admitted that the MDWCA has not completed the transfer of water rights from new members into its system. Tr. 817/01 at 211-212, 220.

Second, for the three MDWCAs with pre-basin groundwater rights (Llano Quemado, Talpa, and Cañon), since the orders have been opened, the Court could adjudicate the water rights of these three MDWCAs based on the current maximum diversions reported to the State Engineer, under the *Mendenhall* doctrine. *See* New Mexico's Response to the Claims of the Mutual Domestic Water Consumer Associations (Docket No. 2701) at 2. The water rights of the Llano Quemado, Talpa, and Cañon MDWCAs therefore could be adjudicated in the amounts set out in Part I.B. above.

Third, the Court could adjudicate the water rights for Upper Des Montes MDWCA, since its order has been opened, based upon its maximum diversions reported to the State Engineer of 9.07 AFY, as it has acquired 8.35 AFY by addition to the 4.62 AFY originally adjudicated. Upper Des Montes was originally permitted and adjudicated a water right in the amount of 4.62 AFY. State Exhibit No. 83. Upper Des Montes MDWCA requires new members to transfer water rights from 0.25 acre of land with a duty of 2.5 acre feet per acre for each household being connected, regardless of household size. Tr. 8/20/01 at 160, 193-194, 197. By acquiring and transferring water rights, Upper Des Montes MDWCA added an additional amount 8.35 AFY of water for its system, based on State Engineer approval of applications to transfer additional water rights filed in 1979. Tr. 8/20/01 at 160. Upper Des Montes MDWCA's permits allow for a total diversion of groundwater in amounts not to exceed 12.97 AFY. Based on meter records for a two year period, the average amount of water actually diverted by Upper

50

Des Montes MDWCA was reported as 9.07 AFY for 1999 and 2000. Tr. 8/22/01 at 157-158. The Court could find further that Upper Des Montes MDWCA's water right should be quantified by its maximum diversion of 9.07 AFY and, in this instance, the balance of its permitted amounts, 3.90 AFY, could be left as a matter of State Engineer administration with respect to future beneficial use.

Finally, for Lower Arroyo Hondo and El Salto MDWCAs, the Court could rely on maximum diversion reported to the State Engineer, not to exceed its legally permitted diversion amount, just as the Court did for the other ten MDWCAs. Lower Arroyo Hondo MDWCA's existing permits are for a combined maximum diversion of 24.30 AFY, and therefore, could be adjudicated an amount of 24.30 AFY based on its maximum diversions reported to the State Engineer. Although this amount to be adjudicated is 1.10 AFY less than the maximum diversions, based on its own testimony at Tr. 8/21/01, at 47-48, this amount appears to be in excess of its average demand. Lower Arroyo Hondo MDWCA's original permit was for 21.42 AFY. State Exhibit No. 83. Subsequently to its formation and original transfers of rights, Lower Arroyo Hondo MDWCA was permitted to transfer 2.88 AFY of water rights from surface irrigation and a well. Although Lower Arroyo Hondo MDWCA requires new member to transfer water rights into the system, the MDWCA has increased its membership by approximately 60 members without transferring sufficient additional rights to its system. Tr. 8/21/01 at 30-33; State Exhibit No. 83 at 21-22. Based on meter records for a seventeen-year period, the greatest amount of water diverted by Lower Arroyo Hondo MDWCA was reported as 25.40 AFY in 1995. Tr. 8/22/01 at 162-163. A witness for lower Arroyo Hondo testified that its system has had line breaks that have resulted in the loss of water to members. Tr.

8/21/01 at 20.  Lower Arroyo Hondo MDWCA has no limitation on the amount of water

members can use each month.  Tr. 8/21/01 at 25.  Witnesses for Lower Arroyo Hondo

MDWCA also testified that the MDWCA in general has not had to over-divert to meet its

members' needs and has only over-diverted in a few instances.  Tr. 8/20/01 at 225-226,

Tr. 8/21/01 at 39.

El Salto MDWCA was originally issued a permit to use 6.78 AFY of water..

Thereafter, the State Engineer partially approved an application in 1975 with a condition

that only 6.78 AFY of the requested 16.66 AFY could be transferred, which action was

expressly not challenged by El Salto.  Tr. 8/16/01 at 110-113, 120-123; MD Ex. No. 202-

32, State Exhibit No. 1. 117-120.  In the mid 1980's, El Salto MDWCA purchased other

surface irrigation water rights for the purpose of transferring those rights into the

MDWCA system.  Tr. 8/15/01 at 126.  The State Engineer approved the transfer of a

diversion right of 3.57 to the El Salto MDWCA and allowed a return flow credit of at

least 70%, which allows the system to divert 16.22 acre feet per annum under the

transferred water right.  Tr. 8/15/01 at 129-130.  In 1988, the State Engineer also approved

the transfer of additional surface water rights to the MDWCA for new members as they

had hooked up, in the amount 1.58 acre feet per annum.  Tr. 8/16/01 at 132-133.  El Salto

also acquired additional irrigation water rights in the amount of 4.4 AFY for its system.

Tr. 8/16/01 at 62.  Based on a compilation of meter records for a twenty four year period,

the greatest amount of water actually diverted by El Salto MDWCA was reported as 17.5

AFY in 2000.  Tr. 8/22/01 at 165.  In addition to its original water right, El Salto acquired

and was permitted to transfer to its system an additional 16.33 AFY of water for

consumptive beneficial use.  El Salto's witness testified that the MDWCA has never

52

diverted and presently cannot use 23 AFY of water, the amount claimed in testimony as its original water right. Tr. 8/16/01 at 63. El Salto testified that it has an adequate supply of water for present needs. Tr. 8/16/01 at 134. El Salto MDWCA's existing State Engineer permits are for a combined maximum amount of 16.33 AFY (and an additional diversionary amount to account for return flow credit of 12.65 AFY) and, therefore, could be adjudicated in the amount 16.33 AFY consumptive use and a right to divert in the amount of 28.98 AFY, and the diversion of the amounts for return flow credit, could remain, in this instance, a matter of State Engineer administration.

