IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

02 OCT 25 PM 2: 36

*[signature]*
CLERK-SANTA FE

| | |
|---|---|
| STATE OF NEW MEXICO, ex rel.<br>State Engineer, and the<br>UNITED STATES OF AMERICA<br>and the PUEBLO OF TAOS,<br>as Intervenor,<br><br>    Plaintiffs<br><br>v.<br><br>EDUARDO ABEYTA, et al.,<br><br>    Defendants | CIV. No. 69-7896 JC<br>Rio Pueblo de Taos<br><br>-and-<br><br>CIV No. 69-7939 JC<br><br>Supp. A |

## DEFENDANT MUTUAL DOMESTIC WATER
## CONSUMER ASSOCIATIONS' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE VICKIE L. GABIN, SPECIAL MASTER:

Defendant Mutual Domestic Water Consumer Associations (MDWCAs) submit the

attached proposed Findings of Fact and Conclusions of Law, in accordance with this Court's

Orders of July 17, 2002 and September 18, 2002. Because the MDWCAs have included legal

authorities in their proposed Conclusions of Law, they are not submitting separate briefs at

this time. Nor are they submitting additional arguments on the Court's evidentiary rulings.

Any references to pleadings previously filed with this Court are contained in

proposed Findings of Fact 5 through 8. Record references are indicated by volume and page

number (e.g., V. 1, p. 1) for references to the official transcript, by OSE and number (e.g.,

OSE 83) for references to Plaintiff's exhibits, and by MD and number (e.g., MD 204-A) for

references to Defendants' exhibits.

*3055*

## I. FINDINGS OF FACT

### A. Background Facts

1.   Defendants are twelve Taos-area mutual domestic water consumer associations (MDWCAs) organized pursuant to the provisions of the Sanitary Projects Act, N.M.S.A. §§3-29-1, et seq. (1978), or predecessor statutes, to supply water to their communities.

2.   The water rights of ten of the twelve MDWCAs were previously adjudicated by subfile orders entered in this cause; those orders were reopened in January, 1999 to determine or redetermine quantities and/or priorities.

3.   The water rights of the El Salto and Lower Arroyo Hondo MDWCAs were not previously adjudicated.

4.   The State Engineer declared that the Rio Grande Underground Water Basin, in which the twelve Taos-area MDWCAs are located, had ascertainable boundaries on November 29, 1956.  By so declaring, the State Engineer assumed jurisdiction over the underground waters in the Rio Grande Basin, including the Rio Hondo and Rio Pueblo de Taos stream systems, for the first time.

5.   In pleadings filed with the Court (Docket No. –New Mexico's Motion to Re-Open Previous Adjudications of Ranchos de Taos, Arroyo Seco, Upper Arroyo Hondo, Lower Des Montes, and Canon Mutual Domestic Water Consumer Associations), the State Engineer acknowledged that "the methods of quantification reflected in the initially permitted quantities varied widely for all of the Taos-area MDWCAs."  The State Engineer further acknowledged that in order to achieve fundamental justice and fairness, "a consistent treatment is needed for all."

6.   In this same pleading the State Engineer acknowledged that "the initial quantifications . . . of the twelve subject MDs used several different methods and that the Special Master and the Court . . . may well choose to go behind the permits and the sworn statements of the MDs' officers and members in an attempt to reach a more consistent result."  In urging the Court to reopen the previous water rights adjudications of five MDWCAs, the State Engineer stated that his "sole motivation is consistency of treatment."

7.   In this same pleading the State Engineer further acknowledged:
  - "Fundamental fairness demands equal treatment of all these similarly situated claimants."
  - "[C]onsistency of treatment is not merely a matter of sound discretion – it is required by law."
  - "[W]here all rights are being adjudicated in one lawsuit . . . the application of

different standards in determining the relative priorities is patently unfair and improper." (Citing State ex rel. Reynolds v. Allman, 78 N.M.1, 427 P.2d 886 (19 ) and stating that the quantity element of a water right should be treated no differently.)

8.    In a subsequent pleading (Docket No. –New Mexico's Reply to the Response of Ranchos de Taos and Arroyo Seco Domestic Water Consumer Associations to the State's Motion to Re-Open Previous Quantity Adjudications), the State Engineer acknowledges:
- "[I]n the sense that 'equal protection' demands consistent treatment of similarly situated entities, the very inconsistency of treatment of the Taos-are MDs in the permitting process, which the state recognizes, is a strong argument for revisiting all of these MDs/ subfile orders to ensure that the Court does in fact consistently adjudicate their rights according to the correct legal standard."
- "Justice and fundamental fairness can only be achieved if the court reopens all ten Mds' subfile orders."
- "The State Engineer has, over the years, applied inconsistent permitting standards to the ten permitted Taos-area MDs, but permitting a diversion right is not at all the same as adjudicating a water right based on beneficial use."
- "[The] effective classification [of the Arroyo Seco and Rancho de Taos MDWCAs] is based wholly upon a time element: they received more favorable treatment in their early interaction with the SEO, when MDs, a creature of the Sanitary Projects Act, were quite new."
- "[L]egislative classification based wholly upon a time element when the time selected has no reasonable relation to the object of the legislation, has been held repugnant to the provisions of the 14th Amendment to the Federal Constitution."
- "The state had, and still has, grave concerns about the quality of the evidence that would, at this late date, be offered to support such claims."

## B. The Sanitary Projects Act

9.    MDWCAs are organized pursuant to the Sanitary Projects Act (SPA). (V. 3, p. 9; MD 145.)

10.    The first state legislation establishing MDWCAs was passed in 1947 and was entitled "The Mutual Domestic Water Consumer Act." (V. 3 p. 9; MD 145.)

11.    Prior to passage of act:
- New Mexico lead the nation in infant mortality.
- Public health officials linked this high death rate to water quality concerns.
- Public health officials believed improvements in water supply and sewage treatment would lead to improvement of public health and drop in dysentary rates.
- State officials believed that unsafe and inadequate water supplies were a deterrent to public health and to progress in general.
(MD1, pp. 3-7.)

12.     The Act was passed to allow people to have abundant water to build a more hygienic environment and to enable them to use washing machines, sinks, bath tubs and other appliances. (MD 1, p. 7.)

13.     "The intent of the State in subsidizing these associations was to make safe water available to all of the people in rural communties." (MD 141. )

14.     Water quality is connected to public health. (V. 3, p. 28.)

15.     Public health is affected by the availability of wastewater systems. (V. 3, p. 29.)

16.     Before MDWCAs, the primary source of water for most rural communities was irrigation ditches and/or shallow wells. (V. 3, p. 18; OSE 83; MD 204-C.)

17.     Septic tank leakage resulting in contamination of groundwater is a health concern in many unincoroporated communities. (V. 3. pp. 20-21.)

18.     In general, MDWCAs are the only public water supply systems in the areas in which they are located. (V.4, p. 17.)

19.     Communities must have been in existence for at least 25 years before they can petition to create a MDWCA. (V.3, p. 11.)

20.     The New Mexico Environment Department has authority to regulate MDWCAs. (V. 3, pp. 6-8.)

21.     The Environment Department estimates that there are about 225 MDWCAs in New Mexico. (V. 3, p. 10.)

22.     MDWCAs are  public water supply systems. (V.3., p.8.)

23.     MDWCAs are local governments and political subdivisions of the state. (V. 3, p. 17.)

24.     MDWCAs are bound by the provisions of the Open Meetings Act. (V. 3, p. 16.)

25.     MDWCAs have the right to condemn land for easements and rights of way. (V. 3, p. 17.)

26.     MDWCAs have the authority to assume debt under revenue bond provisions. (V. 3, p. 17.)

27.     MDWCAs are authorized by statute to construct sanitation and sewer systems. (V.3, pp. 23, 32.)

28.     MDWCAs must allow any community member desiring to join to do so. (V. 3, pp. 16-17.)

29.  MDWCAs are required to report to at least three state agencies.  (V. 3, p. 101.)

30.  MDWCAs are required by law to sample their water.  (V.3, pp. 18-19.)

31.  MDWCAs are required to test for fecal coliform and other contaminants.  (V. 3, pp. 19-20.)

32.  MDWCAs must pay fees for testing water for contaminants.  (V. 3, pp. 21-22.)

33.  Water conservation fees are imposed on every operator of a public water supply system to pay for testing.  (MD 144, p. 1.)

34.  MDWCAs pay water conservation fees to the New Mexico Taxation and Revenue Department.  (V. 3, p. 106; MD 144.)

35.  Water conservation fees are based on the number of gallons used for a certain period of time.  (V. 3, pp. 106-108.)

36.  The Taxation and Revenue Department has developed default gpcd numbers for purposes of collecting money from public water supply systems that do not report specific usage.  (V. 3, p. 108.)

37.  The default usage factors used by the Taxation and Revenue Department for public community water supply systems that serve from 101 - 500 persons is 56,181 gallons annually (or 153 gpcd) and for systems that serve 501-1000 persons is 59,537 gallons annually (or 163 gpcd).  (MD 144, p. 7.)

38.  The Environment Department oversees the Capacity Development Program.  (V.3, p. 24.)

39.  The Capacity Development Program aids public water supply systems to improve managerial capacity for successful construction and operation of public water supplies. (V. 3, p. 24.)

40.  MDWCAs must go through the Capacity Development Program in order to obtain funding from the drinking water state revolving fund if the Environment Department determines that they do not presently have the capacity to operate and maintain their systems.  (V. 3, pp.24-25.)

41.  The federal Safe Drinking Water Act requires communities to go through the Capacity Development Program to obtain federal funds.  (V. 3, pp. 25, 28.)

42.  The Capacity Development Program assists with technical capacity development.  (V. 3, p. 26.)

43.  One aspect of technical capacity development is establishing that an MDWCA has sufficient water rights to deliver water to enough hookups in the community so that loans can be repaid.  (V. 3, pp.26-27, 39, 102.)

44.   The SPA does not limit the use of water from a mutual domestic well to indoor domestic use. (V. 1, p. 73.)

45.   The SPA places two limitations on the use of water from a mutual domestic well—commercial agriculture and commercial livestock production.. (V. 3, p.15.)

46.   MDWCAs may and often do provide water for fire protection. (V. 3, pp. 32-33.)

## C. OSE MDWCA Practices and Policies

47.   OSE personnel are not generally familiar with the SPA. (V. 10, p. 66.)

48.   OSE personnel do not know how many MDWCAs exist. (V. 1, p. 1; V. 2, p. 32.)

49.   The OSE has no written policies or procedures for quantifying MDWCA water rights. (V.1., p. 70; V. 2, p. 66. )

50.   The OSE has used a variety of ways to quantify MDWCA water rights. (V. 2, p. 66.)

51.   The only way that OSE policy or practices concerning MDWCAs can be ascertained is by looking through individual files. (V. 8, p. 218.)

52.   The OSE limits the quantity of water that can be transferred from a private domestic well into a MDWCA well. (V.1., p. 72.)

53.   The OSE limits the quantity of water that can be transferred from a private domestic well into a MDWCA well to the quantity previously used for indoor domestic uses. (V.1, p. 72.)

54.   There is no basis for the OSE practice of limiting transfers of water from individual wells into a MDWCA well to that quantity necessary for indoor uses. (V. 1, pp.76, 82.)

55.   Current OSE practices limit transfers from individual wells into MD wells to inside domestic uses irrespective of what a declaration or application may state. (V. 1, pp.94-95; V. 2, pp. 19, 38-39, 41; V.4, p.11-12, 114-15, 116; V. 8, p. 214; MD 270-A.)

56.   The OSE does not limit the outdoor uses of water from individual domestic wells—it allows the use of such water for gardening, and it allows the use of such water for irrigation purposes. (V. 1, p. 74.)

57.   Information distributed to prospective MDWCAs does not distinguish between pre- and post-basin wells with respect to transferring water rights into a MDWCA. (V. 4, p. 24.)

58.   The OSE has described "providing water to a community" and "providing domestic

water supplies" as a beneficial use of water.  (MD 231-C; MD 241-G.)

59.    In the late 1950's, the OSE allowed transfers of 3 af/a per individual well into MDWCA wells and into community systems.  (V.1, p.103, 150; OSE 83; MD 204-A; MD 204-C.)

60.    In 1955, the OSE allowed 33 well owners to transfer all their rights, or a total of 99 af/a, into the Town of Tatum well.  (MD 207-O.)

61.    In 1959, the OSE allowed additional well owners to transfer "all of their domestic well rights" or 3 af/a per well into the Village of Tatum water system, so that the Village had a total of 219 af/a.  (MD 204-II; MD 207-O.)

62.    In 1958, the OSE allowed the transfer of 3 af/a for each individual well that was transferred into Ranchos de Taos MDWCA.  (OSE 83; V. 8, p. 245.)

63.    In 1958, the OSE allowed the transfer of 3 af/a for each individual well that was transferred into the Arroyo Seco MDWCA.  (OSE 83; V.8, p. 270; MD 204-v.)

64.    In 1958, the OSE allowed the transfer of 3 af/a for each individual well that was transferred into the Ojo Caliente MDWCA.  (MD 204-A; MD 209-A,B,D,F.)

65.    In 1960, the OSE allowed 3 af/a for a school to be transferred into the Dixon MDWCA.  (MD 210-B.)

66.    Water rights for SPA associations were quantified by the OSE at 125 gpcd for a number of years prior to 1967.  (MD 204-F;  MD 204-H : OSE 83.)

67.    In 1960, the OSE used a figure of 125 gpcd to quantify rights for the Dixon MDWCA.  (MD 210-A, 210-B.)

68.    In 1961, the OSE used a figure of 125 gpcd to quantify surface water rights for the Upper Arroyo Hondo MDWCA.  (OSE 83.)

69.    In 1961, the OSE used a figure of 125 gpcd to quantify water rights for well users in the Santa Cruz MDWCA.  (MD 237-B, MD 237-C.)

70.    In 1961, the OSE used a figure of 125 gpcd to quantify water rights from surface water users into the Rio Chiquito MDWCA.  (MD 204-H; MD 212-A,B.)

71.    In 1961, the OSE used a figure of 125 gpcd to quantify water rights for the Valdez MDWCA.  (OSE, 83, p.15.)

72.    In 1962, the OSE used a figure of 125 gpcd to quantify water rights from well users into the Tesuque MDWCA.  (MD 213-A,B,C.)

73.    In 1963, the OSE used 125 gpcd to quantify water rights for the Llano Chimayo MDWCA.  (MD 248-A, B, C, D.)

74. In 1962 , the Upper Des Montes MDWCA filed an application for a permit to change place of use, based on 55 persons using 125 gpcd. (OSE 83, p. 23.)

75. In 1963, the OSE filed a memo stating that people in Des Montes did not need 125 gpcd but only 75 gpcd. (MD 196-39.)

76. In 1963, the OSE denied the Des Montes application in part, granting it based on 75 gpcd, not 125 gpcd. (MD 196-41.)

77. The OSE did not make a finding of impairment before denying the Des Montes application.

78. At some time before April 1971, the OSE reduced the quantity of water available to MDWCAs from 125 gpcd to 75 gpcd. (MD 204-F; MD 204-L.)

79. There were no OSE studies to support the reduction from 125 gpcd to 75 gpcd. (V. 1, p. 104.)

80. The OSE began quantifing water for MDWCAs at 75 gpcd, regardless of whether uses related to underground water or surface water. (MD 204-J.)

81. In 1965, a figure of 75 gpcd was used to quantify rights for people who had used water from wells and for people who did not identify prior use of water for the Upper Ranchitos MDWCA. (MD 198-1.)