The State has prepared the following chart, based on State Exhibit No. 83, which sets forth the various amounts discussed above.

| MDWCA | Claimed | Permit | Additional rights | Adjudicated | Diverted | Record Evidence |
|---|---|---|---|---|---|---|
| Arroyo Seco | 120.00 | 120.00 | | 120.00 | 33.76 | 4.93-5.38 |
| Ranchos de Taos | 105.00 | 105.00 | | 105.00 | 49.08 | 4.70 |
| Valdez | 21.00 | 11.5 | | 11.50 | 5.78 | 1.4-5.51 |
| Upper Des Montes | 31.42 | 4.62 | 8.35 | 4.62 | 9.07 | 0.92-3.69 |
| Upper Ranchitos | 129.00 | 18.15 | | 18.15 | 23.68 | 14.52 |
| Lower Des Montes | 53.14 | 21.59 | | 22.59 | 17.87 | 5.26-17.6 |
| Lower Arroyo Hondo | 177.00 | 21.42 | 2.88 | -- | 25.40 | 17.14 |
| El Salto | 49.08 | 6.78 | 9.55 | -- | 17.50 | 6.97-7.52 |
| Upper Arroyo Hondo | 26.6 | 26.6 | | 26.6 | 14.85 | 3.79-13.37 |
| **Mendenhalls** | | | | | | |
| Llano Quemado | 96.99 | 19.36 | 22.308 | 12.80 6.56 | 42.11 | 42.11 |
| Talpa | 80.66 | 46.23 | Temporary | 46.23 | 64.48 | 64.48 |
| Canon | 71.1 | 42.00 | | 42.00 | 58.34 | 58.34 |

54

## III.    ARGUMENT ON EVIDENTIARY OBJECTIONS

The Special Master made several evidentiary rulings pursuant to this litigation that were strongly disputed by the State. If the Court does not adopt one of the two alternative approaches proposed by the State in Part II above, then the State requests that these evidentiary rulings be revisited. Two of these had such a materially adverse effect upon the record that due process may dictate that a mistrial should be declared. Moreover, the resulting record is so confused as to what evidence is before the Court, and is either so burdened with cumulative evidence on narrow issues (*e.g.*, traditional methods of laundering) or materially insufficient in other areas (*e.g.*, quantification and metering evidence), that the Court may be effectively precluded from quantifying the water rights of the twelve MDWCAs.

The first of these was the Special Master's holding, during the trial, that the Meyer report, a document generated on behalf of, and produced, by the MDWCAs to the State, was inadmissible. The result of this was two-fold: the State was prejudiced to the extent that its case was effectively not heard; and the resulting record in the absence of the State's evidence does not now contain sufficient information to quantify the amounts of the MDWCAs' water rights. The State asks that this ruling be reversed and that the Meyer report, and the State's corresponding offer of proof, be admitted into evidence.

The second was the Special Master's ruling that the MDWCAs' post-trial tender of exhibits be admitted into evidence. The effect of this was to allow the blind addition of 880 unauthenticated documents into the trial record without inspection, cross-examination, or rebuttal by the State. The State asks that this ruling be reversed and that all documents that were not tendered as exhibits during trial and subject to the

55

opportunity for cross-examination of a sponsoring witness be excluded from the record. In the alternative, the State renews its motion for a mistrial.

## A.    THE SPECIAL MASTER'S LAST MINUTE EXCLUSION OF THE MEYER REPORT WAS REVERSIBLE ERROR

For purposes of prosecuting their water rights claims, the twelve MDWCAs employed an historian, Dr. Michael Meyer, to act as their expert and to provide testimony as to historical water uses upon which the MDWCAs sought to base the quantification of their rights. On November 9, 2001, the Mutual Domestics served the expert report of Dr. Meyer on the State of New Mexico. Certificate of Service of MDWCAs Supplemental Expert Report (November 9, 2000) (Docket No. 2694). Dr. Meyer's expert report proved to be favorable, in many respects, to the State's litigation position, and on December 19, 2001, the State served a notice to take Dr. Meyer's deposition to further explore his opinions. State's Notice of Deposition (December 18, 2000) (Docket No. 2707). Thereafter, the MDWCAs withdrew Dr. Meyer as their expert.

Although the MDWCAs withdrew Dr. Meyer from their witness list, in March 2001 the State identified the Meyer Report as an exhibit it intended to introduce at trial. The State's basis for its admissibility was that the MDWCAs had tendered the report to the State as the opinion of their expert agent and representative. The MDWCAs responded by filing a Motion in Limine seeking to exclude Dr. Meyer's report as being inadmissible hearsay. On April 10, 2001, the Special Master denied the MDWCAs' Motion, and expressly held that Dr. Meyer's report was admissible hearsay under two different exceptions. First, it was the statement of a party's agent:

> Subsection (d)(2)(D) [of Fed. R. Evid. 801] exempts [from the hearsay rule] "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" and would apply to Dr. Meyer's report.

Order on MDWCA Motion in Limine (April 9, 2001) (Docket No. 2752) at 3. Second,

the Special Master determined that the Meyer Report constituted the admission of a party

opponent:

> The State wants to introduce Dr. Meyer's report to show that the Mutual
> Domestics' own testifying expert does not agree with the Mutual
> Domestics' contention that 155 gallons per person per day . . . should be
> the amount of water quantified to the original transferors of rights in to the
> Mutual Domestics. In other words, the State is treating this document as
> an admission which will be inconsistent with the MDWCAs' position at
> trial.

*Id.* at 4. In her ruling on the Mutual Domestics' Motion in Limine, the Special Master

unambiguously held that the Meyer report was admissible evidence, and that "the

MDWCAs' hearsay objection is overruled." *Id.*

During the discovery and pre-trial phases of this matter, the State relied on the

Special Master's ruling on the admissibility of Dr. Meyer's expert report in preparing its

case in chief. On July 25, 2001, the State identified the majority of its witnesses as

specifically offering expert opinions on certain key points contained in the Meyer report.

State's Supplemental Witness List (Docket No. 2808). The witnesses were Dr. John

Baxter, Mr. Brian Wilson, and Dr. James McNees. On August 8, 2001, one week before

trial, the MDWCAs, again, served objections to the admission of the expert report of Dr.

Meyer on the State and on the Special Master. MDWCAs Objections to the State of New

Mexico's Proposed Trial Exhibit, at 2-3.[14] The Special Master immediately held a

telephone conference to address the MDWCAs' objections, at which time she again

---

[14] This pleading was served but not filed with the Court, pursuant to Special Master's
Notice and Order Setting Trial (Docket No. 2814).

denied the objections and ruled in favor of the State that the Meyer Report was admissible.[15]

A week later, on August 13, 2001, trial of this matter commenced. It began with the Mutual Domestics' case in chief, which proceeded for a week and a half, and lasted until August 22, 2001. On August 23, 2001, the State called Dr. John Baxter to offer his expert opinion on historical water uses in the Taos area, and to give an expert opinion relating to the findings contained in the Meyer Report. In response, the Special Master *sua sponte* changed her ruling on the Meyer report, and revealed to the State that she had determined to reverse her ruling on its admissibility:

> SPECIAL MASTER: I went back and did some research on the law and, at least in the 10th Circuit, an expert witness is not -- can be considered to be an agent of the party employing that expert witness under 801(d)(2)(D), and so I must withdraw my previous conclusion.
>
> And to the extent this has interfered with the presentation of [the State's] case, I apologize. <u>I had just done this just before trial.</u>[16] They are allowed to withdraw their expert at any time they want, from what I can tell. I find nothing that says they can't. If you can find other bases upon which to have your experts testify, I think I would welcome the testimony, but Dr. Meyer's report at this time is inadmissible as hearsay.