82. In 1966, a figure of 75 gpcd was used to quantify water rights from wells transferred into the South Ojo Caliente MDWCA. (MD 249A, B, C.)

83. In 1967, a figure of 75 gpcd was used  to quantify water rights transferred from wells into the Chamita MDWCA. (MD 232-A, 232-B.)

84. In 1968, a figure of 75 gpcd was used to quantify water rights from surface water and wells transferred into the Lower Des Montes MDWCA. (OSE 83, p. 27-28.)

85. In 1969, the OSE approved El Rito Canyon's application using 75 gpcd for both surface water and underground water. (MD 204-J.)

86. In April 1971, the OSE was still using a figure of 75 gpcd as the amount to be transferred from existing wells into a MDWCA. (MD 204-L.)

87. In April 1971, the OSE had a policy stating what should be included on a declaration. (MD 204-L.)

88. OSE employees have instructed MDWCAs how to fill out declarations. (V. 4, p. 14-16, 18, 23; MD 204-L MD 204-Z;MD 233-C, 233-D ("Information needed to complete Amended Declarations should include the following:  name of family. . . Then, based on 60 gallons per person per day, we may compute an exact amount to

be claimed. When this information is received, I will draft the proposed Amended Declarations. . . ."); MD 270-A.)

89.  The OSE has used systemwide written instructions that set forth procedures for employees dealing with MDWCAs. (MD 204-s; MD 204-t; MD 270-A.)

90.  In May 1971, the OSE reduced  the quantity of water it would allow to be transferred from individual wells into a MDWCA from 75 gpcd to 60 gpcd. (MD 204-L, MD 204-U.)

91.  In May 1971, the OSE reduced the quantity of water it would allow for persons who had previously hauled water from a neighbor's well, ditch or stream to 15 gpcd. (MD 204-L, MD 204-U.)

92.  In May 1971, OSE would not allow transfers of 3 af/a per well, even if the well was or would be capped. (MD 204-L, MD 204-U.)

93.  On July 31, 1972, El Llanito MDWCA declared surface water rights of 2.27 af/a  for domestic uses based on 27 people using 75 gpcd. MD 246-B, MD 246-E5.  On August 14, 1972, El Llanito MDWCA declared  ground water rights of 2.604 af/a for 31 people at 75 gpcd. (MD246-D.)

94.  El Llanito filed an application for a permit to change location of well to use 2.64 af/a. (MD 246-G.)

95.  On May 23, 1973 the OSE informed El Llanito that it would deny the application in part because the OSE accepted only 60 gpcd for previous well uses and 15 gpcd for surface water uses. (MD 246-F. )

96.  The basis for denial of the permit was that the OSE only recognized transfers of 60 gpcd from wells and 15 gpcd from ditchs or hauling. (MD 246-F.)

97.  There was no finding of impairment in the denial of the El Llanito permit.  (MD 246-F; V.1 p. 171.)

98.  In 1977, water rights for the Upper Canoncito MDWCA were quantified on the basis of 60 gpcd for people previously using wells and 15 gpcd for others, for a total of 3.51 af/a for 81 people. (MD 250-A, 250-B.)

99.  In 1978 the OSE used a formula to estimate water use by the Lower Des Montes MDWCA by multiplying 3 persons per family x 75 gpcd. (MD 199-22.)

100.  In 1979, the OSE used a formula to estimate water use by Valdez by multiplying 26 families x 3 persons per family x 60 gpcd. (MD 195-35.)

101.  In 1990, the OSE used a formula to estimate water use by Upper Ranchitos by multiplying 60 gpcd by the number of people in the association. (MD 198-43.)

102. On January 24, 1962, the OSE entered four Orders, each one stating that one of four MDWCAs did not need to file Proof of Beneficial Use:
   - Valdez;
   - Ranchos de Taos;
   - Arroyo Seco; and
   - Ojo Caliente.
   (MD 209-F; OSE 83.)

103. Consent Orders for several MDWCAs in the Upper Pecos Underground Basin refer to "municipal-MDWCA" and provide for a specific quantity of water, but also provided that only a certain portion of that quantity was subject to proof of beneficial use by a date certain. (MD 216-B; 218-A; 219A; 227A; 224A; 222A; 223A; 225A; 226.)

104. The Order that adjudicated the water rights of Cordova MDWCA was entered upon the OSE's offer of judgment. (MD 231-A.)

105. The Cordova MDWCA has a priority date of 1954. (MD 231-A.)

106. The 1975 Order for Cordova MDWCA in the Upper Pecos Underground Basin described the uses as "community domestic" and provided for a specific quantity of water (81 af/a), but also provided that only a certain portion of that quantity (65 af/a) was subject to proof of beneficial use by a date certain. (MD 231-A.)

107. The OSE granted extensions of time to apply water to beneficial use to Cordova when it showed growth from 99 connections with 79 present users in 1993 to 75 active connections and 102 members in 1996. (MD 231-B; 231-C, D.)

108. The OSE has declared that "it is the public interest to grant extensions of time for municipalities . . . holding permits for water in excess of their immediate requirements if it is reasonable to believe that the future growth of the municipality will require the amount within a reasonable time." (MD 206(B)1.)

109. OSE personnel agree that MDWCAs should be treated comparably to municipal utilities in terms of quantifying and adjudicating their water rights. (V. 1, p. 55.)

110. The OSE recently approved an application for a supplemental well based on a declaration for water use reflecting future expansion of the system from 54 connection to 115 connections. (V. 3, pp. 104-105; MD 245-B.)

111. One OSE rationale for requiring meters is "to protect water rights of others in your area." (MD 194-36.)

112. The OSE allows "payback" for overdiversions by requiring an entity to divert less in the following year. (V.8, p. 256.)

113. However, the OSE does not allow "underdiversions" to be applied to

"overdiversions." (V. 4, p. 172.)

114. The OSE has no written policies concerning enforcement actions for overdiversions. (V. 8, p. 254.)

## D. OSE Domestic Well Practices and Policies

115. Each domestic well permitted under §72-12-1 of the Groundwater Code may divert up to 3 af/a without limitation. (V. 1, pp. 123-124; V. 4, p. 24.)

116. OSE personnel refer to domestic well permits as "3.0 af permits." (MD 204-BB.)

117. An individual who has a well permitted under §72-12-1 is allowed to use up to 2, 678 gpcd. (V. 1, p. 124.)

118. Domestic well users are allowed to use water for both indoor and outdoor purposes. (V.1, p. 125; MD 204-K.)

119. Individual domestic well owners do not have to transfer water rights into their wells. (V.1, p. 125.)

120. The OSE can deny a §72-12-1 well permit if there is no water available. (V.2, pp. 131-132.)

121. §72-12-1 well users do not have to provide proof of beneficial use. ( V. 2, p.64; V. 4, p. 32.)

122. Conservation of water is not a consideration by the OSE when granting §72-12-1 permits. (V. 2, p. 87; MD 204-cc.)

123. The OSE has granted §72-12-1 permits to divert up to 3 af/a for future homes. (V. 1., p. 171; MD 204-PPPP.)

124. OSE personnel have defended allowing multiple dwellings to hook up to one domestic well in order to allow families to have water for their children, should they subdivide land. (MD 204-z.)

125. Pursuant to OSE practices, §72-12-1 wells also have been used for commercial purposes. The OSE has allowed water from domestic wells to be used for car washes, hotels and motels, restaurants, stables, swimming pools and landscaping. (MD 204-BB; MD 204-ZZZZ; V. 2, p. 45.)

126. In general, the OSE must make sure that any new groundwater appropriation is offset by retirement of existing valid surface water rights. (V. 2, p. 204.)

127. The OSE does not require retirement of existing valid surface water rights when it approves §72-12-1 groundwater appropriations. (V.2, p. 204; MD 204-j; MD 204-N.)

128. The OSE has recognized that permitting new domestic wells is contrary to the concept of prior appropriation. (MD 204-FFFF; MD 204-l.)

129. The OSE has recognized that domestic wells will affect surface water supplies. (MD 204-FFFF, 204-l.)

130. In 1973, State Engineer Steve Reynolds proposed changing the law of domestic wells by limiting the amount of water that could be diverted by one household to .75 af/a. (MD 204-K; MD 204-AAAA.)

131. This reform attempt to limit diversions from domestic wells was met with resistance because of alleged administrative inconvenience. (MD 204-AAAA.)

132. In 1970, OSE policy provided that a person could not use domestic well permits to create a utility. (MD 204-BBB.)

133. In 1970, OSE practices allowed a subdivider to drill as many wells as s/he wished, provided the total appropriation from each well did not exceed 3 af/a. (MD 204-RR; MD 204-N.)

134. In 1978, the OSE recognized that builders were using domestic well permits to create subdivision water supply systems. (MD 204-XXXX.)

135. In 1978, the OSE suggested changes to the ground water regulations to allow a "user" to acquire a §72-12-1 permit; a builder could then acquire a permit, use it while building a home, and then sell the home and the permit and well to the ultimate "user." (MD 204-XXXX.)

136. In 1981, OSE staff suggested reforming domestic well policy so that developers could not use §72-1-2-1 permits to create water supply systems. (MD 204-YYY.)

137. This 1981 reform of domestic well policy was met with resistance. (MD 204-TTT.)

138. In 1993, Chief of Water Rights D. N. Stone expressed concerns that the use of individual wells for subdivision development would substantially affect existing rights in a fully appropriated system. (MD 204-v, pp2-3.)

139. The State Engineer expressed concerns that the use of individual wells for subdivision development would substantially affect existing rights in a fully appropriated system. (MD 204-K(1973); MD 204-l.)

140. Developers can drill an unlimited number of wells under §72-12-1 if they get a "Condition 9" permit. (V. I, p. 127-129; MD 204-N, paragraph 4; MD 204-XXXX.)

141. The OSE specifically condones the use of "Condition 9" wells by developers. (V.1, p. 129.)

142. Current OSE practice allows unlimited "Condition 9" wells. (V. I,. p. 164.)

143. At least two subdivisions have used §72-12-1 wells to create water supply systems with no limitations on the use of water for outdoor purposes. (V. 1, p. 165.)

144. Vista Redonda is a subdivision that the OSE has allowed to use §72-12-1 wells to create a water system. (V. 1, p. 165; V. 2, p. 91; MD 191-G.)

145. The OSE allows Vista Redonda to divert a full 3 af/a from each well. (V. 2, p. 95; MD 191-G; MD 204-SSSS.) The OSE allows Vista Redonda to use water from the wells for landscape irrigation. (V. 2, p. 95; MD 191-G; MD 204-SSSS.)

146. Valley Vista subdivision received approval to use 8 §72-12-1 wells to divert a full 3 af/a per well. (MD 207-G-1.)

147. A "cluster well" is a §72-12-1 well permitted for multi-household purposes. (V.II, p. 73, 79.)

148. OSE practices have allowed the granting of "cluster well" permits. (MD 204-w, p.1.)

149. Subdivisions have used "cluster wells" to establish water supply systems. (MD 204-w, p. 2; MD 204-z, p.1; V. 2, p. 80.)

150. The OSE has permitted several "cluster wells" within one subdivision. (V. 2, p. 79.)

151. Use of "cluster wells" by subdivision developers bypasses provisions of the Subdivision Act requiring community water systems. (MD 204-w, attachment 1.)

152. Various OSE personnel have been concerned about the granting of "cluster well" permits and abuses of domestic well permits:
   - In 1993, State Engineer Eluid Martinez organized a study. (MD 204-w, p. 1. )
   - In 1994, there was a proposal to limit "cluster wells" as well as "Condition 9" wells. (MD 204-aa, p. 3.)

153. The OSE has received complaints about subdivision developments using "cluster wells" next to community wells. (MD 207-A-2; V. 2, p. 131; MD 201-A-2.)

154. OSE proposals to limit "cluster wells" have been met with resistance. (MD 204-bb; MD 204-cc.)

155. The OSE does not have a current policy on "cluster wells." (V. 2, pp.83, 102.)

## E. Taos-Area Domestic Wells Permitted by OSE

156. In the square mile section in which Arroyo Seco's well is located, the WATERS

database lists 17 wells.  (V.10, p. 189; MD 252-A.)

157. In the two sections in which Arroyo Seco's and El Salto's well lie, the WATERS database lists 45 wells.  (V. 10, p. 189; MD 252-B.)

158. In the square mile section in which Canon MD's well is located, the WATERS database lists 56  wells.  (V. 10, p. 190; MD 253-A.)

159. In the square mile section in which Llano Quemado MD's wells are located, , the WATERS database lists 7 wells.  (V. 10, p. 190; MD 255-A.)

160. In the 4 sqaure mile sections near the Llano Quemado MD wells, the WATERS database lists 16 wells.  (V. 10, p. 190; MD 256-A.)

161. In the square mile section in which the Lower Arroyo Hondo MD well is located, the WATERS database lists 7 wells.  (V.10, p. 190; MD 256-A.)

162. In the square mile section adjacent to that in which the Lower Arroyo Hondo MD well is located, the WATERS database lists 6 wells.  (V. 10, p. 190; MD 256-B.)

163. In another section adjacent to that in which the Arroyo Hondo MD well is located, the WATERS database lists 14 wells.  (V. 10, pp. 190-191.)

164. In the section in which the Lower Des Montes MD well is located, the WATERS database lists 36 wells.  (V. 10, p. 191; MD 257-A.)

165. In a section adjacent to that in which the Lower Des Montes MD is located, the WATERS database lists 10 wells.  (V. 10, p. 191; MD 257-B.)

166. In two sections near the location of the Talpa well, the WATERS database lists 18 wells.  (V.10, p. 191; MD 259-A.)

167. In the section in which the Upper Arroyo Hondo well is located, the WATERS database lists 13 wells.  (V. 10, p. 191; MD 260.)

168. In the section in which the Upper Des Montes MD well is located, the WATERS database lists 45 wells.  (V. 10, p. 191; MD 261.)

169. In the section in which the Valdez MD well is located, the WATERS database lists 39 wells. (V. 10, p. 191; MD 263.)

170. Records of the Water Rights Division of the OSE show that by 1980, there had been 14 domestic wells drilled near the Valdez MDWCA wells.  (MD 206-G.)

171. The WATERS database is incomplete.  (V. 2, p. 138.)

### F. Domestic Uses of Water

172. All persons within the State of New Mexico need water for domestic purposes, and all persons within the State of New Mexico share the same basic needs for water. (V. 10, pp. 67-68.)

173. OSE personnel have defined "domestic use" as that necessary to provide for good sanitary living conditions for the public and perhaps in many cases to provide water to enable one to develop a landscape that provides them with an aesthetic environment that they are happy with." (V. 10, pp. 125-126.)

174. The OSE defines "domestic uses" for purposes of §72-12-1 wells as including drinking, food preparation, bathing, washing clothes and dishes, flushing toilets, evaporative cooling, watering lawns and gardens, and livestock watering. (V. 10, pp. 66-67; MD 183, p. 10.)

175. There are no practical differences in the uses of water for domestic purposes whether the source is an individual domestic well or whether it is a MDWCA well. (V.1, p. 73-74; V.2, p. 45, p. 193; V.4, p. 31-32.)

176. Washing clothes is a domestic use of water, whether performed indoors or out. (V. 10, p. 73; V. 1, pp. 212-213.)

177. Use of water when making adobes for one's personal dwelling is a domestic use of water. (V. 10, p. 74.)

178. Use of water for plastering and maintaining one's personal dwelling is a domestic use of water. (V. 10, p 74.)

179. Use of water to maintain your domicile is a domestic use of water. (V. 10, p. 74.)

180. Using water to create heat from steam is a beneficial use of water. (V. 10, p. 70.)

### G. Quantifying Water Rights

181. The quantification of water rights in New Mexico is inconsistent and not uniform. (V. 1, p. 59.)

182. Actual beneficial use is not the only basis for adjudicating water rights. (V. 1., p. 58-59.)

183. When calculating the amount of water necessary for a community water system, the withdrawal or diversion amount is relied upon rather than the depletion amount. (V. 10, p. 91.)