Tr. 8/23/01 at 142-143 (emphasis added). Counsel for the State explained to the Special Master in detail how the State's case in chief was based upon the Meyer report, and that to hold the Meyer report inadmissible would be to exclude the balance of the State's case.

---

[15] This telephone conference was held in lieu of a formal hearing on the objections pursuant to the express terms of the <u>Special Master's Notice and Order Setting Trial</u> (Docket No. 2814).

[16] No explanation was provided for this delay of several weeks, from "just before trial," when Special Master states she re-researched the issue, to nine days into the trial, when she finally informed the State she had reversed her holding on the Meyer report.

> MR. LEVY:   Special Master, I think, essentially, the situation is very simple. [The] Mutual Domestic[s] produced a document which they now regret introducing. They have withdrawn their testifying expert for a variety of reasons, none of which are terribly clear.
>
> Dr. Baxter was specifically asked to look at what Dr. Meyer produced when he was still a retained testifying expert and disclose a report pursuant to Rule 26.   The Court has already reviewed this report.   It's a statement by a party opponent.   I intend to introduce that report into evidence.
>
> That report is critical to an understanding of the historical uses of water during the time frame which the Mutual Domestics are arguing here, and was prepared by the Mutual Domestics own expert.   And the State intends to offer that report and critiques of that report by both Dr. Baxter and Brian Wilson to specifically show first what the Mutual Domestics' understanding was of the use of water according to their then own experts, and we intend to show which conclusions the Court should draw with respect to the use of domestic water pertinent to this case historically.

Tr. 8/23/01 at 141-142.   The Special Master acknowledged this, and the resulting prejudice to the State, admitting that "if there is any unsportsmanlike [behavior] here at this moment, I will take responsibility for it because I should have probably and – this was neglect, at the very least, on my part."   *Id.* at 145.   The Special Master apologized, but continued to hold that the Meyer Report was inadmissible.   *Id.* at 145-146.

Based on due process grounds and upon the previous rulings of the Special Master that correctly applied the Federal Rules of Evidence, the State moved for a mistrial:

> MR. LEVY:   At this time the State moves for a mistrial and requests a new trial in its entirety.
>
> SPECIAL MASTER: Your request is denied.
>
> MR. LEVY:   Thank you.   The request goes under Rule 59 of the Rules of Civil Procedure.

Tr. 8/23/01 at 16.   The State moved for an opportunity to subpoena Dr. Meyer and bring him to the hearing.   Tr. 8/23/01 at 151.   That relief was also denied.   Ultimately the

59

Special Master allowed the testimony of Dr. Baxter, Dr. McNees and Mr. Wilson to be

tendered as an offer of proof only, not to be admitted into evidence.

### 1.   THE EXPERT REPORT OF DR. MICHAEL MEYER IS ADMISSIBLE

The Special Master's ruling that the Meyer report was inadmissible was made in

error.  The Mutual Domestics cannot un-ring the bell, and withdraw a report that was

prepared by a testifying expert and mandated and ordered by the Special Master to be

disclosed to the State in accordance with the Rules of Civil Procedure.  The Meyer

Report is independently admissible because it is not hearsay.  Rule 801 of the Federal

Rules of Evidence specifically defines as not hearsay:

> (A)   the party's own statement, in either an individual or representative capacity; or
>
> (B)   a statement of which the party has manifested an adoption or belief in its truth; or
>
> (C)   a statement by a person authorized by the party to make a statement concerning the subject; or
>
> (D)   a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

Fed. R. Evid. 801(d)(2).  The Meyer Report is admissible on the face of all four of these

exceptions.  In addition, the report is admissible under Rule 703, which expressly states:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.

Fed. R. Evid. 703.  The expert witnesses for the State, Dr. John Baxter, Dr. James

McNees and Mr. Brian Wilson, all three reviewed Dr. Meyer's report and based opinions

on it.  The Meyer Report is admissible as a basis for those opinions.

In addition, case law in this district, and binding authority in the 10th Circuit interpreting these rules of evidence, also clearly require that Dr. Meyer's report be admitted. In a recent Federal District of New Mexico slip opinion, *SE Technologies, Inc. v. Summit Electric Supply Co., Inc.*, the plaintiff, SE Technologies had identified an expert witness, Yves Perreault, and provided Mr. Perreault's preliminary expert report to the defendant, Summit Electrical Supply. *SE Technologies, Inc. v. Summit Electric Supply Co., Inc.*, No. CIV-00-1511 LH-LFG (D.N.M. Feb. 7, 2002) (Memorandum Opinion and Order) (attached hereto as Exhibit A). SE later withdrew Mr. Perreault as its expert witness, basing the withdrawal on his unavailability, and filed both a motion in limine to exclude and a motion to strike Mr. Perreault's report based on grounds that it was unsworn, hearsay and inadmissible. *Id.* The court disagreed, noting that "[t]he very fact that SE produced this piece of evidence and tendered it to Summit as a report of its then expert is an important and distinguishing factor that must be considered in the equation of whether or not this report . . . is admissible at trial." *Id.* at 4. It held that "[u]nder Fed. R. Evid. 801(d)(2)(B), evidence is not hearsay if it 'is offered against a party . . . and is a statement of which the party has manifested an adoption or belief in its truth.'" The court held that, clearly, SE Technologies had manifested just such an adoption or belief with regard to Mr. Perreault's report:

> [I]n this case, SE solicited the preliminary report to from Perreault and
> tendered it to Summit in January 2001. Providing it to Summit signified
> SE's acceptance and adoption of the contents of the report, and affirmative
> action on its contents. This report is sufficiently "tied" to SE, because SE
> accepted and acted upon the report. SE . . . has indicated that it withdrew
> Perreault as its expert due to his unavailability, not due to the lack of
> unreliability [sic] of his statements. SE has not contested the report's
> authenticity.  I conclude that all of these factors indicate sufficient
> trustworthiness and reliability of truth in its contents, that the report is not
> hearsay, and that it is admissible evidence.

Id. at 6.

The operative facts of *SE Technologies* are virtually identical to the instant matter. Like SE Technologies, the MDWCAs identified an expert witness, solicited a report from him, and tendered it to opposing counsel. Also like *SE Technologies*, the MDWCAs later withdrew their expert and filed a motion *in limine* to exclude his report. Like *SE Technologies*, the MDWCAs offered Dr. Meyer's report against the State -- a party opponent -- and manifested an adoption or belief in its truth. As such, like Mr. Perreault's report, Dr. Meyer's Report is not hearsay under Fed. R. Evid. 801(d)(2)(B), and cannot be excluded from consideration by this Court.