184. It is reasonable to consider system losses when calculating how much water is

necessary for a community water system. (V. 10, p. 92; MD 183, p. 2.)

185.   It is reasonable to consider water for fire protection when calculating how much water is necessary for a community water system. (V. 10, p. 97-99.)

186.   Pumping records are not the best evidence of the quantity of water actually put to beneficial use. (V. 1, p. 58; V. 2, pp. 24-25.)

187.   Many factors should be considered when adjudicating a mutual domestic water right. (V. 1, p.58.)

188.   One factor that should be considered when adjudicating a mutual domestic water right is reasonable future use. (V.1, p. 59,61-63.)

189.   One factor that should be considered when adjudicating a mutual domestic water right is well capacity. (V. 1, p 65.)

190.   Another factor that should be considered is the declaration. (V. 1., p. 58.)

191.   Declarations of water rights can be done in a variety of ways. (V. 1, p. 60-63.)

192.   Early mutual domestics recorded prior individual usage through several different documents, including declarations and/or affidavits. (OSE 83; MD 204-C.)

193.   The OSE regarded individual declarations to be inefficient. (MD 204-C.)

194.   Without metering wells, you have to estimate the amounts of water used. (V. 2, p. 195.)

195.   When metered, small community wells typically use turbine meters that are located immediately downstream of the well. (V. 5, pp. 92-93.)

196.   In a turbine meter, water flows past a spinning turbine, which registers a flow rate; the totalizer, much like an odometer, reflects the total number of gallons pumped. (V. 5, p. 92.)

197.   The life and effectiveness of a flow meter, designed to pump clean water, is affected by both the groundwater itself, which is often highly mineralized, containing different particulate matter, and the well-drilling process. If a well is not sufficiently developed, or cleaned up immediately after drilling, particulate matter can end up in the meter, resulting in almost immediate metering problems. (V. 5, pp. 93-99.)

198.   Water meters are generally accurate for a given period of time, or for a certain volume of water, after which they should be cleaned, damaged or worn parts replaced, and calibrated. (V. 5, pp. 100-102.)

199.   Meters are also affected by the scale that comes off of the well casings, as well as the

"precipitation" that forms inside the well where the water comes in contact with the air and atmospheric pressure.  (V. 5, pp. 100-101.)

200.   Meter calibration ensures that the meter is accurately reading water flow, based on the manufacturer's standards.  (V. 5, pp. 101-102.)

201.   The submersible pumps typically seen in small community wells are generally capable of running all the time (24 hours a day) and indefinitely, if necessary.  (V. 5, pp. 102-104, 124-125.)

202.   Well metering problems can remain hidden from the actual water users for long periods of time.   Meter calibration problems can go undetected for years at a time. (V. 5, pp. 105-107.)

203.   Because small community water systems are maintained by volunteers, maintenance tends to be a chronic problem.  (V. 5, p. 108.)  Maintenance requires training and is expensive, due to the specialized equipment involved.  (V. 5, pp. 108-109.)

204.   As a water meter ages and is affected by particulate matter within the system, it will typically reflect fewer gallons used than actually used.  As the turbine wears and things become lodged within the meter, turbine rotation is slowed down, resulting in inaccurate readings.  (V. 5, pp.110-111, 136.)

205.   Because pumps and meters are sized for particular applications, accurate meter readings also require that the meter be sized for the application in question.  (V. 5, pp. 113-114.)

206.   Meters can also be misread.  Because different meters have different multipliers, totalizer amounts can be off by as much as a magnitude of 10 or 100.  (V. 5, pp. 115-117, 134-136.)

207.   Meter readings are not an accurate way of determining water consumption for the further reason that they fail to reflect leaks in system that occur downstream of the meter.  (V. 5, pp. 117-118.)

208.   All systems tend to have some system loss due to leaks.  (V. 5, p. 139.)

209.   In the northern Rio Grande basin, only 10 percent of the water meter users that should report meter readings do so.  (V. 8, pp. 88-89.)

210.   The majority of the Taos-area MDWCAs report meter readings.  (V. 8, p. 89.)

211.   Meter readings and meter reading forms submitted to the State Engineer are not always filled in properly.  (V. 8, p. 92.)

212.   The meter reading data submitted by the Taos-area MDWCAs reflects various problems in providing accurate data:  multipliers are left off, digits are transposed; multiple wells are confused with one another, reporting periods are skipped or

reporting periods overlap, roll-overs are skipped, actual water usage is reported rather than meter readings, and readings are inconsistent due to the use of different meter readers. (V. 8, pp. 112-118, V. 9, p. 68, 85.)

213. Additional inaccuracies reflected in the Taos-area MDWCA meter readings include: failure to provide readings for all wells (V. 8, p.171-172), inconsistent submission of readings (V. 8, pp. 173-174), confusion concerning water usage when meters are replaced (V. 8, pp. 175-177), confusion of readings between MDWCAs (V. 8, pp. 177-178), use of inconsistent documentation (V. 8, pp. 186-187), uncertainties as to the source of the documentation (V. 8, p. 187, 191, V. 9, p. 39, 88), obvious inconsistencies in the numbers reported (V. 9, p. 33-35), trouble making sense of meter readings (V. 9, pp. 38-39), use of uncalibrated meters (V. 9, pp. 67-68), and use of estimates, which are not allowed by the State Engineer (V. 9, p. 97.) (See also V. 9, p. 124.)

214. OSE personnel discussed Canon MDWCA rights as "Mendenhall" rights. (MD 201-7.)

215. Whether a water rights owner can show that he/she has been working on placing his full declared right to use is a factor that should be evaluated for diligence. (V. 2, p. 197.)

216. The OSE can grant extensions of time to show beneficial use as long as diligence is shown. (V.2, p. 156; V. 2, p. 163.)

217. Many factors determine whether a well can pump 100% of the time. (V.2, p. 182.)

218. The OSE does not accept 100% of declared rights based on well pumping capacity. (V.2 2, p. 59; MD 207-Q-1.)

219. The OSE accepts only up to 60% of declared pumping capacity. (V. 2, p. 60; MD 207-Q-1.)

220. The OSE has no studies justifying the 60% limit. (V. 2, pp. 61, 106, 156-157.)

221. The OSE has used multipliers other than 60%.

222. The OSE has used a multiplier of 81.3%

223. In 1977, the OSE found that the Thoreau MDWCA well pumped between 81%- 97% of time. (MD 205-F.)

224. In 1998, the State Engineer approved an application for a supplemental well for Moquino MDWCA where the underlying 1993 declaration claimed a right based on pumping 100% of the time. (V.4, pp. 28-30, 44.)

## H. Reasonable Quantities of Water for Domestic Use

225.  The legislature has expressed an opinion that the uses enumerated under §72-12-1 are a small amount of water. (V.2, p. 193.)

226.  The OSE has construed 3 af/a to be a negligible amount of water. (MD-204-v, p.2.)

227.  A reasonable way to determine actual water usage considers the number of people using the water. (V.1., p.134.)

228.  It is appropriate to consider system losses when calculating how much water is needed for a community water system. (V 10, p. 92; MD 183, p. 2.)

229.  Twenty percent (20%) is a reasonable quantity of unaccounted-for water in a water system. (MD 183, p. 2.)

230.  Unaccounted-for water includes measuring errors, transmission losses and water used for fire fighting. (MD 183, p. 2, 16.)

231.  MDWCA use of water for firefighting purposes is a proper use of water. (V. 2, p. 37.)

232.  The OSE under Steve Reynolds conducted an in-house survey of actual water use from the late 1950's through early 1970's. (V1, pp. 157-162; MD 2-4-AAA; V. 2, p. 69; MD 204-GGG.)

233.  The OSE in-house study is the only study attempting to measure actual use of water by household in an attempt to determine reasonable quantity of water for individual household uses. (V.1, p. 162.)

234.  In 1970, the average per capita use of OSE employees was 194 gpcd. (MD 204-GGG.)

235.  In 1974, actual use by OSE personnel ranged from a high of .73 af/a to a low of .28 af/a. (MD 204-LLL.)

236.  Actual use by a former chief of the OSE Water Rights Division ranged from a low of 157 gpcd in 1960 to a high of 605 gpcd in 1970. (MD 204-AAA.)

237.  IN 1964, the OSE estimated that the per capita use in Portales, NM at between 160-180 gpcd. (MD 207-J.)

238.  The OSE estimated that 1.162 af/a per residence would be needed to supply the City of Deming. (MD 204-WW.)

239.  In 1970, the average use per home in Rio Rancho Estates was 0.67 af/a. (MD 204-OO.)

240. In 1995, the United States Geographical Survey estimated that the average use of water for persons in public water-supply systems in the Rio Grande Basin was 148 gpcd. (V. 10, p. 122; MD 173.)

241. In 1995, the USGS estimated that the average use of water for persons in public water supply systems in the State of New Mexico was 136 gpcd. (V. 10, p. 122; MD 173.)

242. The OSE provided figures to the USGS for its 1995 report. (V. 10, p. 122.)

243. Municipalities generally use the figure of 200 -250 gpcd to plan for future growth. (V. 2., p.23-24.)

244. The average gpcd for Albuquerque residential use is 144. (V. 10, p. 121.)

245. The OSE estimates that the average gpcd for well users in Corrales is 150. (V. 10, p. 157.)

246. The Aamodt settlement agreement regarding private domestic wells provided for an amount of 0.7 af/a or historic beneficial use to be proven up within 10 years from date of settlement to be adjudicated to each private domestic well. (MD 204-t, p. 10.)

247. The Aamodt settlement agreement regarding private domestic wells did not restrict well use to indoor uses. (MD 204-t, p. 10.)

248. In 1988, the New Mexico federal district court found that water use from a domestic well diverting 0.50 af/a for indoor uses, 0.07af/a for irrigation of 1300 square feet and 0. 25 af/a for livestock water, or a total of 0.82 af/a, was "de minimis" and need not be adjudicated. (MD 143.)

249. In 1973, State Engineer Steve Reynolds proposed that .75 af/year would be a reasonable amount of water for a household of five persons to be diverted from an individual well. (MD 204-K.)

250. In 1973, the OSE determined that 0.75 af/a was sufficient water for "the requirements of in-house use in a residence occupied by 5 people using 80 gallons per person per day with enough remaining for the irrigation of about 44 square feet." (MD 204-N.)

251. IN 1973, 20% of all domestic well permits monitored used more than .75 af/a. (MD 204-AAAA..)

252. Current OSE personnel agree that .75 af/a is a reasonable amount of water for a household of five persons. (V.1, pp. 155-157; V.2, p. 60.)

253. Three-quarters (.75) of an acre-feet per year is a reasonable about for water for a household of 5. (MD 204-K; MD 204-JJ.)

254. A domestic well using 3 af/a can support 6 households with moderate landscaping.

(MD 204-z, p.1.)

255. Installation of water saving appliances was not required until January 1, 1994. (MD 183, p. 16.)

256. All the MDWCAs in this proceeding were established before 1994 and the appliances of the majority of their members predate 1994.

257. The OSE has quantified the amount of water necessary for a person to dine 3 times daily at 10 gpcd. (MD 207-S-2. MD 207-2-6 .)

258. It is reasonable to assume that a person taking a shower will use 30 gallons per day. (MD 183, p.17, 19; MD 184, p. 8.)

259. It is reasonable to assume that each person flushes a toilet six times daily. (MD 184, p. 8.)

260. In the early 1950's toilets used 7-8 gallons per flush. (MD 184, p. 8; V.10, p.101.)

261. It is reasonable to assume that each person used 42 gallons a day flushing toilets in the 1950's. (MD 184, p. 8; V. 10, p. 103.)

262. Until the 1980's, toilets used 5.5 gallons per flush. (MD 184, p. 8.)

263. It is reasonable to assume that each person used 33 gallons per day flushing toilets before the 1980's.

264. It is reasonable to assume that before the 1980's, a person used from 37 to 48 gallons of water each day flushing toilets.

265. It is reasonable to assume that toilet leakage is 20%. (MD 184, p. 8.)

266. It is reasonable to assume that toilet leakage is from 4-10 gallons per person per day.

267. Pre-1980 showerheads flow rates ranged from 5-8 gallons per minute. (MD 184, p. 8.)

268. It is reasonable to assume that a person spends 5 minutes daily taking a shower. (MD 183, p. 19.)

269. It is reasonable to assume that before 1980, a person used 25-40 gallons each day for showers.

270. Before 1980, a kitchen faucet flowed at 3-7 gallons per minute. (MD 184, p. 8.)

271. Before 1980, bathroom faucets had a flow rate of 3-7 gallons per minute. (MD 184, p. 8.)

272. It is reasonable to assume that a person washes his/her hands for 30 seconds after each toilet use.

273. It is reasonable to assume that a person uses from 9-21 gallons of water each day for handwashing.

274. It is reasonable to assume that a person consumes 2-5 gallons of water each day for drinking and eating.  (MD 183, p. 58 .)

275. It is reasonable to assume that it takes 20 gallons to wash 8 place settings of dishes, or an average of 2.5 gallons per person per setting.  (MD 184, p. 8.)

276. It is reasonable to assume that a washing machine uses 45 gallons of water per load.  (MD 184, p. 9.)

277. It is reasonable to assume that 12.9 gallons of water per person per day is used in washing clothes.  (MD 183, p.19.)

278. It is reasonable to assume that a person before 1980 used up to 125 gallons of water each day for domestic uses without outside irrigation use.  (V.10, p. 101-108, MD 285.)

279. The OSE has determined that 23.14 af/a (203 x 0.24 af) is a sufficient quantity of water for 70 homeowners.  (MD 204F-4.)

280. The OSE has quantified and allowed 0.24 acre/feet for each of 203 empty lots.  (MD 207-F-2.)

281. The OSE has quantified motel room use at 60 gpcd.  (MD 207-S-2, 207-S-6.)

282. Annual water needed for stock varies depending on the source of the water.  (MD 207-R-7.)

283. It takes more water if the source is a ditch or stream than if the source is a well.  (MD 207-R-7.)

284. It is reasonable to assume that 10 chickens will consume 0.8 gallons of water per day.  (MD 183, p. 53.)

285. It is reasonable to assume that a beef cow will consume 10 gallons per day.  (MD 183, p. 50.)

286. It is reasonable to assume that a milk cow will consume 20 gallons per day.  (MD 183, p. 52, MD 204-K.)

287. A hog will consume between 3-4.5 gallons of water per day.  (MD 183, p. 53; MD

207-R-3.)

288.    It is reasonable to assume that a horse will consume 12 gallons of water per day.  (MD 183, p. 53.)

289.    It is reasonable to assume that a sheep will consume 2 gallons of water per day.  (MD 183, p. 53.)

## I. The Taos-Area MDWCAs--Common Facts

290.    All twelve defendants were organized pursuant to the Sanitary Projects Act, or its predecessor, the 1947 Mutual Domestic Water Consumers Act.

291.    Before 1947, people in each of the twelve communities used water for domestic purposes in much the same way.  (V. 5, pp. 2, 199; V. 6, p. 5; V. 7, pp. 61-62, 90-98, 140; V. 8, p. 23.)