In the Tenth Circuit case of *Wright-Simmons v. The City of Oklahoma City*, a city personnel director prepared a two  investigative report with interview notes attached.  155 F.3d 1264 (10th Cir. 1998).  The defendant argued that the report was inadmissible hearsay.  The plaintiff contended that neither the report nor the notes were hearsay under Fed. R. Evid. 801(d)(2)(B), which exempts from the hearsay rule "a statement of which the party has manifested an adoption or belief in its truth."  The Tenth Circuit agreed with the plaintiff that the evidence was not hearsay, and held that:

> [E]ven if the district court ruled on the summary judgment motion without considering the report and attached notes, that decision to exclude the evidence would itself constitute an abuse of discretion requiring reversal and consideration of the report and the interview notes.

Id. at 1268 (emphasis added).  In so holding, the Tenth Circuit adopted a test that had been applied by the First Circuit, which asked "whether the surrounding circumstances tie the possessor and the document together in some meaningful way."  *Id.* (quoting Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 870 (1st Cir. 1997) (citations and

62

internal quotation marks omitted).  <u>Pilgrim</u> held that a document is sufficiently "tied" to the possessor "to the extent the adoptive party accepted and acted upon the evidence." <u>Pilgrim</u>, 118 F.3d at 870.  In Wright-Simmons, the Tenth Circuit specifically adopted the First Circuit's approach to adoptive admissions as articulated in <u>Pilgrim</u>.  <u>Wright-Simmons</u>, *supra* at 1268.

It is beyond dispute that the Mutual Domestics are an "adoptive party" who "accepted and acted upon the evidence."  The evidence in the instant matter is the Meyer report, and the Mutual Domestic's accepted and acted upon it by serving it on the State. As such, the Mutual Domestics are "tied" to the Meyer report in a meaningful way. Under the Tenth Circuit adoptive admissions test the Meyer report is admissible.  To exclude it, as the <u>Wright-Simmons</u> Court noted, is reversible error.

**2. THE SPECIAL MASTER'S ELEVENTH-HOUR REVERSAL ON THE ADMISSIBILITY OF THE MEYER REPORT SO PREJUDICED THE STATE THAT A NEW TRIAL IS WARRANTED**

The Special Master's reversal of her ruling on the Meyer report, and her holding that it was inadmissible hearsay effectively excluded the majority of the State's case in chief.  This not only prevented the State from presenting its case, but also excluded from the record much of the evidence necessary to quantify the Mutual Domestics' water rights.  The result is a flawed and substantively lacking record that may prove an inadequate basis for the adjudication of the MDWCAs' water rights.  This denial of due process and failure to develop an adequate evidentiary record warrant a new hearing.  To the extent the Special Master's evidentiary rulings stand, the State renews its motion for a mistrial.

63

This prejudice adhered because the State based its trial strategy largely on the Special Master's ruling in advance of trial – not once, but twice – that the Meyer report was admissible. The State's reliance upon those rulings was completely reasonable. The Special Master's subsequent reversal of these rulings at trial, in the middle of the State's case in chief, could not reasonably have been anticipated or accommodated by the State. At the time of her ruling, the Special Master clearly recognized that it was a surprise to the State, that it had a devastating effect on the State's ability to present its case, and that the State was no way responsible for the situation.  On the record the Special Master expressly acknowledged her own responsibility for it:

> SPECIAL MASTER: Let's all calm down.  This is unfortunate, and I bear a great part of the responsibility, so let's just think about things . . .

Tr. 8/23/01 at 152.  She apologized for it: "to the extent this has interfered with the presentation of your case, I apologize," "I'm going to apologize and you are going to hear it because I don't do that very often."  Trial Transcript, Vol. IX, August 23, 2001, pp. 143, 145.

The Special Master also acknowledged that she had revisited the issue sometime before without the State's involvement: "I don't want you to be in the dark, I have done some more research on this," and  "I had done this just before trial."  Trial Transcript, Vol. IX, August 23, 2001, pp. 142, 143.  She further acknowledged the surprise that her sua sponte review caused: "I did not mean for a second to have your people sitting here and waiting and then ambush them at the last minute."  Trial Transcript, Vol. IX, August 23, 2001, pp. 146.

64

Notwithstanding the Special Master's recognition of the result of her reversal, the State's case nonetheless remained outside the trial record, and much of the evidence necessary for the Court to quantify the Mutual Domestics' water rights is not now before it.  Much of the State's case, moreover, while derived in part from an analysis of the Meyer Report, stands independently from the Report and is admissible as the independent expert testimony of the State's expert witness.  *See, i.e.,* Tr. 8/24/01, Testimony of Brian Wilson.  In the midst of hearing and as the State began its direct presentation of its case, the Special Master queried if the State could identify, as it went along, those portions of testimony that did not rely on the Meyer report.  Under the circumstances, the State could not uniformly have done so and counsel informed the Special Master that he did not know of a way to parse the testimony as they went along.  *Id.*  A review of all of the expert testimony of the State demonstrates that it is admissible in its entirety as independent expert opinions.

As discussed above, the Meyer report is admissible evidence, and should be held admitted to the trial record, as should the State's entire offer of proof.  However, in the event the Special Master does not reverse her ruling, the prejudice to the State and the deficiencies in the trial record resulting from this reversal warrant a new trial.  The Special Master recognized this prejudice in the record.  If the Special Master's ruling that the Meyer report is inadmissible remains unchanged, the State renews its motion for a mistrial.

**B.     IT WAS ERROR TO ALLOW THE ADMISSION INTO EVIDENCE OF THE MDWCAS' POST-TRIAL TENDER OF EXHIBITS**

At the close of its case in chief, the MDWCA attorneys sought leave of the Court to enter into the record documents identified by their Exhibit Index which had not been

tendered during the trial.  August 23, 2001 Order Concerning MDWCAs' Exhibits 192-203 (No. 2777).  The Special Master granted the MDWCAs' motion, determining that the vast majority of them purported to come from the State Engineer files and were exempt from any hearsay limitation as all "the formal files of the Office of the State Engineer . . . qualify as public records within the meaning of Fed. R. Evid. 803(8)."  *Id.*  Attorneys for the State timely objected that the documents were not all public records, would have not been authenticated, that they would have no sponsoring witness, that they would lack foundation, that they contained both hearsay and double hearsay, and that they were irrelevant.  *Id.*

The Special Master defined this procedure for the post-trial tender of exhibits in greater detail in her Order and Schedule for Post-Trial Proceedings (No. 2841).  In that Order she expanded her previous ruling, and allowed the MDWCAs to tender not just documents obtained from the formal files of the Office of the State Engineer ("OSE"), but any documents identified by their Exhibit Index:

> The Mutual Domestics shall complete tender of their exhibits, including portions of the twelve Office of the State Engineer (OSE) water rights files made the subject of the Court's August 23, 2001 Order Concerning MDWCAs' Exhibits 192-203 (Docket No. 2828), and any other exhibits reflected on the Mutual Domestics' Exhibit List . . .