292.    Before 1947, there were many large families.  (V. 5, pp. 20, 183; V. 6, p. 106; V. 7, pp. 91, V. 8.)

293.    Before 1947, the children in the families had the task of hauling water.  (V. 5, p. 42; V. 6, p. 106, 233; V. 7, pp. 99-100.)

294.    Before 1947, people did not obtain water for domestic purposes from one source but rather used a variety of sources, including shallow wells, springs, acequias and rivers, depending on the particular domestic use.  (V. 3, pp. 48, 68, 72-76; V. 4, pp. 67, 157; V. 5, pp. 5, 19-20, 25-27, 188; V. 6, pp. 5-6; V. 7, pp. 61-63, 99, 196, 245; MD 194-34.)

295.    People would divert water from ditches into large cisterns or ponds near their house for domestic and livestock use.  (V. 5, pp. 7, 25-27; V. 7, p. 57-58.)

296.    More than one family might share a well.  (V. 3, p. 68; V. 5, pp. 21-24.)

297.    Before 1947, families grew much of their own food in gardens and in irrigated fields.  (V.3, p. 72, 73, 79; V. 4, pp. 78-79; V. 5, pp. 48, 51-52, 185; V. 6, p. 107; V. 8.)

298.    Before 1947, people would often have flower gardens near their houses.  (V. 5, pp. 48-53, 196.)

299.    Before 1947, people raised livestock for their own consumption, including beef cows, pigs, sheep, and poultry field work.  (V. 3, pp. 49-51, 53-57; V. 4, pp. 73-77; V. 5, pp. 14-15, 27-28.)

300.    Before 1947, most families had horses that they used for transportation and fieldwork.  (V. 4, pp. 73, 77; V. 5, pp. 27-30, 35.)

301.    Before 1947, livestock was allowed to obtain water from acequias, rivers and

watering troughs. (V. 3,pp. 71-72; V. 4, pp. 49, 78; V. 5, pp. 35, 71-72, 191.)

302. Before 1947, families processed their own food by canning, grinding crops and by butchering. (V. 3, pp.33, 52; V. 4, pp. 76, 79-82; V. 5, pp. 15-16, 28, 30, 191; V. 6, pp. 227-230; V. 7, pp. 180-246.)

303. Before 1947, families would wash woolens, mattresses, fleece, jergas and bedding either near acequias or rivers or hot springs, using the natural flows to rinse. (V. 3, pp. 61-63; V. 4, pp. 67-68, 71; V. 5, pp. 9-12, 32, 54, 56, 193-195; V. 6, p. 236.)

304. Before 1947, people kept hot water heating in the calenton of their woodstoves throughout the day, providing a constant source of hot water for drinking and cleaning and providing steam for heating and moisturizing V. through evaporation. (V. 3, pp. 52; V. 4, pp. 22, 88, 89; V. 5, pp. 8, 13, 22, 34, 199; V. 6, pp. 5, 233.)

305. Before 1947, people washed their clothing frequently. (V. 4, pp. 67, V. 5, pp. 54; V. 6, p. 233.)

306. Before 1947, people bathed frequently. (V. 4, pp. 90-92.)

307. Before 1947, people built their own houses, using water to manufacture adobes. (V. 3, pp. 78-79; V. 4, pp. 87.)

308. Before 1947, people in the communities were free to use as much water as necessary to make plaster for the interior and the exterior of their houses and their churches and schools. (V. 3, pp. 78-79; V. 4, V. 5, pp. 8, 16, 24, 34.)

309. Before 1947, people were free to use as much water as necessary to bathe; to cook and wash dishes; to drink; to wash their clothing, mattresses and rugs; to build, maintain, and clean their houses, churches and schools; to grow and process their own food; to raise livestock for their meat, milk and eggs; to butcher livestock for their family consumption; to grind their own grain for family consumption; and for all purposes necessary to maintain their domicile. (V. 3, pp. 68, 71; V. 4, pp. 87-89; V. 5, pp. 31; V. 6, pp. 223-232; V. 7 pp.61-62.)

310. Before 1947, people in the community fought fires using the nearest available source of water in as great a quantity as necessary. (V. 3, pp.77.)

311. Each MD is the only public water supply system in its community.

312. Each MD has a certified system operator who collects monthly water samples for testing for water quality.

313. The majority of members in each mutual domestic are Hispanic in origin. (V. 4, p. 142; V. 5; V. 6, pp. 56, 218; V. 7, p. 47, 87, 136, 187; V. 8, p. .)

## J. Arroyo Seco

314. Arroyo Seco is located in the Rio Pueblo de Taos watershed. (MD 190, map sheets 1, 2, 3.)

315. Arroyo Seco MD was incorporated as a Mutual domestic water consumers association on October 29, 1956, for the purpose of construction and installation of water facilities. (MD 46 .)

316. The State of New Mexico paid for Arroyo Seco MDWCA's first water system. (MD 43.)

317. Arroyo Seco had 80 families as members in 1958, V.3, p. 48, MD 44, 45, 46, 193-15, 193-5, 193-9; had about 119 hookups in 1982, MD 193-35; and currently has about 120 hookups, serving one school, the community church and parish hall, and ten commercial businesses, including 3 restaurants. V. 3, pp. 47, 75. Arroyo Seco also has other members who have not yet been hooked up but have paid memberships. (V.3, pp. 475.)

318. Arroyo Seco has two fire hydrants that are used for fire protection by the Hondo Seco Fire Department. (V.3, pp.76-77.)

319. To determine water quantity for Arroyo Seco MD, members submitted ten affidavits of use from springs, ditches and rivers by individual households and 25 declarations of water use from individual wells. (OSE 83, pp. 1-5; MD 193-1,193-2,193-3,193-4, 193-41, 193-42.)

320. Arroyo Seco MD filed a Declaration claiming 120 af/a with a priority of "prior to Nov. 29, 1956" for domestic use. (MD 193-5.)

321. The State Engineer conducted a field investigation of the declaration and confirmed the uses on declaration and recognized 120 acre/feet per annum for Arroyo Seco. (MD 43, OSE 83, pp.1-5; MD 193-9.)

322. All of the wells declared no longer exist and cannot be used to obtain water. (V.3, pp. 66-67, 83.)

323. In April 1958, Arroyo Seco filed Application No. RG 1850 for Permit to Change Location of Well and Place or Method of Use of Underground Waters for 120 af/a, which the OSE approved on July 15, 1958. (OSE 83, p. 5; MD193-38, 204-v.)

324. ON June 3 1960, Arroyo Seco filed Proof of Completion of Well for Well no. RG-1850, which was tested on November 9, 1958 and that had a capacity of 50 gallons per minute. (OSE 83, p. 5.)

325. ON January 24, 1962, the State Engineer entered an Order that Completion of Well would complete Arroyo Seco's application and that Proof of Beneficial Use would not be required. (OSE 83, p.5; MD 48, MD 193-40.)

326. The United States District Court entered an Order adjudicating 120 af/a to Arroyo Seco by Default Order on October 8, 1971. (MD 193-33; OSE 83,p. 6.)

327. In February 1971, Arroyo Seco filed Application no. RG-1850-S for Permit to Appropriate Underground Water, which was approved by the OSE in February 1973. (OSE 83, p. 5.)

328. In April 1978, the OSE estimated that Arroyo Seco could have used up to 64.29 af or as little as .64 af in three months.  (MD 193-29 .)

329. Arroyo Seco has had trouble with broken meters.  (MD 193-29; MD 193-35.)

330. Arroyo Seco has not been notified by the OSE that it has overdiverted.

## K. Lower Arroyo Hondo

331. Lower Arroyo Hondo is in the watershed for the Rio Hondo. (MD 189, Map sheets 3, 9.)

332. Most of the members of the Lower Arroyo Hondo MDWCA are Hispanic.

333. Lower Arroyo Hondo currently has one well RG-16502  (OSE 83, p. 21-22.)

334. Lower Arroyo Hondo is also known as Central Arroyo Hondo MDWCA. (MD 200-21, MD 200-29.)

335. Before the mutual domestic well was drilled, people in the community got their water from shallow handdug wells.

336. In 1968, twenty four (24) families petitioned the State Department of Public Health for assistance in forming a MD. (MD 62.)

337. By 1974 Lower Arroyo Hondo was serving 40 families (MD 200-46), and currently has 81 members, of which 63 are active and 18 are inactive. (V. 6, pp. 222-223.) Inactive members are people from the community who have houses there but who are not currently residing in the area; inactive members pay the cost of membership. (V. 6, p. 223.)

338. Lower Arroyo Hondo has  fire hydrants and provides water for firefighting to the Hondo Seco fire department.  (V. 7, p. 15.)

339. The New Mexico Department of Public Health, through Aubrey Willard, acted on behalf of Lower Arroyo Hondo in transactions with the Office of State Engineer. (MD 71, 200-1,200-2, 200-3, 200-4,  200-7, 200-8, 200-12, 200-13, 200-14, 200-16, 200-44, 200-51, Vol 6, p. 182.)

340. On April 3, 1969, Lower Arroyo Hondo filed a declaration claiming a water right of 20.67 af/a based on 246 persons from 66 families each using 75 gpcd from 51 handdug and 3 drilled permitted domestic wells. (MD 200-5, 200-41, 200-43; OSE 83, p. 21.)

341. In April 1969, Central Arroyo Hondo filed an application for Permit to Change Location of Well  seeking to change uses of 75 gpcd for 255 persons using water

from 54 wells for 21.42 af/a, which was approved by the OSE on August 4, 1969. (OSE 83, p. 21.)

342.   Lower Arroyo Hondo's original well had a capacity of 70 gpm. (MD 58, 200-45.)

343.   Central Arroyo Hondo filed Proof of Completion of Well in 1972. (OSE 83, p. 21.)

344.   In 1976, the Engineering Division of the Environmental Improvement Agency determined that the Lower Arroyo Hondo well should be capable of supplying water to 600 people. (MD 67.)

345.   In 1993, Lower Arroyo Hondo made an Application to Change Location of Well to transfer 1.0 af/a from a well into their community well, to bring total permitted diversion to 22.42. (MD 200-34.)

346.   This application was approved in March 1993. (OSE 83, p. 21.)

347.   In 1995, Lower Arroyo Hondo filed an application to change surface water to ground water, in the amount of 0.63 afce feet consumptive use, requesting a 50% return flow, which the OSE approved on October 27, 1995. (MD 200-48.)

348.   Lower Arroyo Hondo holds OSE permits to divert a total of 23.05 af/a. (OSE 83, p. 21.)

349.   Lower Arroyo Hondo has been notified by the OSE that it has overdiverted water and that it must pay the water back.. (V. 6, pp. 223, 226; MD 200-35, 200-37.)

350.   Lower Arroyo Hondo has turned down applications for membership because it does not have enough water rights. (V. 6, p. 226.)

## L.  Upper Arroyo Hondo

351.   Upper Arroyo Hondo is in the watershed of the Rio Hondo. (MD 189, sheets 7, 8.)

352.   Most of the members of the Upper Arroyo Hondo MD are Hispanic.

353.   In January 1961, 44 families petitioned the New Mexico Department of Public Health for assistance in forming association. (MD103.)

354.   Upper Arroyo Hondo was incorporated as a mutual domestic water consumer association on June 2, 1961. (MD 100.)

355.   The New Mexico Department of Public Health contracted for Upper Arroyo Hondo's well. (MD 97.)

356.   The New Mexico Dept. of Public Health, with Aubrey Willard as its agent, acted on behalf of Upper Arroyo Hondo in transactions with OSE. (MD 101, 106, 203-12.)

357. Today, Upper Arroyo Hondo has 76 members, 56 of whom are active and receiving water. (V. 7, p. 138.)

358. Upper Arroyo Hondo has fire hydrants to provide water to the Hondo-Seco Fire Department for firefighting purposes. (V. 7, p. 150.)

359. Upper Arroyo Hondo's original well tested at 24 gallons per minute in 1962. (MD 107.)

360. On September 1961, Upper Arroyo Hondo filed a Declaration of pre-1907 rights claiming 26.6 acre-feet per annum for domestic use from the Acequia Madre del Llano, quantified on the bases of 190 persons in 44 families using 125 gpcd. The water rights were not appurtenant to any tracts of land. (MD 108, 203-6, OSE 83,p. 16.)

361. Affidavits supporting the claims of use of water from the ditch were filed with the Declaration. (MD 203-2, 203-4.)

362. In October 1961, the OSE conducted field investigation and found claims on declaration to be valid. (MD 203-10.)

363. In September 1961, Upper Arroyo Hondo filed Application No. RG 6580 amending 01701 for Permit to Change Point of Diversion for 26.6 af/a, which was approved by the OSE on November 28, 1971. (MD 203-5.)

364. In October 1962, Upper Arroyo Hondo filed Application No. 6580 amending 01701 into RG 7609 for Permit to Change Location of Well for 26.6 af/a, which the OSE approved on December 1962. (MD 203-24, OSE 83, p. 16.)

365. Upper Arroyo Hondo filed Proof of Completion of Well on December 3, 1963. (OSE 83, p. 16.)

366. In 1993, Upper Arroyo Hondo filed Application RG 7609-S to Appropriate Underground Waters, which was approved on August 3, 1992. (MD 203-26.)

367. In August 1993, Upper Arroyo Hondo filed Proof of Completion of Well No. RG 7609-S stating well capacity to be 40 gpm. (MD 203-19, OSE 83, p. 17.)

368. Upper Arroyo Hondo has never been contacted by the OSE concerning overdiversion.

369. Before 1947, people in the community of Upper Arroyo Hondo used water for domestic purposes in the same fashion of people in other communities in the Rio Hondo, Rio Pueblo and Rio Grande del Rancho valleys.

370. Upper Arroyo Hondo has had trouble with sand clogging its meters and with meter malfunction. (V. 7, pp. 145-147.)

## M. Cañon

371. Canon MD is located in Rio Pueblo de Taos Water shed. (MD 190, Sheet Nos. .)

372. Canon MD incorporated as a mutual domestic water consumer association on September 14, 1955 with 48 members, for the purpose of construction and installaion of water facilities. (MD 56.)

373. The New Mexico Department of Public Health contracted and paid for Canon water system. (MD 50, MD 51, MD 55.)

374. In May 1956, Canon had 48 members in May 1956, MD 55; between 79-120 members in 1976, MD 52, Md 201-7; 192 members in 1991, MD 201-22, and currently serves

375. In November 1956, Canon's test pump of its original well tested to 15 gpm capacity. (MD 54.)

376. The OSE Hydrographic Survey originally listed Canon MD as having a priority of November 14, 1956 with an amount of water of 10.0 af/a. (MD 201-2.)

377. On March 10, 1972, the OSE filled in an application for canon for a supplemental well. (MD 201-4.)

378. In April 1971, OSE sent an Offer of Judgment to Canon MD for a quantity of 10 af/a for "community domestic use". (MD 201-4; 201-5.)

379. On March 10, 1972, OSE wrote Canon stating Offer of Judgment must be signed before Application could be approved. (MD 201-4.)

380. On March 16, the OSE received a signed Application for Permit to Appropriate Underground Waters for a quantity of 10 af/a to supplement existing well RG 18191. (MD 201-46.)

381. In February 1976, Ose met with Canon to discuss procedures in declaring rwater rights under the "Mendenhall" idea. (MD 201-50.)

382. The OSE investigated the circumstances concerning Canon's original well and found that the original pump capacity at the well was 30 gpm, and the community had choked down their pump at that time to meet the existing uses at the time the well was first being used. (MD 201-50.)