On November 9, 2001, pursuant to the two orders, the MDWCAs served on the State their highlighted Index to MDWCA Exhibits, purporting to identify those additional documents they wished to introduce as exhibits after the hearing had concluded.  The MDWCAs identified 880 exhibits as ones "being tendered by the MDWCAs" on November 9, 2001.  This is more than five times the 173 documents the MDWCAs had introduced at trial.  The MDWCAs' did not provide the State with copies of any of the

documents they stated they had tendered to the Court after the close of trial on November 9, 2001.

The State renews its objection to the admission into evidence of those additional 880 documents subsequent to trial, and asks that the Special Master reverse her ruling, and exclude the Mutual Domestics' post-trial tender from the trial record.

### 1.    THE PROCESS FOR POST-TRIAL TENDER OF EXHIBITS ESTABLISHED BY THE SPECIAL MASTER'S ORDERS DEPRIVED THE STATE OF THE FUNDAMENTAL OPPORTUNITY TO EVALUATE AND OBJECT TO TENDERED EVIDENCE

It is fundamental to our system of justice that a litigant be presented with the evidence offered against it and given an opportunity to test that evidence. *Cf.* Fed. R. Evid. 103(a) (timely objection or offer of proof required to claim error in ruling admitting or excluding evidence); Fed. R. Evid. 612 (adverse party entitled to review writing used to refresh witness's memory). Here, however, the MDWCAs have been allowed to tender exhibits to the Court as evidence without serving copies of those documents on the State. The Special Master's October 12, 2001 Order required the MDWCAs to file with the Court by November 9, 2001 a list of exhibits tendered and a copy of each exhibit, but allowed the MDWCAs to serve upon the State only the list of exhibits tendered. The MDWCAs have not served upon the State copies of any of the exhibits identified by the MDWCAs' November 9, 2001 tender of exhibits. This sort of "blind hearing" is effectively an ex parte communication, and violates the fundamental requirement of fairness which is the touchstone of our judicial system.

Reported decisions on the admission of exhibits into evidence after trial are scant. The reported decisions that can be found reflect the difficulty of reconciling post-trial

67

admission of evidence with fundamental principles of fairness and just judicial administration. For example, in *Chicago Painters and Decorators Pension, Health and Welfare and Deferred Savings Plan Trust Funds v. Karr Bros., Inc.*, 755 F.2d 1285, 1288 n. 2 (7th Cir. 1985), the Seventh Circuit upheld the trial court's denial of a party's motion to admit exhibits filed after trial. The Seventh Circuit agreed with the trial court's refusal to admit the post-trial exhibits on the grounds that the exhibits were available to the proponent during trial yet the proponent failed to move for admission of the exhibits when it had the opportunity to do so at trial. *Id.* Here, the MDWCAs had every opportunity at trial in August, 2001 to move for the admission of the exhibits identified in the MDWCAs' November 9, 2001 tender of exhibits. Since they failed to move for admission at trial, they should not be allowed to do so now through a process that prejudices the ability of the State to evaluate the tendered exhibits, object to their admission as necessary, and offer rebuttal testimony.

If exhibits are to be allowed to be tendered after trial, orderly procedure would require the Court to re-convene the evidentiary hearing and allow the State to confront the evidence tendered against it. *See, e.g., Overseas Development Disc Corp. v. Sangamo Const. Co., Inc.*, 502 F.Supp. 1256, 1260 (C.D. Ill. 1980) (motion to introduce exhibits three months after trial denied because it would either preclude an orderly procedure or would require the reconvening of a trial proceeding). The Tenth Circuit reached a similar conclusion in *Blanke v. Alexander*, 152 F.3d 1224, 1238 (10th Cir. 1998), holding that the trial court did not abuse its discretion when it re-opened the record at trial to allow a party to introduce additional exhibits through a sponsoring witness.

2.    **THE EXHIBITS TENDERED BY THE MDWCAS POST-TRIAL HAVE NOT BEEN AUTHENTICATED, VIOLATE**

**THE BEST EVIDENCE RULE, CONTAIN INADMISSIBLE HEARSAY, AND ARE NOT RELEVANT**

Authentication is a foundational prerequisite to the admission of documentary evidence. Fed. R. Evid. 901(a). Generally, the Rules contemplate that a party seeking to enter a document into evidence must lay this foundation by presenting evidence extrinsic to the document itself. *See id.* ("authentication . . . as a condition precedent to admissibility is satisfied **by evidence** sufficient to support a finding that the matter in question is what its proponent claims") (emphasis added); Fed. R. Evid. 901(b)(1) (testimony of a witness with knowledge); Fed. R. Evid. 901(b)(7) (evidence that a purported public record is from the public office where such records are kept). The MDWCAs have presented no such extrinsic evidence to authenticate the exhibits identified by the MDWCAs' November 9, 2001 tender of exhibits. As such, the State objects to the admission of any exhibits tendered by the MDWCAs post-trial based on the MDWCAs' failure to provide evidence authenticating them.

The State has not been provided the opportunity to evaluate the authenticity of the tendered exhibits. The exhibits identified by the MDWCAs' November 9, 2001 tender of exhibits purport to come from the formal files of the OSE. As such, the tendered documents must be copies, because the relevant OSE procedures require that the original documents remain in the OSE files. The MDWCAs, however, have not served upon the State copies of these exhibits tendered post-trial. As a result, the State has not been afforded the opportunity to verify whether such copies are accurate copies of the originals in the OSE files. Nor has the State been able to determine whether the tendered copies are inaccurate, poorly made, truncated, unreadable, or suffer from any of the other deficiencies endemic to the reproduction by photocopying of original documents. The

69

State as a result has been precluded from identifying specific objections it might have to the authenticity of specific tendered exhibits.

This is not merely a technical concern. With regard to copies of documents from OSE files which the MDWCAs sought to introduce at trial, several were found to be flawed. On August 15, 2001 – the third day of trial – the MDWCAs sought to introduce their exhibit 145. Trial Transcript, Vol. III, pp. 9-10. The State objected that the copy the MDWCAs were seeking to introduce was unreadable. Trial Transcript, Vol. III, p. 10. Special Master agreed, stating that ". . . for purposes of exhibits, we need better copies." Trial Transcript, Vol. III, p. 10. This was by no means an isolated incident.

On August 14, 2001 – the second day of trial – the State objected in four separate and distinct instances to documents the MDWCAs sought to introduce into evidence based on the impossibility of identifying the MDWCAs' copy with the original contained in the State's files. Trial Transcript, Vol. II, pp. 106-107; Trial Transcript, Vol. II, pp. 125-126; Trial Transcript, Vol. II, pp. 176-177; Trial Transcript, Vol. II, p. 209. On several other occasions during the two weeks of trial copies of the State's files which the MDWCAs sought to introduce into evidence were found to be incomplete, incorrect or otherwise flawed copies. It is safe to assume that at a minimum, the MDWCAs' current tender of copies contains a similar ratio of flawed copies. Given the fact that their Exhibit Index reflects a post-trial tender of document five times the number admitted at trial, the actual number of bad copies contained therein is likely to be substantially greater in number than the number of flawed copies identified at trial.