383. OSE calculated a water right based on an original well capacity of 32 gpm x 81.3%. (MD 201-51.)

384. In August 1976, Canon MD filed Declaration RG-18191 declaring a water right of 42 af/a for domestic and sanitary and related uses, based on a present well cpacity of 32 gpm. (MD 201-9.)

385. The declaration clearly stated "facility has provided water for expanding membership which to date is 120. (MD 201-9.)

386. In June 1976, Canon filed Application for Permit to Change Location of well, which the OSE approved in June 1977. (MD 201-8; OSE 83, p. 34.)

387. Proof of Completion of Well no. RG 18191-S was filed July 9, 1984, stating wlll capacity of 90 gpm. (OSE 83, p. 34.)

388. In 1977, OSE sent an Amended Offer of Judgment to Canon MD for a quantity of 42 af/a for "community domestic use." (MD 191-21.)

389. In 1977 OSE found Canon was showing diligence in applying water to beneficial use. (MD 201-50.)

390. Canon MD has submitted meter readings to OSE. (MD 201-15, 16, 17, 18, 19-20, MD 201-41.)

391. OSE calculation of Canon meter readings showed Canon used 48.38 in 1991, MD 201-35, 201-39, 201-41, and 47.14 af/a in 1993, MD 201-32, MD 201-39, and 52.86 af/a in 2000. (MD 201-65.)

392. Canon has received correspondence concerning overdiversion and the possibility of losing its permit. (MD 201-66.)

## N. Lower Des Montes

393. Lower Des Montes water rights originated from water rights in the La Cuchilla ditch, which diverts from the Rio Hondo. (MD 189, Sheets 2, 6.)

394. Most of the members of the Lower Des Montes MD are Hispanic.

395. Lower Des Montes was incorporated as an MDWCA on April 6, 1967 with 47 members for the purpose of construction and installation of water and sewage works. (MD 14.)

396. Lower Des Montes grew from 47 members in 1967 (MD 14), to 66 members in 1968 (OSE 83, pp. 27-28), to at least 94 members in 1978. (MD 199-22.)

397. Lower Des Montes currently has 100 members, of which 85 are active and 15 are inactive. (V. 7, p. 55.)

398. The New Mexico Department of Public Health contracted for the construction of the well for Lower Des Montes. (MD 4a.)

399. Aubrey Willard of NM Department of Public Health acted on behalf of Lower Des

Montes in transactions with the Office of the State Engineer.  (MD 9, 11, 199-9, 199-14, 199-17, 199-18, 199-19, 199-20, 199-37.)

400.  On August 22, Lower Des Montes MD filed Declaration No. 01742 claiming a water right of 20.58 af/a from La Cuchilla Ditch, quantified by multiplying 245 persons x 75 gpcd. in 62 families using La Cuchilla Ditch since the nineteenth century.   (MD 15, 199-34; OSE p. 27-28.)

401.  In September, 1968, Lower Des Montes filed Application no. 01742 and RG 16107 for Permit to Appropriate Underground Waters was filed, asking to appropriate 20.58 af/a. (MD 13, 199-35.)

402.  On December 23, 1968, OSE partially approved Application for 20.16 af/a, denying for 0.42 af/a. The OSE did not make a finding of impairment. (MD 199-35.)

403.  In September, 1968, Lower Des Montes also filed an application for Permit to Change Location of Well, seeking to transfer 1.43 af/a from 4 individual wells, quantified by multiplying 17 persons x 75 gpcd, into RG 161079.  (MD 13, 199-36.)

404.  ON January 23, 1968, OSE approved the September application.  (MD 199-36.)

405.  OSE has recognized that Lower Des Montes has a right to divert a total of 22.59 af/a.  (OSE 83, p. 27-28.)

406.  Lower Des Montes filed Proof of Completion of Well No. RG 16107 on October 15, 1971.  (MD 10, OSE 83, p. 27.)  The well tested at 35 gpm.  (MD 6, 7, 8, 11, 199-5, 199-12.)

407.  In October 1971, the United States District Court entered a Default Order adjudicating to Lower Des Montes the right to divert for 22.59 af/a for community domestic use.  (OSE 83, p. 27.)

408.  Lower Des Montes currently has one well. RG 16107.  (OSE 83, p. 27-28.)

409.  In 1978, OSE estimated that Lower Des Montes was using be 18.90 af/a.  (MD 199-22.)

410.  Lower Des Montes has had trouble with sand clogging the meters on its well and has often not had a functioning master meter.  (V. 7, pp. 58-59, 68-69.)

411.  Lower Des Montes has never been notified by the Office of State Engineer that it was overdiverting.

## O. Upper Des Montes

412.  Upper Des Montes MD is in the watershed of the Rio Pueblo de Taos.  (MD 84, 190, Map sheets 1, 2.)

413. Upper Des Montes originally incorporated as a mutual domestic water consumer association in May 1959. (MD 94 .)

414. New Mexico Department of Public Health, through Aubrey Willard, acted on behalf of Upper Des Montes in transactions with the Office of the State Engineer. (MD 81, 84, 196-17, 196-34, 196-58, 196-59; 196-74.)

415. Des Montes began discussions with OSE concerning water rights for association in 1959. (MD196-3.)

416. Upper Des Montes currently has 70 aactive members and a few more inactive members. (V. 6, p.130.)

417. In December 1959, Des Montes filed a Declaration of pre-1907 water rights in the amount of 29.74 af/a, claiming water from the Des Montes Community Ditch, based on 191 persons using 125 gpcd. (MD 196-4.)

418. On Dec. 9, 1959, De Montes filed application No. RG 4076 for permit to change point of diversion of 29.74 af/a. (MD 196-6.)

419. Application No. RG 4076 application was protested by the Des Montes Community Ditch. (MD 196-10.)

420. ON September 26, 1960, Des Montes filed Application no. RG 5215 for Permit to Change Point of Diversion for 29.74 af/a. (MD 196-14.)

421. Application No. RG 5215 was protested by members of the Des Montes Community Ditch. MD 196-19, and was subsequently withdrawn. (OSE 83, p. 23.)

422. People who protested these early applications later formed the Lower Des Montes MDWCA. (V. 6, pp. 149-150, 154, 156.)

423. In December 1962, Des Montes MD filed Declaration no 01742, claiming 28.84 af/a for use for domestic purposes by 206 persons in 37 families using 125 gpcd from the La Cuchilla Ditch from the Rio Hondo. (OSE 83 p. 23.)

424. Des Montes filed an Application No RG 8387 amending 01742 for Permit to Change Partial Point of Diversion in 1962 for a quantity of 28.64 af/a from the Rio Cuchilla, MD 89, which was withdrawn on January 13, 1964. (MD 196-53; OSE 83, p. 23.)

425. In December 1962, Des Montes filed MD Declaration 0173 claiming 7.7 af/a for domestic purposes by 55 persons in 12 families using 125 gpcd. (OSE 83, p. 23; MD 196-35.)

426. Des Montes filed an Application No. RG 8387 amending 01743 for Permit to Change Partial Point of Diversion in 1962 for a quantity of 7.70 af/a for purpose of taking water from the Acequia Madre. (MD 88.)

427.    On April 9, 1963, OSE field personnel expressed it was their belief that 125 gpcd was too liberal for persons living in northern New Mexico. (MD 196-39.)

428.    On April 18, 163, OSE approved Application No. 8387 amending 01743 for 4.62 af/a, based on 55 persons using 75 gpcd and denying the transfer of 3.08 af/a, which equals 55 x 25 gpcd. (MD 196-41.)

429.    The OSE did not find impairment when denying the transfer of the additional 3.08 or additional 25 gpcd. (MD 196-41.)

430.    In January 1964, Des Montes Mutual Domestic Water Consumers' and Mutual Sewage Works Association amended articles of incorporation to confirm that it had 48 members families with 187 persons who were eligible for membership by reason of living within the Rio Lucero watershed. (MD 196-52, 196-55, 196-56, 196-58; V. 6, pp. 157-159.)

431.    In January 1964, Des Montes passed resolution expelling people who received water supply from the Rio Hondo via La Cuchilla as ineligible. (MD 196-57, 196-59, 196-60, 196-62, 196-115: Vol 6, pp. 157-160.)

432.    Des Montes did not file an application to transfer water rights from 132 other people in association until 1979.

433.    Upper Des Montes' first well had a maximum capacity of 20 gpm. (MD 78.)

434.    Des Montes filed proof of completion of well, signed by Aubrey Willard, on June 23, 1965. ( MD 196-80.)

435.    In January 1971, Des Montes filed an application no. RG 8387 for Permit to Appropriate Underground Water, which was approved by the OSE on March 18, 1971. (MD 196-80; OSE 83, p. 24.)

436.    In April 1973, Upper Des Montes filed Proof of Completion of Well that stated capacity was 15 gpm. (OSE 83.)

437.    On December 30, 1971, the United States District Court entered an order adjudicating 4.62 af/a for community domestic use.   (MD 196-82.)

438.    On March 2, 1979, Des Montes filed Declaration no. 01743 claiming water rights for domestic uses from surface water sources for 146 users in 36 families using 15 gpcd, a total of 2.45 af/a. (OSE 83, p. 24.)

439.    IN 1979, OSE practices allowed only for transfer of 15 gpcd for surface water domestic uses.

440.    Upper Des Montes filed Application no. 01743 amended into RG 8387 to change point of diversion for 2.45 af/a., which was approved by the OSE on May 15, 1979. (MD 196-92; OSE 83, p.25.)

441.  In May 1979, Des Montes filed Application no. 057 et al to Change Point of
      Diversion and Place of Use from Surface to Ground Water into RG 8387 to transfer
      water rights from 5.9 acres of irrigated land, which was approved by the OSE for the
      diversion of 6.24 af/a on September 3, 1987. (OSE 83.)

442.  Upper Des Montes has OSE permits for a cumulative water right of 13.31 af/a. (MD
      196-105.)

443.  Upper Des Montes has been notified several times that it has overdiverted and that it
      must pay back overdiversions. (MD 196-96, 196-97.)


**P. El Salto**

444.  El Salto is in watershed of the Arroyo Seco, a tributary of the Rio Pueblo de Taos.
      (MD 190, Sheet no. 1,2,3.)

445.  El Salto is actually a part of the community of Arroyo Seco.  (V.4, p.49;  MD 204-v.)

446.  El Salto formed when Northern Rio Grande Development Association solicited the
      community to form a mutual domestic. (V. 4, pp.52-53.)

447.  Before the mutual domestic, sources of water were shallow wells, springs and ditches.
      (V.4, p. 64, 66, 96.)

448.  The shallow wells no longer exist. (V. 4, pp. 64-65.)

449.  El Salto by-laws make it illegal to have cross connections between the community
      system and individual domestic wells. (V. 4, p. 65-66; MD 202-34.)

450.  El Salto organized in 1972 with 18 members.  (V.4, p. 4, 97.)

451.  El Salto currently has 58 active connections and 22 inactive connections for a total of
      80 member, delivering water to about 232 people. (V. 3, pp. 117, 120; V.4, pp. 44,
      98.)

452.  Through out formation and in  dealings with State Engineer, Northern Rio Grande
      Development Association Acted on behalf of El Salto. (V.4, pp. 54-55, 63, 94,
      97,102-105, 112,113, 115, 122, 134.)

453.  On November 8, 1973, El Salto filed Application no. RG 24252 for Permit to
      Explore Underground Waters. (OSE 83, p. 29.)

454.  In June 1974, El Salto filed Declaration no. RG 24252 claiming right to use 5.44 af/a
      for domestic and sanitary and related household purposes, which was quantified on
      basis of 81 persons from 23 families using 60 gpcd from handdug pre-basin and
      drilled wells. (OSE 83, p. 29; MD 202-35.)

455.  In July 1974, El Salto filed Declaration no 057-A, 01743-A and 01749-A of pre-1907 Water Right Ownership, claiming 0.18 af/a of water for domestic uses from 11 persons in 5 families using water from ditches.  (OSE 83, p. 28;  MD 202-38.)

456.  In July 1974, El Salto filed Application No. RG 1850-A and RG 24252 for Permit to Change Location of Well for 23.44 af/a for domestic use. (MD 202-7, OSE 83, p. 29.)

457.  In  1974, six wells that the OSE had recognized as having 3 af/a of water rights in 1958 and that had originally been included in Arroyo Seco MDWCA were transferred into El Salto.  (MD 204-v.)

458.  On May 28, 1975, OSE partially approved and partially denied the July 1974 Application NO. RG 1850-A. It approved the application for a quantity of 6.78, and denied it for a quantity of 16.66 af/a.  The OSE made no finding of impairment in its denial.  (MD 202-6.)

459.  On July 3, 1974, El Salto filed Application Nos. 057-A et al. for Permit to Change Point of Diversion form Surface to Ground Water  in the quantity of 0.18 af/a, which the OSE approved on May 28, 1975.  (MD 202-5; OSE 83, p. 29.)

460.  In May 1975, the OSE permitted El Salto to divert a total of 6.96 af/a.  (MD 202-5, 202-6, 202-32.)

461.  On September 13, 1976, El Salto filed Proof of Completion of Well, stating well capacity of 40 gpm.  (OSE 83, p. 29.)

462.  El Salto was notified by OSE prior to 1992 that it had overdiverted.  (V.3, p. 126; MD 202-39.)

463.  Although the OSE told El Salto it could pay back overdiversion by cutting back on water the next year. (V.4, p. 61.), El Salto responded by acting to transfer irrigation water rights into the system. (Vol 3, p. 126; V. 4, pp. 62, 132-134.)

464.  In August 1985, El Salto file Application 02498 et al into RG-242542 to Change Point of Diversion and Place and Purpose of Use from Surface to Ground Water, which was approved for 2.19 af/a consumptive use and 3.77 diversion amount on December 18, 1988.  (OSE 83, p. 30.)

465.  On July 16, 1993, the OSE approved El Salto's application for a 78 % return flow credit.  (V. 3, p. 129; MD 202-19, 202-23, 202-25, 202-28.)

466.  In October 1994, El Salto filed Application no. 0932 et al. into RG 24252 & 24252-S to Change Point of Diversion and Place and Purpose of Use from Surface to Ground Water, which was approved for 17.87 af/a diversion with a return flow plan on February 10, 1995.  (OSE 83, p. 31.)

467.  To date, El Salto has been approved by the OSE to divert a total of 30.97 af/a, which includes 6.96 original permit, 1992 permit for 3.77 and 1994 permit to divert 17.87. (OSE 83, p. 31; MD 202-32, p.6 .)

## Q. Llano Quemado

468.  Llano Quemado is in the watershed for the Rio Grande del Rancho.  (MD 190, Rio Grande del Rancho sheet 1.15.)

469.  Before the mutual domestic, sources of water were shallow wells, springs and ditches. (V.4, p. 157;  V. 5, pp. 5-7, 25-27; MD 194-34.)

470.  Most of the members of the Llano Quemado MD are Hispanic.   (V.4, p. 142.)

471.  Llano Quemado was incorporated as a mutual domestic water consumer association in 1953 with 34 members, with a stated purpose for "the construction and installation of water facilities . . . ."  (MD 114, 115.)

472.  Llano Quemado's first well was drilled in 1953 and had a capacity of sixty (60.) gallons per minute when tested.  (MD 194-1, MD 194-60.)

473.  In 1955, Llano Quemado had 51 members in 1955 (MD 113.); 75 members in 1959, (MD 112, 194-1.); 129 residential hookupsand 135 members serving 540 people in 1974 (MD 111, 194-21.); and currently delivers water to about 225 connections serving about 900 people. (V.4, p. 181; V.5, p. 37-38.)