With regards to those documents identified with specificity by the MDWCAs' November 9, 2001 tender of exhibits, if the MDWCAs serve the State with copies of the

70

tendered exhibits, the State will stipulate to their authenticity to the extent that the State is able to determine that a tendered exhibit is an accurate reproduction of the corresponding original document the State has located in the OSE files.

The requirement of extrinsic evidence of authentication as a condition precedent to admissibility is not required for certain documents considered by the Rules of Evidence to be self-authenticating. Fed. R. Evid. 902. Copies of public records are self-authenticating where the copy is certified as correct by the records custodian or other authorized person. Fed. R. Evid. 902(4); *cf.* NMSA 1978, § 72-2-7 (1907) (*certified* copies of records on file in the OSE shall be evidence equally with the originals in those files (emphasis added)).

The Special Master has held that "the formal files of the Office of the State Engineer" are public records. *See* August 23, 2001 Order Concerning MDWCAs' Exhibits 192-203 (No. 2777). If that holding were correct, it would allow the tendered documents to avoid scrutiny under the hearsay rule. But, to the extent that the exhibits tendered by the MDWCAs on November 9, 2001 are copies of original public records in the OSE files, they must be certified copies to avoid the Federal Rules of Evidence requirement that they be authenticated by extrinsic evidence. Since, however, the MDWCAs have not served upon the State copies of any of the documents the MDWCAs may have tendered to the Court after the close of trial, the State consequently has no knowledge as to whether any of those documents purporting to have been copied from the OSE files have been certified. Nor have the MDWCAs at any point provided evidence that the documents produced or tendered were certified. As such, the State must

assume they have not been certified, and hereby objects to them on the grounds that they are not self-authenticating.

To prove the contents of a document, the Best Evidence Rule requires the original document or an acceptable duplicate. *See* Fed. R. Evid. 1002. The Federal Rules of Evidence further specify that the contents of a public record may be proved by either a copy certified in accordance with Fed. R. Evid. 902 or by a copy testified to be correct by a witness who has compared it to the original. Fed. R. Evid. 1005. The New Mexico water code mirrors this requirement. *See* NMSA 1978, § 72-2-7 (1907) (certified copies of records on file in the OSE shall be evidence equally with the originals in those files).

To the extent that the exhibits tendered by the MDWCAs on November 9, 2001 are copies of original public records in the OSE files, to satisfy the Best Evidence Rule they must either be certified copies or be supported by the testimony of a sponsoring witness. Because the exhibits by the MDWCAs on November 9, 2001 were tendered post-trial, the MDWCAs have not supported the admission of these purported public records by the testimony of a sponsoring witness. In addition, since the MDWCAs have not served upon the State copies of any of the exhibits in their November 9, 2001 tender, the State has no knowledge as to whether any of those documents purporting to have been copied from the OSE files have been certified. As such, the State must assume they have not been certified, and hereby objects to them on the grounds that they violate Fed. R. Evid. 1005.

Hearsay is defined by the Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). As the MDWCAs post-trial tender of

exhibits is being undertaken by them without a sponsoring witness, by definition the entire submission is hearsay. Absent a showing that the submission comes within one of the hearsay exceptions, they cannot be admitted.

On August 23, 2001 the Court found that the MDWCAs' proposed submission did indeed come within an exception to the hearsay rule – the public records exception:

> The files in question are the formal files of the Office of the State Engineer in connection with its duties to generally supervise the waters of New Mexico and the measurement, appropriation and distribution thereof. NMSA 1978 §72-2-1 (1907). As such, **they qualify as public records within the meaning of Fed. R. Evid. 803(8)**.

Order Concerning MDWCAs' Exhibits 192-203 (emphasis added). The hearsay exception cited by the Court in this order defines records and reports of public agencies as being ones which set forth:

(A)    the activities of the office or agency, or

(B)    matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . , or

(C)    in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed. R. Evid. 803(8). The State concedes that some portions of "the formal files of the Office of the State Engineer" are likely to fall within the three limitations set out by Rule 803(8), and therefore would qualify for this hearsay exception. It is equally likely, however, that a significant portion of those same files do not fall within those three limitations and therefore cannot be considered "public records" under Rule 803(8). Without an individual examination of each document, it is impossible to determine whether it is a public record for purposes of this exception to the hearsay rule.

As noted above, the only document received by the State pursuant to Special Master's orders regarding post-trial tender of exhibits is the MDWCAs' highlighted "Index to MDWCA Exhibits." The State has not been provided with copies of any of the 880 documents the MDWCAs state they have tendered to the Court after the close of trial, and consequently is unable to determine whether the MDWCAs' tender included copies of documents contained in "the formal files of the Office of the State Engineer," and if so, whether such documents then come within the definition of public records.

In any event, notwithstanding whether any documents from the "the formal files of the Office of the State Engineer" have been tendered to the Court as evidence subsequent to the close of trial, and whether such documents indeed come within the Federal Rules of Evidences definition of public records, the State would ask that Special Master reconsider her finding that all such files "qualify as public records within the meaning of Fed. R. Evid. 803(8)," and hold that such a determination requires a document by document evaluation. In any event, for purposes of this brief, the State must assume that the documents tendered by the MDWCAs are not public records, are hearsay, and hereby objects to their admission into evidence on that basis.

Special Master's August 23, 2001 Order Concerning MDWCAs' Exhibits 192-203 addressed the threat of the MDWCAs' supplemental tender of exhibits being burdensome and cumulative:

> . . . complete copies [of the files in question] would most likely burden an already voluminous record with **irrelevant or cumulative evidence**.

Special Master's August 23, 2001 Order Concerning MDWCAs' Exhibits 192-203. The "already voluminous record" noted by Special Master consisted at that time of only the 173 exhibits introduced by the MDWCAs at trial. As noted above, the MDWCAs

74

Exhibit Index states that they are now seeking to supplement that record with 880 additional documents, or five times the number that Special Master already considered a "voluminous record." In some cases, the supplemental documents are effectively "complete copies of the files in question," just as Special Master feared. Although it has not been served with copies of the 880 documents the MDWCAs Exhibit Index indicates they have tendered to the Court subsequent to trial, the State must agree with Special Master that such a tender is "most likely . . . cumulative and irrelevant." The State is significantly prejudiced by this wholesale dumping of cumulative and irrelevant evidence on the Court, as it muddies the trial waters, making it unclear what facts the MDWCAs are really basing their case on, and even what claims are being asserted. The State hereby objects to them on that basis.

## IV.    CONCLUSION

Based on the foregoing arguments and the substantial evidence in the record, the State of New Mexico requests that the Special Master adopt one of the alternative approaches proposed by the State in Part II above to quantify the water right amounts of the MDWCAs. The Court could reinstate the water right amounts set forth in the original orders adjudicating the water rights of the ten MDWCAs. The remaining two MDWCAs could be adjudicated their water rights in the same manner, that is, based upon the permits issued by the State Engineer. In the alternative, the Court could reinstate adjudication orders for six MDWCAs, adjudicate the water rights for the three pre-basin MDWCAs based on actual diversions, and adjudicate the remaining MDWCAs' water rights based on actual diversions within their permitted amounts.