474.  Llano Quemado also currently serves one school and one commercial business. (V.4, pp. 154-155.)

475.  Llano Quemado has 11 fire hydrants on its system and provides water for firefighting to the Taos Fire Department. (V.4, pp. 149, 159-160.)

476.  There were at least 36 pre-basin wells that were abandoned and uses transferred into Llano Quemado when the system was formed in 1953. (MD 194-34.)

477.  The OSE refused to recognize any rights for pre-basin wells. (MD 194-36; V.4, p. 166.)

478.  The wells used by people before the community well was built no longer exist. (MD 194-34; V.4, pp. 163-164; V.5, pp. 7, 27.)

479.  In October 1959, Llano Quemado filed Declaration No. RG. 3894 of Owner of Underground Water Right, claiming rights to water for a domestic water supply with a priority of 1953. (MD 194-1.)

480.  In October 1959, Llano Quemado stated an intent to fully develop its well capacity, stating on the face of Declaration no. RG 3894 of Owner of Underground Water Right that stated on its face a use for "domestic water supply for Llano Quemado"

and clarified that "[t]he community was in the process of growing and new members are tying into system each year and the figure is expected to increase to capacity of well. The well tested for 60 gpm . . . ." (MD 194-1,194-14.)

481.   In October, 1959, Llano Quemado filed Application No. 3894 for Permit to Repair Well which was approved by the OSE on December 18, 1959. (OSE 83, p. 7.)

482.   On September 14, 1962, Llano Quemado filed a Well Record for RG 3894, that stated that the repair was completed in 1964 and that the well was in very good shape at that point. (MD 194-6; OSE 83, p. 7.)

483.   In 1971, the OSE sent Llano Quemado an offer of Judgment for 12.8 af/a of water for community domestic purposes. (MD 194-9.)

484.   In 1971, the United States District Court entered an Order adjudicating 12.8 acre-feet per annum for community domestic purposes to Llano Quemado. (OSE 83.)

485.   In July 1972, the OSE notified Llano Quemado that it had to file an amended declaration, sending a completed declaration form to Llano Quemado. (MD 194-11.)

486.   In August 1972, Llano Quemado filed Amended Declaration of Owner of Underground Water No. 3894 amended, stating a quantity of water of 19.36 acre feet for municipal, domestic and sanitation purposes, the quantity of water calculated on 20 gallons per minute x 1440 minutes/day x 365 days x .60 pumping time. (MD 194-62, OSE 83.)

487.   The Declaration states that the "community project is still in process of development and new members are tying into the system each year. (MD 194-62.)

488.   In 1973, Llano Quemado filed Application No RG 3894-S for Permit to Appropriate Underground Water for "municipal, domestic, and sanitation purposes" from a supplemental well RG 3894-S, which was approved by the OSE on January 7, 1974. (OSE 83, p. 7; MD 194-12.)

489.   In 1974, the Office of the State Engineer sent Llano Quemado another Offer of Judgment for a quantity of 6.56 af/a of a water right inchoate in nature for community domestic use. (MD 194-20.)

490.   On February 1, 1974, the United States District Court entered an Order adjudicating 19.36 af/a to Llano Quemado, 6.56 af/a subject of proof of beneficial use. (OSE 83, p. 8.)

491.   On November 6, 1974, Llano Quemado responded to an OSE water survey, stating it serve 540 persons through 135 memberships, and that more families wanted to join the system. (MD 194-21.)

492.   On January 18, 1977, Llano Quemado filed Proof of Competion of Well, stating the well was tested April 12, 1976, with a capacity of 50 gallons per minute. (OSE 83, p.

8; MD 194-28..)

493. Llano Quemado has been notified several times and continues to be notified that it has overdiverted. (MD 194-32, 194-40, 194-44, 194-48, 194-49, 194-51, 194-56.)

494. The OSE has stated that Llano Quemado may pay back overdiversions by diverting less in the future (MD 194-34, 194-46, 194-49.), but that it will not allow underdiversion years to be set against overages. (V.4, p. 172.)

495. In June 1982, Llano Quemado filed Application no 0609 & RG 3894 for Permit to Change Point of Diversion and Place and Purpose of Use which was approved on December 30, 1982 to pay back past overdiversions. (OSE 83, p. 9.)

496. In 1986, Llano Quemado filed Proof of Beneficial Use. (OSE 83,p. 10; MD 194-43.)

497. In September 1989 Llano Quemado filed Application no. 0609, 0992 & RG 3894 to Change Point of Diversion and Place of Use from Surface to Ground Water, which was approved by the OSE on September 26, 1991 for a consumptive use of 7.29 af/a and a diversion right of 16.2 with a Return Flow Plan. (OSE 83,p. 11.)

498. OSE approved Llano Quemado Return Flow plan on January 8, 1996, recognizing a diversion right of   35.56 af/a.  (OSE 83, p. 12, MD 194-50, 194-55.)

499. Soon after the OSE approved the return flow plan, OSE notified Llano Quemado that it had overdiverted. (MD 194-66.)

500. Llano Quemado diverts water 24 hours each day, alternating wells. (V. 4, p. 155.)

## R. Ranchos de Taos

501. Ranchos de Taos is in watershed of Rio Grande del Rancho. (MD 190, Map sheet 1.10.)

502. Ranchos de Taos was incorporated as mutual domestic water consumer association in November 1, 1956 with seventy (70.) member families with the stated purpose of constructing and installing water facilities. (MD 130, 131.)

503. Before the community well was formed, people in Ranchos de Taos got their water from shallow wells, springs and the ditch. (V. 8, pp. 20-21.)

504. The New Mexico Department of Public Health contracted for the Ranchos de Taos well. (MD 127.)

505. The New Mexico Department of Public Health, through its agent Aubrey Willard, acted on behalf of Ranchos de Taos in transactions with the Office of State Engineer. (MD 126, 127, 192-12, 192-20, 192-28, 192-30, 192-31, 192-32, 192-33, 192-34, 192-35, 192-125.)

506. Ranchos de Taos had 70 members in 1956 (MD 130), 185 memberships serving 550 people in 1974 (MD 192-50), and currently has 232 members, of which 180 with about 850 people are currently hooked up to the system. (V. 8, pp 22-23, 35)  Active connections include the church, a school, two bars and several restaurants serving the local community and tourists. (V. 8, pp. 23, 36, 69-71.)

507. Ranchos de Taos has several fire hydrants and provides water to Taos Fire Department for firefighting.  Ranchos de Taos has asked the OSE to credit them for water provided for firefighting. (Vol 8, pp. 25-31, 54-56; MD 277, 278.)

508. There were thirty-six declarations filed by individuals declaring rights to three acre feet for individual wells, as well as affidavits of use for other uses from springs and ditches filed when quantifying Ranchos de Taos right in 1958. (OSE 83, pp. 37, 42; MD 192-2 through 192-11, 192-13, 192-68 thorugh 192-121.)

509. Ranchos de Taos MDWCA filed Declaration No. RG 1756, claiming 105 acre-feet per annum based on 34 wells and 70 uses. (OSE 83, p. 42.)

510. In 1958, OSE investigated the claim on the declaration and found them to be valid. (MD 192-21, 192-24.)

511. In April 1958, Ranchos de Taos MD filed Application for Permit to Change Location of Well for 105 af/a., which the OSE approved in June 1958. (MD 192-68.)

512. The well test conducted on RG 1756 on October 24, 1958 showed the well had a capacity of sixty (60) gallons per minute. (MD 121, MD 192-27.)

513. On June 3, 1960, Ranchos de Taos flied a Proof of Completion of Well, signed by Aubrey Willard. (MD 192-27.)

514. On January 24, 1962, the State Engineer entered an Order that Proof of Completion of Well shall be the final instrument and that Ranchos De Taos MD did not have to file Proof of Beneficial Use. (MD-124, 192-38.)

515. In December 1971, the United States District Court entered an Order adjudicating 105 acre-feet per annum to Rancho de Taos MD for "community domestic purposes. (MD 192-45.)

516. In 1971, Ranchos de Taos file Application No. 17560-S for Permit to Appropriate Underground Water for domestic uses, which the OSE approved on August 24, 1971. (MD 192-26.)

517. Proof of Completion of Well No. 1756-S was filed on January 28, 1974, stating the well capacity was 42 gallons per minute. (OSE 83, p. 42.)

518. In January of 1983, Ranchos de Taos filed Application No. 1756-S-2 for Permit to Appropriate Underground Water for domestic and sanitation purposes, which the

OSE approved on August 23, 1983. (MD 192-57.)

519. Proof of Completion of Well No RG 1756-S-2 was filed on July 225, 1986, stating well capacity was 25 gallons per minute. ( OSE 83, p. 43.)

520. OSE has recognized Ranchos de Taos water right of 105 af/a since 1958. (MD 192-33, 192-58.)

521. Ranchos de Taos has never received correspondence from OSE concerning overdiversion.

## S. Talpa

522. Talpa is in the watershed of the Rio Grande del Rancho. (MD 190, Map sheet 1.1.)

523. Before the community well, people in Talpa got their water from acequias and the river. (V. 7, p. 245.)

524. Talpa incorporated as a mutual domestic water consumer association on July 13, 1954 with fifty-nine (59) original members, with the purpose of constructing and installing water facilities. (MD 135.)

525. The New Mexico Department of Public Health contracted for Talpa's domestic water facilities and well. (MD 133, 134.)

526. The New Mexico Department of Public Health, through Aubrey Willard, acted on behalf of Talpa in transactions with the Office of State Engineer. (MD 136.)

527. The original well test showed that Talpa's original well had a maximum capacity of 85 gallons per minute, and that it produced 50 gallons per minute with no drawdown. ( MD 138, 140, 141.)

528. The NM Health Department found that the original well had the capacity to meet the needs of 250 families. (MD 140.)

529. Talpa originally had 59 members in 1954 (MD 135), was serving 133 families and a school by 1964 (MD 197-12); was serving 215 member households in 1979 (MD 197-30) and currently has 250 members, of which 220 are active and receiving water. (Vol 7, pp. 192-193.)

530. Talpa has four fire hydrants and provides water to Taos Fire Department for firefighting. (Vol 7, p. 191.)

531. IN 1956, Talpa explained its intent to expand its facilities in a letter to engineer William Turney. (MD 140.)

532. In 1956, the NM Department of Public Health encouraged Talpa to encourage all community members still using shallow wells or ditch water to join and emphasized

that Talpa must allow any person within the community to join. (MD 141.)

533.    In June 1963, Talpa filed an "Application for Permit to Appropriate Underground Water" for drinking purposes. (MD 196-71.)

534.    On August 15, 1963, Talpa filed a Declaration of Ownership of Underground Water Right claiming use from well with 50 gallon per minute capacity for municipal use since 1955. (MD 197-5.)

535.    In June 1964, Talpa indicates to the OSE that the number of people on its system is increasing. (MD 197-10.)

536.    In July 1964, the OSE calculates the quantity of water for Talpa declaration based on 526 people in 133 families using 75 gpcd for 44.19 acre-feet and 255 students using 15 gallons of water each day for 200 days for 2.04 acre-feet, for a total of 46.23 acre-feet per annum.   (MD 197-12.)

537.    In August 1994, Talpa files Application NO. 9655-S for Permit to Appropriate Underground Waters to supplement existing well No. 9655 in providing municipal water for the community of Talpa, MD 197-23 which the OSE approved on October 28, 1964.  (OSE 83, p. 18.)

538.    Proof of Completion of Well was filed in April 1966, stating a well capacity of 30 gpm. (MD 197-19, OSE 83, p. 18.)

539.    In 1973, OSE filled out an application for a permit for a supplemental well  (MD 197-24.) which Talpa filed in May 1973 and which was approved by OSE in August 1973.  (OSE 83, p. 18; MD 197-25.)

540.    Proof of Completion of Well No. RG 9655-s-2 is filed in July 1975, stating the well has a capacity of 30 gallons per minute.  (OSE 83, p. 18-19.)

541.    On October 8, 1973, the United States District Court enters a Default Order adjudicating 46.23 acre-feet per annum for community domestic purposes to Talpa. (MD 197-75.)

542.    In the late 1970's, the OSE calculated that Talpa was serving 210 families with 840 persons and was using 72.40 acre-feet per annum.  (MD 197-27, 197-33.)

543.    IN 1994, OSE calculated that Talpa was diverting 64.48 acre feet.  (MD 197-58.)

544.    Talpa MD has had problems with meters functioning correctly.  (MD 197-22, 197-29.)

545.    The OSE has notified Talpa concerning overdiversion of water.  (MD 197-31.)

546.    Talpa has responded to OSE concerns by transferring rights from the school system into its system.  (OSE 83, p. 19.)

547.   Talpa currently has four wells, which in some combination are pumped 24 hours daily.  (V. 7, p. 189, 197.)

## T. Upper Ranchitos

548.   Upper Ranchitos is in the watershed for the Rio Pueblo de Taos.  (MD 190, Sheet No. 14-15, Rio Pueblo de Taos.)

549.   Upper Ranchitos is also known as Upper Ranchito.  (OSE 83, p. 14.)

550.   Most of the members of the Upper Ranchitos MD are Hispanic.

551.   Upper Ranchitos incorporated as a mutual domestic water consumer association on December 18, 1963 with 28 members, for the purpose of construction and installation of water and sewage works.  (MD 23.)

552.   New Mexico Department of Public Health contracted for Upper Ranchitos MD well.  (MD 24, 26.)

553.   The New Mexico Department of Public Health, through Aubrey Willard, acted on behalf of Upper Ranchitos in transactions with Office of State Engineer.  (MD 17, 18, 19, 198-16.)

554.   By 1964, Upper Ranchitos had 52 members.  (MD 17.)

555.   Upper Ranchitos is currently delivering water to about 78 members, including one bed and breakfast commercial business.   (V. 5, p.166, 169.)

556.   Upper Ranchitos has 7 fire hydrants on its system and provides water to the Taos Fire Department (V. 5, pp. 167-168, pp. 195-196.)

557.   There were 33 dug, and 14 drilled pre-basin wells that had some quantity of water transferred into Upper Ranchitos when system was formed in 1965. ( MD 198-1.)

558.   Many of these pre-basin wells were abandoned.  (V. 5, p 184.)

559.   Before the mutual domestic was formed, people in Upper Ranchito also used water from ditches and springs for domestic purposes.  (V. 5, p. 188, V. 6, pp. 5-6.)

560.   In January 1965, Upper Ranchito filed Declaration of Owner of Underground Water Right RG 12138, declaring a right to 20.08 af/a, quantified on the basis of 239 persons at 75 gpcd.  (MD 198-1.)

561.   On January 7th, Upper Rancho filed application for Permit to Change Location of Well to change diversion point for 20.08 af/a.  (MD 198-3.)

562.   At some time, the OSE adjusted the declaration by removing the names of five

persons filed with the original declaration and subtracted 1.93 af/a. (MD 198-1, p.2.)

563.   Some people who had been listed on declaration had no knowledge of the declaration, the application or its contents. (MD 198-8, 198-9, 198-8.)

564.   The OSE investigated claims on declaration and accepted it and approved application based thereon. (MD 198-10.)

565.   On March 24, 1965, the OSE partially approved the January 7 application for the amount of 18.15 af/a diversion for domestic use. (OSE 83, p. 14.)

566.   The Upper Ranchitos well had an original capacity of 30 gpm. (MD 22, 198-212.)

567.   Upper Ranchitos filed Proof of Completion of Well on November 16, 1966. Upper Ranchitos currently has one well numbered RG 12138. (OSE 83, p. 14.)

568.   In December 1971, the United States. District Court entered an order adjudicating 18.15 af/a to Upper Ranchitos for community-domestic use. (MD 198-23.)