With regard to the evidentiary objections raised prior to trial, during the course of proceedings, and in this pleading, if the Special Master does not adopt one of the two alternative approaches to quantifying the water right amounts of the MDWCAs proposed by the State, then the State asks that the Special Master reverse her ruling and allow the Meyer Report and the State's corresponding offer of proof be admitted into evidence.  In the alternative, the State renews its motion for a mistrial.  The State further asks that the Special Master reverse her ruling with regard to the post-trial tender of exhibits and hold the Mutual Domestics' post-trial tender inadmissible, and excluded from the trial record.

RESPECTFULLY SUBMITTED,

DL Sanders, General Counsel
Gregory C. Ridgley
Edward Bagley
Stacey J. Goodwin
Special Assistant Attorneys General
New Mexico Office of the State Engineer
Post Office Box 25102
Santa Fe, New Mexico  87504-5102
(505) 827-6150

**Counsel for Plaintiff,
State of New Mexico ex rel. State Engineer**

CERTIFICATE OF SERVICE

I hereby certify that copies of the State of New Mexico's Proposed Findings of Fact and Conclusions of Law, Objections to Evidentiary Rulings, and Memorandum Brief in Support were mailed to the following persons on this 22nd day of October, 2002:

Special Master Vickie L. Gabin
United States District Court
P.O. Box 2384
Santa Fe, NM 87504-2384

Mary E. Humphrey, Esq.
P.O. Box 1574
El Prado, NM 87529-1574

Bradley S. Bridgewater, Esq.
Lynn A. Johnson, Esq.
U.S. Dept. of Justice
Environment & Nat. Res. Div.
999 18th Street, Suite 945
Denver, CO 80202

Darcy S. Bushnell, Esq.
USDC-DNM
Water Adjudication Office
333 Lomas Blvd. NW
Box 270
Albuquerque, NM 87102

Lester K. Taylor, Esq.
Jessica Aberly, Esq.
Nordhaus, Haltom, Taylor,
Taradash & Frye
500 Marquette, NW, Suite 1050
Albuquerque, NM 87106

Fred J. Waltz, Esq.
Box 6390
Taos, NM 87571

Edward C. Bagley

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SE TECHNOLOGIES, INC.,

             Plaintiff/Counter-Defendant,

v.

                                         CIV No. 00-1511 LH/LFG ACE

SUMMIT ELECTRIC SUPPLY
COMPANY, INC.,

             Defendant/Counter-Claimant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on motions that involve proposed witness Yves Perreault and his preliminary report. Specifically, the Court will address Summit Electric's Objections to Magistrate Judge's Order of August 9, 2001 (Docket No. 176 in 00CV378)[1]; SE Technologies, Inc.'s Motion to Strike Unsworn Preliminary Report of Withdrawn Expert (Docket No. 38); and SE Technologies, Inc.'s Motion in Limine to Preclude Evidence Regarding Withdrawn Expert Witness Yves Perreault and Perreault's Preliminary Report (Docket No. 40).

For the reasons that follow, Perreault's preliminary report shall be admissible and a trial deposition of Perreault shall be allowed,  in the remaining four weeks before trial in this matter is

---

[1] The Court finds no pleading filed directly in response to these objections by SE Technologies, Inc.

1



EXHIBIT
A

scheduled to begin.  To be precise, SE Technologies, Inc.'s Motion to Strike Unsworn Preliminary

Report of Withdrawn Expert (Docket No. 38) is **denied**; SE Technologies, Inc.'s Motion in Limine

to Preclude Evidence Regarding Withdrawn Expert Witness Yves Perreault and Perreault's

Preliminary Report (Docket No. 40) is **denied**; and Summit Electric's Objections to Magistrate

Judge's Order of August 9, 2001 (Docket No. 176 in 00CV378) is **denied as being moot.**


## 1. Procedural Background

SE Technologies, Inc. ("SE") originally designated Perreault as an expert and provided a

preliminary report to Summit Electric Supply Co., Inc. ("Summit") on January 12, 2001.  SE

withdrew him as its expert witness on April 25, 2001,[2] the date set by Judge Garcia's January 26,

2001 Order (Docket No. 47 in 00CV378) as the last date to identify expert witnesses.  On that same

date, SE substituted John Cordio as its expert witness.  Discovery in this case closed on May 25,

2001.  Summit disclosed Perreault as a "may call" fact witness in the July 30 Pretrial Order,

approximately two months later.

At the end of July 2001, Summit filed a motion to compel SE to produce Perreault for an

August 10, 2001 deposition.  This motion was denied by Magistrate Judge Garcia on August 9, 2001

(Docket No. 174 in 00CV378).  In his ruling, Judge Garcia decided that Perreault's deposition could

not be taken, in part,  because he was not a timely disclosed fact witness.  Judge Garcia concluded

that Perreault could not be called as a fact witness.  Judge Garcia made neither reference to, nor

---

[2] In the Affidavit of Alan C. Torgerson (Ex. A to Mem. of Law in Support of SE's Mot. in Limine to Preclude Evidence Regarding Withdrawn Expert Witness Yves Perreault and Perreault's Preliminary Report), Mr. Torgerson stated:  "SE elected to withdraw Mr. Perreault as its expert witness because Mr. Perreault became unavailable because of his work assignment to a lengthy project in Sweden." (*Id.* at ¶8).

2

findings and conclusions regarding, Perreault's preliminary report.

## II. Perreault's Preliminary Report

SE has filed both a motion in limine to exclude and a motion to strike this report. In essence, SE seeks both non-consideration and exclusion of it on grounds that it is unsworn, hearsay and/or inadmissible under FED.R.EVID. 403.[3] In addition, SE seeks to preclude Summit from mentioning Perreault's role as a former expert witness for SE.

Summit counters that Perreault was an SE employee during the time of events giving rise to this lawsuit, that one of the factual statements in his report is based on knowledge acquired while he was an employee, is directly relevant to the issues in this case, and is admissible under FED.R.EVID. 801(d)(2)(B).

### A. Admissibility of this Report

In its motion to strike, SE argues that Perreault's report contains unsworn statements that are inadmissible summary judgment evidence. SE argues that this report must not be considered because it is not sworn or made under penalty of perjury.[4]

The Court notes that this report was provided to Summit by SE. SE makes no objections as to its authenticity. The very fact that SE produced this piece of evidence and tendered it to Summit as a report of its then expert is an important and distinguishing factor that must be considered in the

---

[3] Contrary to SE's arguments, Judge Garcia did not expressly rule on the admissibility of this report. Accordingly, I will evaluate this issue without any reference to any prior rulings by the magistrate judge.