569.   Upper Ranchitos has had problems with broken meters. (V. 5, p. 172; MD 198-37, 198-24, 198-26, 198-42, 198-52.)

570.   Upper Ranchitos has received letters from the OSE concerning overdiversion. (V. 5, p.177; MD 198-43, 198-41.)

571.   State Engineer stated could pay back overdiversion by cutting back on water the next year. (MD 198-48.)

572.   People who live in Upper Ranchitos and who are not members of the MD have individual private wells. (V. 6, p. 7-8.)

573.   People in Upper Ranchitos area are concerned about number of individual domestic wells in area because of health concerns. (V. 6, pp. 7-8, 18.)

574.   Upper Ranchitos has diligently sent in meter readings to the OSE.

## U. Valdez

575.   Valdez MD is in watershed of Rio Hondo. (MD 189, Map Sheets 2.)

576.   All of the people who are members of Valdez are of Hispanic origin.

577.   Prior to the formation of the mutual domestic, people in Valdez obtained water for domestic purposes from the ditch, the river, springs and shallow wells.

578.   In March 1959, 18 families petitioned the New Mexico Department of Public Health to incorporate as a MDWCA. (MD 33.)

579. By November 1974, Valdez served 30 families. (MD 195-30.) Valdez currently has 39 hookups, of which 30 are active. (V. 7, p. 90.) Valdez serves the church and has fire hydrants. (Vol 7, pp. 96, 97.)

580. Valdez incorporated as a Mutual Domestic Water consumer Association in March 1959 with 18 members for the construction and installation of water and sewage works facilities. (MD 37.)

581. The New Mexico Department of Public Health contracted for the original Valdez water system. (MD 33.)

582. The New Mexico Department of Public Health, through Aubrey Willard, acted on behalf of Valdez MDWCA in transactions with the OSE. (MD 30, 31, 34, 35, 195-20, 195-23, 195-24, 195-26.)

583. Valdez MDWCA filed a declaration on December 11, 1959 claiming a right to use water for domestic uses from the San Antonio Ditch with a priority date of 1928. (MD 195-1.)

584. Although no quantity is found the face of the declaration, a quantity of 11.5 af/a of water is claimed for domestic use, quantified on the basis of 82 person from 18 families each using 125 gpcd from the ditch. (MD 195-1; OSE 83, p. 15.)

585. The claimed water rights are not appurtenant to any tract of land. (MD 195-1.)

586. On Dec. 16, 1959, Valdez MD filed an Application for a Permit to Change Point of Diversion for 11.5 af/a. (MD 195-3.)

587. The OSE approved application in full on March 11, 1960. (MD 195-3, 195-10.)

588. The OSE stated that irrigation water rights would not be affected as declared rights were "domestic". (MD 195-5.)

589. The OSE allocated 11.5 af/a to Valdez. (MD 31.)

590. On January 24, 1962, the OSE entered an Order that Proof of Application of Water to Beneficial Use was not required by Valdez MD. (MD 195-15, 195-16.)

591. Valdez filed Proof of Completion of Works on Feb. 6, 1964. (MD 24.)

592. The United Stated District Court entered an order on Dec. 30, 1971 adjudicating to Valdez a right to use 11.5 af/a for community domestic purposes. (MD 195-27.)

593. Valdez MD has had problems with its meter. (MD 34, 35,195-20, 195-23, 195-36, 195-41, 195-35.)

594. The OSE estimated water use for Valdez based on 3 persons in a family using 60

gpcd in 1979. (MD 195-35.)

595.    Valdez has never received any letters from the OSE concerning overdiversion. (V. 7, p. 132.)

596.    Many new individual wells have been drilled in the Valdez area, which concerns long time residents that water quality and water quantity may be impaired. (V. 7, pp. 102-103, 121.)


## II. CONCLUSIONS OF LAW

1.    This Court has jurisdiction of these proceedings.

2.    Plaintiff the State of New Mexico, ex rel. the State Engineer is responsible for administering water rights in New Mexico. NMSA 1978 §§72-2-1, et seq. and 72-4-13, et seq.

3.    Defendants are twelve Taos-area mutual domestic water consumer associations (MDWCAs) organized pursuant to the provisions of the Sanitary Projects Act, NMSA 1978 §§3-29-1, et seq., or predecessor statutes, to supply water to their communities.

4.    New Mexico's water laws are designed to encourage use and to discourage waste and non-use. Beneficial use of water is "the basis, the measure and the limit to the right to the use of water." N.M.Const., art. XVI, §3; see also NMSA 1978 §72-12-2.

5.    New Mexico law regarding the appropriation and use of groundwater is codified at NMSA 1978 §72-12-1, et seq., commonly referred to as the Groundwater Code. It was first enacted in 1931.

6.    Section 4 of the Code codifies the state constitutional guarantee that "[a]ll existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed." NMSA §72-12-4; NM Const. Art. XVI, §1.

7.    Section 1 of the Groundwater Code, 1978 NMSA §72-12-1, commonly referred to as the "domestic well" statute, provides in part as follows:

> Any person, firm or corporation desiring to use any of the waters described in this act for watering livestock, for irrigation of not to exceed one acre of noncommercial trees, law, or garden; or for household or other domestic use shall make application or applications from time to time to the state engineer on a form to be prescribed by him. Upon the filing of each such application, describing the use applied for, the state engineer shall issue a permit to the applicant to so use the waters applied for.

Pursuant to this statute and regulations promulgated by his office[1], the State Engineer must grant a permit to use up to three acre-feet of water per annum for domestic purposes to any individual or entity that applies for a permit.

8. The uses of water that are allowed under a "domestic well" permit include household and other domestic uses for one or more residences, drinking and sanitary purposes, irrigation of non-commercial tress and lawns and gardens, and livestock watering. 1978 NMSA §72-12-1; Groundwater Rules 1-15.3.

9. The domestic well statute and OSE regulations do not reconcile their provisions for the use of up to three acre-feet of water per annum with the state constitutional and statutory provisos that beneficial use is the limit, measure and basis of a water right. NM Const. Art. XVI, §3; NMSA 1978 §72-12-2. However, the domestic well statute specifically recognizes "the varying amounts and time such water is used and the relatively small amounts of water consumed in the watering of livestock, in irrigation of not to exceed one acre of noncommercial trees, lawn or garden; in household or other domestic use" before prescribing that the state engineer "shall issue a permit." NMSA §72-12-1.

10. New Mexico law and the OSE have consistently treated domestic uses of water as "de minimus" uses. Section 1 of the Groundwater Code specifically refers to "the relatively small amounts of water consumed," NMSA 1978 72-12-1, while other provisions of the Code accord domestic uses special treatment. See, e.g. NMSA 1978 72-12-3.1C (exempting domestic uses from a permitting moratorium). In addition, domestic water use applications are governed by their own procedures—notice is not required and applications are to be approved without delay. See, e.g., Order #67, MD Exhibit 204r; Groundwater Rules 1-15.

11. The SPA is a part of the New Mexico Municipal Code. NMSA 1978 Ch. 3. It was passed in 1957. Its predecessor statute, the Mutual Domestic Water Consumer Act, was passed in 1947, subsequently amended and finally subsumed in the SPA.[2]

12. The explicit legislative purpose of the SPA's predecessor statutes was to "eliminate the present hazardous practices involved in the use of ditch water, open shallow wells, creeks and rivers which are subject to contamination, and therefore, injurious to the public health." 1947 N.M. Law, Ch. 206; 1949 N.M. Law, Cha. 79; 1951 N.M. Laws, Ch. 52. The SPA provides that its primary purpose is to "improve the public health of the people of New Mexico through a program which will provide for the installation of sanitary domestic water facilities, sewage works, or both and thus eliminate present hazardous practices and conditions." NMSA 1978 §3-29-3.

13. The SPA provides that its provisions "shall not in any way affect any water systems or water rights under existing law." NMSA 1978 §3-29-14.

---

[1] See State Engineer's "Rules and Regulations Governing Drilling of Wells and Appropriation and Use of Groundwater in New Mexico," (1995) (hereinafter Groundwater Rules).

[2] See *Morningstar Water Users Assoc. v. New Mexico Public Utility Comm'n*, 120 N.M. 579, 904 P.2d 28 (1995), for a history of the SPA and the term "mutual domestic water consumer association."

14.   The intent of the SPA is to provide people in rural communities with safe supplies of water for domestic use. NMSA 1978 §3-29-3.

15.   The SPA provides procedures by which communities can form associations (MDWCAs) to provide safe water supplies for their citizens. MDWCAs are public, non-profit corporations. NMSA 1978 §§3-29-15, et seq.

16.   Formation of MDWCAs is limited by law to rural, unincorporated areas that have been in existence for twenty-five years or longer. NMSA 1978 §3-29-2(A), §3-29-5(B).

17.   In order to qualify for state funding, an association must be willing to contribute "all unskilled labor, such skilled labor as is available and desirable . . . sand, gravel, stone, timbers, vigas, adobes, and other materials . . ." as well as pay for at least a third of the cost of the project. 1978 NMSA §3-29-5(A)(4), (C).

18.   The SPA does not limit the uses of water diverted from a Sanitary Projects Act well, except that water cannot be used for commercial irrigation or commercial stock watering. NMSA 1978 §3-29-7(A)(1).[3]

19.   The SPA envisions that MDWCAs expand to meet the needs of the community. MDWCAs are required to let anyone in the community who desires to join to do so. NMSA 1978 §3-19-11; *El Vadito de los Cerriollos Water Ass'n v. N.M. Public Service Comm.*, 115 N.M. 784, 858 P.2d 1263 (1991); 1961-62 Op. N.M. Att'y Gen. No. 61-44.

20.   The SPA does not define "domestic" or "domestic water facilities" or "domestic water supplies."

21.   There is no basis to conclude that the "domestic" uses contemplated by the SPA (enacted in 1957) are inconsistent with the "domestic" uses contemplated by the domestic well statute (enacted in 1953). The law presumes that a legislative body is aware of existing law when it passes additional legislation; whenever possible, laws should be interpreted to give effect to both. *El Vadito de los Cerrillos v. PSC*, 115 N.M. 784, 858 P.2d 1263, 1270 (1993); *Clothier v. Lopez*, 103 N.M. 593, 595, 711 P.2d 870, 872 (1985).

22.   There is likewise no basis to conclude that the "domestic" uses contemplated by the SPA should not be considered "de minimus" in the same manner and to the same extent as the "domestic" uses under the domestic well statute.

23.   The SPA specifically declares it to be "the policy of the legislature to assist in

---

[3] The Groundwater Rules similarly limit the use of water obtained from private individual domestic wells; they provide that "water diverted from the well may not be used for any commercial purpose." Groundwater Rules 1-15.3(c).

providing facilities for the development of adequate, sanitary domestic water supplies, sewage works, or both . . . in rural unincorporated communities." NMSA 1978 §3-29-3.

24.   When the State Engineer "declares" a basin, the effect is to require all new groundwater diversions to be permitted through the OSE. Existing or "pre-basin" wells are recognized as valid, NMSA 1978 §72-12-4, and do not require permits absent a change in location or purpose of use. NMSA 1978 §72-12-7(A).

25.   The State Engineer may impose limitations on water rights in declared basins when an appropriator requests a change in the location of use. *State ex rel. Reynolds v. Rio Rancho Estates*, 95 N.M. 560, 564, 624 P.2d 502 (1981). However, he may impose limitations only if he finds that the change in location will impair existing rights. *City of Roswell v. Berry*, 80 N.M. 110, 452 P.2d 179 (1969). Without a find of impairment, the State Engineer has no jurisdiction to impose limitations. Reynolds v. City of Roswell. 99 N.M. 84, 654 P.2d 537 (1982).

26.   The "Mendenhall" doctrine is a relation-back doctrine pursuant to which pre-basin groundwater rights may be increased after a basin is declared.

27.   Pursuant to *State ex rel State Engineer v. Mendenhall*, 68 N.M. 467, 362 P.2d 998 (1961), a landowner who lawfully initiates the development of an underground water right prior to the State Engineer's assumption of administrative jurisdiction over the artesian basin in question has a pre-basin water right with a priority date relating back to the initiation of the development of that right.

28.   To establish a pre-basin water right, *State v. Mendenhall* requires that the landowner exercise due diligence in developing the water right pursuant to a plan, that the landowner complete the appropriation, and that the landowner apply the water to actual beneficial use within a reasonable time. 68 N.M. 467, 362 P.2d 998 (1961).

29.   The requirements that a landowner proceed diligently to develop the water right pursuant to a plan and that the landowner apply the water to beneficial use within a reasonable time may be tolled in cases where litigation over the right interrupts development of the right and application of water to beneficial use. *State ex rel. Reynolds v. Rio Rancho Estates, Inc.*, 95 N.M. 560, 563, 624 P.2d 502, 505 (1981).

30.   The Mendenhall doctrine applies to municipal water rights—that is, the doctrine of relation back includes contemplation of a municipality's planned future of water. *State ex rel Reynolds v. Rio Rancho Estates*, 95 N.M. at 564.

31.   A municipality has a right to appropriate water for future use. *State v. Crider*, 78 N.M. 312, 431 P.2d 45 (1967). In determining the extent of a municipal water right, a court may look to a municipality's planned future use of water caused by increasing population. *State ex rel. Reynolds v. Rio Rancho Estates*, 95.N.M. at 564.

32.   The New Mexico legislature has given member-owned community water systems such as MDWCAs the same latitude and flexibility allowed municipalities in planning

for future use.  NMSA 1978 §72-1-9(A)(1999).  The statute provides:

> It is recognized by the state of New Mexico that it promotes the
> public welfare and the conservation of water within the state for
> municipalities, counties, state universities, member-owned community
> water systems and public utilities supplying water to municipalities or
> counties to plan for the reasonable development and use of water
> resources.[4]

33. Pursuant to this statute, member-owned community water systems, like
    municipalities, have forty years to implement their water development plans and apply
    water to beneficial use.  NMSA 1978 §72-1-9(B)(1999).

34. The United States and New Mexico constitutions both guarantee that citizens of New
    Mexico will be afforded equal protection of the laws.  Equal protection guarantees
    that people who are similarly situated will be treated similarly by the state and its
    agents.  U.S. Const., Amend. XIV, §1; N.M. Const. Art. II, §18.  See also *Norton v.*
    *Village of Corrales*, 103 F.3d 928 (10th Cir. 1996); *In re Castellano*, 119 N.M. 140,
    145, 889 P.2d 175, 180 (1995); Garcia v. La Farge, 119 N.M. 523, 893 P.2d 428
    (1995).

35. Equal protection "prohibits the government from creating statutory classifications
    that are unreasonable, unrelated to a legitimate statutory purpose, or not based on real
    differences."  *Madrid v. St. Joseph Hosp.*, 122 N.M. 524, 535, 928 P. 250, 261
    (1996).

36. Corporations as well as individuals are protected by constitutional equal protection
    guarantees.  *Liggit v. Baldridge*, 278 U.S. 105, 49 S.Ct. 57 (19 ); *State v. Sunset*
    *Ditch Co.*, 48 N.M. 17, 25, 145 P.2d 219, 223 (1944).

37. Equal protection violations may occur facially, where, for example, a statute or
    regulation violates equal protection on its face, or when a neutral statute or regulation
    is applied in a discriminatory manner.  *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct.
    1064 (1886).

38. "When a state distributes benefits unequally, the distinctions it makes are subject to
    scrutiny under the Equal Protection Clause of the Fourteenth Amendment."  Hooper
    v. Bernalillo County Assessor, 472 U.S. 612, 618 (1985).