[4] SE also contends that Summit's references to Perreault's report is a circumvention of Judge Garcia's August 9 order. As noted above, the Court has concluded that this report was not part of the scope of this August 9 order; consequently this argument is without merit.

3

equation of whether or not this report may be considered in the pending summary judgment motions, and whether or not it is admissible at trial.

SE urges the Court to construe Rule 56 too narrowly[5]. The Tenth Circuit has held that a nonmovant must make a showing that, "if reduced to admissible evidence," would be sufficient to carry the nonmovant's burden of proof at trial. *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992)(*quoting Celotex Corporation v. Catrett*, 477 U.S. 317, 327 (1986)). The nonmoving party must point to evidence that is *admissible*, in order to survive summary judgment. *See Adams v. American Guarantee and Liability Insurance Company*, 233 F.3d 1242,1246 (10th Cir. 2000); *see Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir. 1995).

Obviously hearsay evidence is inadmissible. Accordingly, the Court must evaluate the report to determine whether this report is hearsay, both for consideration in its summary judgment analysis and with respect to its potential admissibility at trial.

Under FED.R.EVID. 801(d)(2)(B), evidence is not hearsay if it "is offered against a party... and is a statement of which the party has manifested an adoption or belief in its truth."

I find the issue of admissibility of this report similar to one raised in the recent Tenth Circuit case of *Wright-Simmons v. The City of Oklahoma City*, 155 F.3d 1264 (10th Cir. 1998). In that Title VII case, the district court granted summary judgment to defendant. The district court opinion did not address the admissibility of an investigative report prepared by a City personnel director. Before examining plaintiff's evidence to determine if it was sufficient to survive summary judgment, the

---

[5] In addition to affidavits, Rule 56(c) contemplates the use of pleadings, depositions, answers to interrogatories, and admissions on file. This report may fall within the "admissions" category.

4

Tenth Circuit determined that this report was admissible. This was a two-page report, to which

interview notes were attached. Defendant argued that this report was inadmissible hearsay. Plaintiff

contended that neither the report nor the notes were hearsay under Rule of Evidence 801(d)(2)(B).

The Tenth Circuit concluded that this evidence was not hearsay and held that "even if the district

court ruled on the summary judgment motion without considering the report and attached notes, that

decision to exclude the evidence would itself constitute an abuse of discretion requiring reversal and

consideration of the report and interview notes." *Id.* at 1268.

In its analysis, the *Wright-Simmons* Court adopted a test that had been applied by the First

Circuit: "whether the surrounding circumstances tie the possessor and the document together in

some meaningful way." *Id.*,(quoting *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 870 (1st

Cir. 1997)(*citations and internal quotation marks omitted*)). *Pilgrim* held that a document is

sufficiently "tied" to the possessor "to the extent the adoptive party accepted and acted upon the

evidence". *Pilgrim*, 118 F.3d at 870. The *Wright-Simmons* Court stated that the Tenth Circuit

specifically adopted the First Circuit's approach to adoptive admissions. *Wright-Simmons*, 155 F.3d

at 1268.

In *Wright-Simmons*, the Court noted that the City Manager would not have sought an

employee's resignation had he not believed the report. This action signified acceptance of and

reliance on the contents of the report, and action upon its contents. "Because [the City Manager]

accepted the documents and acted upon them, we hold that neither the two-page report nor the

attached notes are hearsay, and are therefore admissible." *Id.* at 1269.

Similarly, in this case, SE solicited the preliminary report from Perreault and tendered it to

Summit in January 2001. Providing it to Summit signified SE's acceptance and adoption of the

5

contents of the report, and affirmative action on its contents. This report is sufficiently "tied" to SE, because SE accepted and acted upon the report. SE, via Mr. Torgerson's affidavit, has indicated that it withdrew Perreault as its expert due to his unavailability, not due to a lack of unreliability of his statements. SE has not contested the report's authenticity. I conclude that all of these factors indicate sufficient trustworthiness and reliability of truth in its contents, that the report is not hearsay, and that it is admissible evidence.

In *Wright-Simmons,* the personnel director's report was neither an affidavit nor a statement sworn under penalty of perjury, yet, following its Rule 801(d)(2)(B) analysis, the Tenth Circuit ruled that it was reversible error for the district court to exclude the report from its summary judgment analysis. By analogy, this Court is required to consider and to admit Perreault's report.

### B. Analysis Under FED.R.EVID.403

SE argues that even if otherwise admissible, this report must be excluded under Rule of Evidence 403.

FED.R.EVID.403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion or the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

SE argues that because Perreault's report was prepared in the early stages of litigation, that his role as an expert and his report have no probative value. Further, SE argues that any possible probative value will be substantially outweighed by the dangers of unfair prejudice to SE, and of misleading the jury. SE contends that unfair prejudice will result if Summit is permitted to refer to Perreault and/or his report, in the absence of Perreault's explanation, supplementation, and/or revision

6

of those opinions after considering additional information developed during the course of discovery. Finally, SE contends that it will be unfairly prejudiced by the mention of Perreault's role as a former expert and by the admission of his report, due to possible jury speculation as to why SE did not call its former expert as a witness.

I have carefully reviewed Perreault's preliminary report and I have conducted my Rule 403 balancing. I conclude that the probative nature of the evidence contained in the report outweighs any of the prejudicial concerns raised by SE. Furthermore, my decision, as set forth below, to allow a trial deposition of Perreault to be taken, will afford SE the opportunity to ask Perreault to explain, supplement or revise the statements contained in his report, thus alleviating that concern about possible prejudice raised by SE. The taking of this deposition, if used at trial, will eliminate jury speculation as to why SE did not call its former expert as a witness.

For these reasons, SE's motion to preclude this evidence under Rule 403 is denied. In addition, SE's arguments under FED.R.CIV.P.26(b)(4)(B) are inapposite, now that SE has withdrawn Perreault as its expert, and now that the Court has allowed Perreault's deposition to be taken.


## III. Deposition of Perreault

In light of my decision to admit the report of Perreault into evidence, I conclude that it would be unfair to deny the parties the opportunity to take his deposition. The taking of his deposition shall be allowed. In light of this approach, I conclude that Summit Electric's Objections to Magistrate Judge's Order of August 9, 2001 is moot and shall be denied.

**WHEREFORE,** for the reasons above stated, I conclude that SE Technologies, Inc.'s Motion to Strike Unsworn Preliminary Report of Withdrawn Expert (Docket No. 38) is **denied**; SE

7

Technologies, Inc.'s Motion in Limine to Preclude Evidence Regarding Withdrawn Expert Witness

Yves Perreault and Perreault's Preliminary Report (Docket No. 40) is **denied**; and Summit Electric's

Objections to Magistrate Judge's Order of August 9, 2001 (Docket No. 176 in 00CV378) are **denied**

**as being moot.**

      **IT IS SO ORDERED.**

                                              **UNITED STATES DISTRICT JUDGE**