39. In *State ex rel. Reynolds v. Allman*, 78 N.M. 1, 427 P.2d 886 , a proceeding to
    determine priority dates, the New Mexico Supreme Court held that "where all rights

---

[4] Although "member-owned community water systems" were not added to the statute until 1999, the courts
recognized that municipalities were entitled to plan for future use well before passage of statutory provisions
giving them this right.  See *State v. Crider*, 78 N.M. 312, 431 P.2d 45 (1967).  Accordingly, there is no basis to
exclude the defendant MDWCAs from the policy of planning for future use first enunciated in Crider and now
codified in the statute.  The legislature has indicated clearly that it "promotes the public welfare and the
conservation of water" that member-owned community water systems, like other public entities, be permitted
to plan for the development and use of water.

are being adjudicated in the lawsuit . . . the application of different standards in
determining the relative priorities is patently unfair and improper." 78 N.M. at 3.

40.    Courts apply three levels of scrutiny when analyzing equal protection claims. *Trujillo
v. City of Albuquerque*, 1998 NMSC 31, ¶14, 125 N.M. 721, 965 P.2d 305. Strict
scrutiny is utilized when the classifications involve a "suspect" class, such as race or
national origin, or whenever a fundamental right, such as the right to interstate travel,
is implicated. *Riddle v. Mondragon*, 83 F.3d 1197 (10th Cir. 1996); *Meyer v. Jones*,
106 N.M. 708, 711, 749 P.2d 93, 96 (1988). Strict scrutiny requires that the
classifications satisfy a compelling state interest and that the classifications be
narrowly tailored to that interest. *Illinois State Bd. of Elections v. Socialist
Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, (1979); *Marrujo v. New Mexico
State Highway Transp. Dep't.*, 118 N.M. 753, 887 P.2d 747 (1994).

41.    Intermediate scrutiny is utilized to assess legislative classifications "infringing
important but not fundamental rights, and involving sensitive but not suspect
classes," *Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 693, 763
P.2d 1153, 1158 (1988), overruled on other grounds, *Trujillo v. City of
Albuquerque*, 1998-NMSC-031, 125 N.M. 721, 965 P.2d 305, where for example, the
classifications are gender-based or involve illegitimacy. Intermediate scrutiny requires
that the classifications bear a substantial relationship to an important governmental
interest. *Mississippi University for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct.
3331 (1982); *Trujillo*.

42.    The third level of scrutiny, or the "rational basis" test, is applied in all other cases. It
requires that the classifications further a legitimate state interest and that they bear a
rational relationship to that interest. *Cummings v. X-Ray Assoc. of New Mexico,
P.C.*, 1996-NMSC-035, 121 N.M. 821, 918 P.2d 1321; *Marrujo v. New Mexico
State Highway Transp. Dep't.*, 118 N.M. 753, 757-58, 887 P.2d 747, 751-52 (1994).

43.    By its practices, the OSE has created two classes of people who divert ground water
for domestic purposes—those who divert groundwater from a common source, such
as a community or mutual domestic well, and those who divert water from a private
individual well.

44.    Courts have not expressly determined the level of scrutiny to be applied to the use of
or right to water. However, water is a vital necessity; in analyzing the right to food
stamps, which guarantee access to another vital necessity, the Supreme Court has
applied an intermediate level of scrutiny greater than the "rational basis" standard.
*U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S. Ct. 2821 (1973*); U.S.
Dept. of Agriculture v. Murry*, 413 U.S. 508, 93 S. Ct. 2831 (1973).

45.    Water rights are property rights. *Lindsay v. McClure*, 136 F.2d 65 (10th Cir. 1943).

46.    Using even the least strict, most deferential "rational basis" standard of equal
protection scrutiny, the OSE's practice of limiting the amount of water available for
domestic use from community wells, without placing similar limitations on the
amount of water available for domestic use from private wells, violates equal

protection.

47. The classifications that result from the OSE's practices do not further a legitimate state purpose, nor do they bear a rational relationship to a legitimate state purpose. Rather, the OSE's practices frustrate the legitimate purposes of both the New Mexico Groundwater Code, which recognizes domestic water uses as "de minimus," and the Sanitary Projects Act, which reflects the legislative intent that rural communities have adequate supplies of water for domestic uses.

48. By its practices, the OSE has created additional classes of people who divert groundwater for domestic purposes, based soley on the timing of their associations' first interaction with the State Engineer. This is an impermissible basis for distinguishing between associations and the rights of their members. See *State v. Sunset Ditch Co.,* 48 N.M. 17, 25, 145 P.2d 219, 223 (1944)("[l]egislative classification based wholly upon a time element when the time selected has no reasonable relation to the object of the legislation, has been held unreasonable and arbitrary, and repugnant to the provisions of the 14th Amendment").

49. Equal protection requires not only that all MDWCAs be treated consistently as among themselves, but also that they be treated consistently as among all domestic water users.

50. Due process guarantees that no person will be deprived of life, liberty or property unfairly. Substantive due process guarantees that no one will be so deprived for arbitrary reasons. A deprivation of life, liberty or property is permissible only if proscribed by reasonable legislation, reasonably applied. *Schwere v. Board of Bar Examiners,* 60 N.M. 304, 306, 291 P.2d 607, 608 (1955). Procedural due process guarantees, at a minimum, notice and an opportunity to be heard before an unbiased decisionmaker. *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 70 S.Ct. 652 (1950).

51. By its practices, the OSE has violated the due process rights of water users transferring water rights to their MDWCA. The OSE arbitrarily limited transfers to amounts of water (e.g. 60 gpcd, 75 gpcd) without basis in law or in fact. Water users who previously had had more than adequate supplies for their domestic uses were deprived of those supplies, resulting in hardships, artificially imposed water use restrictions, and, in many instances, in complaints of overdiversion by the OSE.

It is accordingly that the MDWCAs are adjudicated water rights as follows:

<u>Arroyo Seco Mutual Domestic Water Consumer Association</u>

In 1958, Arroyo Seco MDWCA filed a declaration claiming the right to use 120 acre-feet per annum for domestic uses. This declaration was supported by 25 other individual

declarations of use claiming the right to use water from several shallow wells in the area. It was also supported by affidavits of use by ten individuals who described the use of springs, the river, or ditches by their themselves and their respective families. The Office of the State Engineer investigated these claims at the time and found them to be valid. In 1962, the State Engineer entered an Order that Arroyo Seco MDWCA did not need to file Proof of Beneficial Use. Recognizing a right to divert three acre-feet for each pre-basin well in existence is consistent with the current OSE practice of allowing diversion of up to three acre-feet per annum. Recognizing a quantity of 120 acre-feet for Arroyo Seco MDWCA fulfills the purposes of the Sanitary Project Act and is in the public interest. Therefore, Arroyo Seco should be adjudicated a quantity of 120 acre-feet per annum for community domestic use.

Canon Mutual Domestic Water Consumer Association

Canon MDWCA drilled its first well prior to November 29, 1956, when the State Engineer declared the Rio Grande Underground Water to have reasonably ascertainable boundaries. When it began developing its water right, Canon MDWCA began delivering water to an unknown number of persons who had previously obtained their water from domestic purposes from ditches and shallow wells already in existence in the basin. Canon MDWCA and its members have clearly expressed an intent to provide water for all members of the Canon community. The Sanitary Projects Act requires Canon to allow any person within the community who so desires to join. Canon currently provides water to 150 member families and has a waiting list of over 50 families who wish to hook up. If Canon has sufficient water rights, it can provide water for those members of its community who wish to join. OSE investigations in the mid-1970's confirmed that Canon MDWCA's first well had a capacity of 32 gpm. Since that time, Canon has drilled another well in its plan to

develop a water right sufficient to meet the needs of its community.  The capacity of Canon's second well is 90 gpm.  Canon has diverted 52.86 acre-feet in one year and has expressed its intent to fully develop its water supply to meet the future needs of Canon and will fulfill the purposes of the Sanitary Projects Act.  Canon should be adjudicated the quantity of 87.10 acre-feet per year (based on pumping the second well producing 90gpm 60% of the time)

In the alternative, Canon MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system times 150 gpcd.

### El Salto Mutual Domestic Water Consumer Association

In 1974, there were 23 owners of domestic wells dug or drilled prior to November 29, 1956 who joined El Salto MDWCA.  There is a presumption that an owner of a domestic well has the right to divert up to three acre-feet per year from his or her well.  The owners of the well sought to effectuate the purposes of the Sanitary Projects Act when transferring their wells into the El Salto community system.   Recognizing an initial right of 69 acre-feet per annum for El Salto MDWCA is consistent with the purposes of the SPA and is consistent with current OSE practice regarding appropriation of water for domestic uses.   (El Salto MDWCA has also acquired adjudicated irrigation water rights and has obtained permits from the OSE for change of place and purpose of use;  these rights had been previously adjudicated and are not the subject of this adjudication.)  Therefore, the Court should adjudicate a quantity of 69 acre-feet per annum to El Salto.

In the alternative, El Salto MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system times 150 gpcd.

### Llano Quemado Mutual Domestic Water Consumer Association

Llano Quemado MDWCA drilled its first well prior to November 29, 1956, when the State Engineer declared the Rio Grande Underground Water to have reasonably ascertainable boundaries. When it began developing its water right, Llano Quemado MDWCA began delivering water to an unknown number of persons who had previously obtained their water at least 36 pre-basin shallow wells already in existence in the basin. Llano Quemado MDWCA and its members have clearly expressed an intent to provide water for all members of the Llano Quemado community. The Sanitary Projects Act requires Llano Quemado to allow any person within the community who so desires to join. Llano Quemado currently provides water to 225 member families. Llano Quemado's original well had a capacity of 60 gpm. Since that time, Llano Quemado has drilled another well in its plan to develop a water right sufficient to meet the needs of Llano Quemado. The capacity of Llano Quemado's second well is 50 gpm. Llano Quemado alternately pumps these wells to provide water to its community. This court should adjudicate a quantity of 96.78 acre-feet to Llano Quemado, based on pumping a 60 gpm well 100% of the time.

In the alternative, Llano Quemado MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system times 150 gpcd.

<u>Lower Arroyo Hondo Mutual Domestic Water Consumer Association</u>

In 1974, there were 51 owners of domestic wells dug or drilled prior to November 29, 1956 who joined Lower Arroyo Hondo MDWCA. There is a presumption that an owner of a domestic well has the right to divert up to three acre-feet per year from his or her well. The owners of the well sought to effectuate the purposes of the Sanitary Projects Act when transferring their wells into the Lower Arroyo Hondo to community system. Recognizing an initial right of 153 acre-feet per annum for Lower Arroyo Hondo MDWCA is consistent with the purposes of the SPA and is consistent with current OSE practice

regarding appropriation of water for domestic uses.   (Lower Arroyo Hondo MDWCA has also acquired adjudicated irrigation water rights and has obtained permits from the OSE for change of place and purpose of use;  these rights had been previously adjudicated and are not the subject of this adjudication.)  Therefore, the Court should adjudicate a quantity of 153 acre-feet per annum to Lower Arroyo Hondo MDWCA.

In the alternative, Lower Arroyo Hondo MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system times 150 gpcd.

### Lower Des Montes Mutual Domestic Water Consumer Association

Lower Des Montes currently serves 85 households.  It is unknown exactly how many people obtain their water.  Lower Des Montes should be adjudicated an amount of water equal to the number of persons currently served by the system x 150 gpcd.

### Ranchos de Taos Mutual Domestic Water Consumer Association

In 1958, Ranchos de Taos MDWCA filed a declaration claiming the right to use 105 acre-feet per annum for domestic uses.  This declaration was supported by 36 other individual declarations of use claiming the right to use water from several shallow wells in the area.  It was also supported by affidavits of use by individuals who described the use of springs, the river, or ditches by their themselves and their respective families.  The Office of the State Engineer investigated these claims at the time and found them to be valid.   In 1962, the State Engineer entered an Order that Ranchos de Taos MDWCA did not need to file Proof of Beneficial Use.  Recognizing a right to divert three acre-feet for each pre-basin well in existence is consistent with the current OSE practice of allowing diversion of up to three acre-feet per annum.  Recognizing a quantity of 105 acre-feet for Ranchos de Taos MDWCA fulfills the purposes of the Sanitary Project Act and is in the public interest.

### Talpa Mutual Domestic Water Consumer Association

Talpa MDWCA drilled its first well prior to November 29, 1956, when the State Engineer declared the Rio Grande Underground Water to have reasonably ascertainable boundaries.   When it began developing its water right, Talpa MDWCA began delivering water to an unknown number of persons who had previously obtained their water from ditches, streams and shallow wells already in existence in the basin.   Talpa MDWCA and its members have clearly expressed an intent to provide water for all members of the Talpa community.   The Sanitary Projects Act requires Talpa to allow any person within the community who so desires to join.   Talpa currently provides water to 225 member families. Talpa's original well had a capacity of 50 gpm.   Since that time, Talpa has drilled three additional wells in its plan to develop a water right sufficient to meet the needs of Talpa. Talpa alternately pumps two or more of these wells at any and all times in order to provide water to its community.   This court should adjudicate a quantity of 96.78 acre-feet to Talpa, based on pumping two 50 gpm wells each in operation 60% of the time.

In the alternative, Talpa MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system times 150 gpcd.

### Upper Arroyo Hondo Mutual Domestic Water Consumer Association

Upper Arroyo Hondo currently serves 56 member households.   It is unknown exactly how many people obtain their water.   Upper Arroyo Hondo MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system x 150 gpcd.

### Upper Des Montes Mutual Domestic Water Consumer Association

Upper Des Montes currently serves 70 member households.   It is unknown exactly how many people obtain their water.   Upper Des Montes MDWCA should be adjudicated

an amount of water equal to the number of persons currently served by the system x 150 gpcd.

### Upper Ranchito Mutual Domestic Water Consumer Associaton

In 1974, there were 47 owners of domestic wells dug or drilled prior to November 29, 1956 who joined Upper Ranchito MDWCA. Five of these subsequently left, leaving 42 wells seeking to transfer rights. There is a presumption that an owner of a domestic well has the right to divert up to three acre-feet per year from his or her well. The owners of the well sought to effectuate the purposes of the Sanitary Projects Act when transferring their wells into the Upper Ranchitos community system. Recognizing an initial right of 126 acre-feet per annum for Upper Ranchitos MDWCA is consistent with the purposes of the SPA and is consistent with current OSE practice regarding appropriation of water for domestic uses. Therefore, the Court should adjudicate a quantity of 126 acre-feet per annum to Upper Ranchitos MDWCA.

In the alternative, Upper Ranchitos MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system times 150 gpcd.

### Valdez Mutual Domestic Water Consumer Association

Valdez MDWCA currently serves 30 households. It is unknown exactly how many people obtain their water. Valdez MDWCA should be adjudicated an amount of water equal to the number of persons currently served by the system x 150 gpcd.

Respectfully submitted,

Mary E. Humphrey
Connie Odé

P.O. Box 1574
El Prado, New Mexico   87529
(505) 758-2203
(505) 758-5129 Fax

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that I mailed a copy of the foregoing pleading to the following persons on

the _22_ day of October, 2002, in accordance with the Federal Rules of Civil Procedure:

Edward Bagley
Gregory Ridgley
NM State Engineer Office
P. O. Box 25102
Santa Fe, NM  87504

Spec. Master Vickie Gabin        Darcy Bushnell, Esq.
USDC/DCNM                        USDC/DCNM
P. O. Box 2384                   333 Lomas Blvd. NW
Santa Fe, NM  87504-2384         Albuquerque, NM  87102

Mary E. Humphrey