IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, on its
own behalf and on behalf of the
PUEBLOS OF JEMEZ, SANTA ANA, and ZIA

and

STATE OF NEW MEXICO, *ex rel.*
State Engineer,

        Plaintiffs,

and

THE PUEBLOS OF JEMEZ, SANTA ANA, and ZIA,

        Plaintiffs-in-Intervention,

v.                                                          CV 83-1041 MV/WPL
                                                        JEMEZ RIVER ADJUDICATION

TOM ABOUSLEMAN, *et al.*,

        Defendants.

PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
REGARDING ISSUES 1 AND 2

**THIS MATTER** comes before me on Opening, Response and Reply briefs of the Jemez River Basin Water Users Coalition ("Coalition") (Docs. 4361, 4375, 4371), the Pueblos of Santa Ana, Zia, and Jemez, and the United States ("US/Pueblos") (Docs. 4362, 4364, 4370), and the State of New Mexico ("State") (Docs. 4363, 4366, 4369), on Issues 1 and 2. As explained herein, I recommend that the Court find that the Pueblos possessed aboriginal water rights prior to the Spanish occupation of New Mexico, but conclude that the Spanish crown exercised complete dominion and control over New Mexico in a manner adverse to the Pueblos and thus extinguished the Pueblos' aboriginal water rights.

**Issues 1 and 2**

The parties requested that the Court rule on the following legal issues before proceeding with the adjudication of the Pueblos' water rights claims:

Issue No. 1: Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands, and if so, have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico, or the United States?

    Sub-issue: Did the Acts of 1866, 1870, and 1877 have any effect on the Pueblos' water rights and, if so, what effect?

    Sub-issue: Did the Pueblo Lands Acts of 1924 and 1933 have any effect on the Pueblos' water rights and, if so, what effect?

    Sub-issue: Did the Indian Claims Commission Act have any effect on the Pueblos' water rights and, if so, what effect?

Issue No. 2: Does the *Winans* doctrine apply to any of the Pueblos' grant or trust lands?

(Doc. 4363 at 2.)

**Issue No. 1: Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands, and if so, have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico, or the United States?**

In addressing Issue No. 1, its sub-issues, and Issue No. 2, I have considered the briefs of the parties, the testimony, and expert reports of the expert witness for the US/Pueblos, Charles R. Cutter, Ph.D., and the expert witness for the State, Professor G. Emlen Hall, and the relevant law.

**Aboriginal Rights**

"Aboriginal title denotes an interest that an Indian tribe possesses in land based solely on rights acquired by the Indians as original inhabitants of the land and not upon a statute, treaty, or grant by the sovereign." *Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 784 (Fed. Cl. 1993) (citing *Johnson & Graham's Lessee v. M'Intosh*, 21 U.S. 543, 574 (1823)). Aboriginal title "is not a property right but amounts to a right of occupancy which the sovereign grants and

protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955). In addition to the right to occupancy of lands, aboriginal title includes the use of the waters and natural resources on those lands where the Indians hold aboriginal title. *See United States v. Winans*, 198 U.S. 371, 381 (1905) (treaty reserved to the Indians their pre-existing right to fish at all usual and accustomed places); *United States v. Adair*, 723 F.2d 1394, 1413-1414 (9th Cir. 1983), *cert. denied* 467 U.S. 1252 (1984) (tribe's aboriginal title included timber rights, aboriginal hunting and fishing rights, and water right to support its hunting and fishing lifestyle); *Joint Bd. of Control of Flathead, Mission & Jocko Irrigation Dist. v. United States*, 832 F.3d 1127, 1131 (9th Cir. 1987) (treaty preserved aboriginal fishing rights). The doctrine of aboriginal title applies to the lands ceded to the United States by Mexico in the Treaty of Guadalupe Hidalgo. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1160-91 (10th Cir. 2015) (stating that *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339 (1941), "reaffirmed principles first established in *Johnson v. M'Intosh*, reaffirmed that aboriginal title is not determined by treaty, and applied the doctrine of aboriginal title to the Mexican cession area").

The first part of Issue No. 1 asks whether the Pueblos have ever possessed aboriginal water rights in connection with their grant or trust lands. For a tribe or pueblo to establish aboriginal title, it must provide proof "of actual, exclusive and continuous use and occupancy for a long time prior to the loss of the land." *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975) (quoting *Confederated Tribes of the Warm Springs Reservation v. United States*, 177 Ct. Cl. 184, 194 (1966)) (internal punctuation omitted). Aboriginal title is a question of fact. *Id.* Exclusive possession means that the tribe "used and occupied the land to the

exclusion of other Indian groups." *Strong v. United States*, 518 F.2d 556, 561 (Ct. Cl. 1975) (quoting *Pueblo of San Ildefonso*, 513 F.2d at 1394), *cert. denied*, 423 U.S. 1015. Multiple tribes using one parcel of land, so-called mixed use, precludes any of the tribes from establishing aboriginal title, unless the tribes "occupy a defined areas in joint and amicable possession." *Uintah Ute Indians*, 28 Fed. Cl. at 785. To prove use and occupancy, a tribe generally provides "evidence regarding its way of life, habits, customs and usages of the land." *Id.* (citing *Mitchel v. United States*, 34 U.S. 711, 746 (1835)). The "long time" requirement means that the tribe must have "made the area into domestic territory." *Id.* (citing *Confederated Tribes*, 177 Ct. Cl. at 194).

**Extinguishment of Aboriginal Title**

The second part of Issue No. 1 asks whether those aboriginal water rights have been modified or extinguished in any way by any actions of Spain, Mexico, or the United States.

Congress possesses the supreme power to extinguish any claims of aboriginal title. *Santa Fe Pac.*, 314 U.S. at 347. Issues related to Congress's exercise of this authority are political issues, not justiciable ones. *Buttz v. N. Pac. R.R.*, 119 U.S. 55, 66 (1886). "[T]he exclusive right of the United States to extinguish [Indian] title . . . has never . . . been doubted." *M'Intosh*, 21 U.S. at 586. Regardless of the means used to exercise this right, that exercise "is a question of governmental policy, and is not a matter open to discussion." *Beecher v. Wetherby*, 95 U.S. 517, 525 (1877); *see also Santa Fe Pac.*, 314 U.S. at 347.

The United States can extinguish aboriginal title in numerous ways, including a determination that the tribe failed to satisfy any of the elements required to establish aboriginal title. *Uintah Ute Indians*, 28 Fed. Cl. at 787. As such, a "sovereign's exercise of complete dominion adverse to the Indian right of occupancy defeats a claim to aboriginal title." *Id.* (citing *Quapaw Tribe v. United States*, 120 F. Supp. 283, 286 (Ct. Cl. 1954), *overruled on other*

4

*grounds by United States v. Kiowa*, 166 F. Supp. 939 (Ct. Cl. 1958), *cert. denied* 359 U.S. 934 (1959)). In *Quapaw Tribe*, the Court of Claims stated that "when an Indian tribe ceases for any reason, by reduction of population or otherwise, to actually and exclusively occupy and use an area of land clearly established by clear and adequate proof, such land becomes the exclusive property of the United States as public lands," as such, "the Indians lose their right to claim and assert full beneficial interest and ownership to such land." 120 F. Supp. at 286 (citations omitted). Furthermore, "the United States cannot be required to pay therefor on the same basis as if it were a recognized treaty reservation." *Id.*; *see also Uintah Utes Indians*, 28 Fed. Cl. at 787 (quoting *Quapaw Tribe*).

While the United States can extinguish aboriginal title and aboriginal title can be lost by various actions that cease to meet the requirements of aboriginal title, extinguishment of aboriginal title "cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Santa Fe. Pac.*, 314 U.S. at 354; *see Pueblo of San Ildefonso*, 513 F.2d at 1390. "It is well-settled that an intention to authorize the extinguishment of Indian title must be 'plain and unambiguous,' either 'expressed on the facts of the [instrument] or . . . clear from the surrounding circumstances.'" *Seneca Nation of Indians v. New York*, 382 F.3d 245, 260 (2d Cir. 2004) (quoting *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 276 (1985)) (alterations in original). In *Seneca Nations*, the Second Circuit went on to "see no reason not to apply a similar standard to Indian treaties negotiated by . . . a prior sovereign." *Id.* at 260 n.17.

**Spanish Sovereignty**

The Spanish crown recognized the Pueblos' ownership of their land when it incorporated the Pueblos into the Spanish Empire. (Cutter Tr. Mar. 31, 2014, at 21 ("I believe that the crown,

5

from the earliest times, recognized that the Indians possessed their lands and were the true owners of the lands"); Doc. 4351 at 71 ("Cutter Report") ("Spanish authorities in New Mexico recognized the Pueblo Indians of New Mexico as original owners of their lands"); *but see* Hall Tr. Apr. 1, 2014 at 207 (under Spanish law, the pueblos "don't share land in the same way" that they share water).) The Spanish crown also recognized the Pueblo's right to use water based on their use of water before the arrival of the Spaniards. (Cutter Report at 71; *but see* Hall Tr. at 203-04 ("I conclude . . . that the arrival of Spain . . . and the imposition of Spanish sovereignty imposed the civil law of Spain on the pueblos and on New Mexico generally, and on the public shared water resources specifically. . . . I concluded that the pueblo discretion to use water in whatever way it chose to was limited by the imposition of that law, and simply by the imposition of it. And I concluded that public water – and this was agreed to by Professor Cutter – public waters were now held in common by pueblos and non-Indians, the resources to be shared, and the sharing was to be ultimately controlled by the broader government, not the pueblos themselves."), 211-12 ("it's the sovereign that adjusts and readjusts access to public shared waters between pueblos and non-Indians"), 225, 270 ("The pueblo rights at the time of sovereign – turned sovereign – were neither prior nor paramount nor permanent.").)

"The Spanish crown insisted on its prerogative, or regalía, in matters pertaining to land, water, and other resources, but this regalía did not apply to properties owned by Indians." (Cutter Report at 70.) "Regalía" refers to the right of "the crown [to exercise] supreme power over the administration, licensing, and adjudication of certain spheres of activity and kinds of resources." (*Id.* at 38 (quoting definition of "regalía" from the first edition of the Spanish Diccionario de Autoridades (1726-1739): "The private and exclusive preeminence, prerogative, or exception that, by virtue of its supreme authority and power, any sovereign exercises in his kingdom or

6

states"). The crown claimed regalía with regard to natural resources including "lands, fields, woodlands, pasturage and public waters, all of which [a 17th century jurist] termed 'realengas' (that is, belonging to the crown)." (*Id.*) Regalía "did not extend to all property in the New World, however, but rather only to that which was not considered to be held privately." (*Id.*) "Regalía wouldn't bear on the Indian lands unless some major project were being planned and some kind of right-of-way had to be exercised, eminent domain." (Cutter Tr. at 50.)

The crown's regalía included the power to determine rights to public shared waters. (*Id.* at 105 ("regalia included the power to determine rights to public shared water"); *see also id.* at 50 ("to oversee the use of water"), 51 ("That is the prerogative of the crown, to ensure effective use of water"), and 126 ("The crown reserved the right to allocate access to public shared waters.").) The right to use public waters was an interest separate from land ownership. (*Id.* at 112-16 ("the surface interests of land was a separate interest under Spanish and Mexican law from the mineral interests and from the interest in common public water sources"); *see also id.* at 119-22; Hall Tr. at 211 ("I think we both agree that land and water were separate. . . .[T]hey were separate legal regimes and different kinds of legal rights under Spanish/New Mexican law that govern these resources.").) Private waters, which include springs and groundwater on privately owned land, were the property of the landowner and were not subject to regalía. (Cutter Tr. at 59-61.)

Public water in rivers was a common resource for use by everybody. (*Id.* at 113-14; *but see* Hall Tr. at 226 (once a pueblo has diverted water into an irrigation system, the pueblo controls that water).) The general principle was one could not use public waters to the detriment of other users. (Cutter Tr. at 114-15; Hall Tr. at 269.) A user could increase his use of water so long as that increased use was not to the detriment of other users. (Cutter Tr. at 130; Hall. Tr. at

7

215.) If one user's increased use caused a detriment to another user, the crown could intervene in the conflict and make an allocation. (Cutter Tr. at 124, 130.)

One way the crown could resolve conflicts and allocate rights to public waters was through the process of "repartimiento." (*Id.* at 126; Hall Tr. at 212 (repartimiento is not an exercise of eminent domain because the sovereign never completely divested its interest in the public waters), 229 (repartimiento could be used to "formalize the existence of a water right").) The "allocation of water by repartimiento involved the simultaneous application to all parties of the following factors: One, prior use; two, need; three, purpose of use, [intent]; four, legal rights; . . . five, injury to third parties; and six, equity and the common good." (Cutter Tr. at 132-33; *see also* Hall Tr. at 212 ("The repartimientos parcel out the resource according to standards which can be specified and have been specified in this case. . . . [The sovereign] can do a lot with respect to adjusting and readjusting the resources.").) "The factors can be separately stated and analyzed, but they tended to blend together in decisions, with it being difficult to say what the relative weight of each factor was." (Cutter Tr. at 132-33.) No formal repartimiento ever took place in the Jemez Valley watershed with respect to the Pueblos of Jemez, Santa Ana, and Zia, due to lack of conflict over water. (*Id.* at 48; *see also id.* at 176-77 (no historical documentation that Jemez, Santa Ana, or Zia were limited in their ability to use river water at any time during the Spanish or Mexican regimes in New Mexico).)

**Mexican Sovereignty**

The then-new country of Mexico took over sovereignty from Spain by virtue of the Treaty of Cordova, which was August 21, 1821." (*Id.* at 54; Cutter Report at 54 ("by virtue of the Treaty of Córdoba (August 21, 1821).").) The treaty between Spain and the new Mexican government, and the Mexican declaration of independence, reaffirmed the principles of the Plan

of Iguala. *See United States v. Ritchie*, 58 U.S. 525, 538 (1854). The Plan of Iguala declared that "all the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians, are citizens of this monarchy," and that "the person and property of every citizen will be respected and protected by the [Mexican] government." *Id.*

"The laws governing land and water rights during the Mexican period remained substantially the same as during the Spanish colonial era." (Cutter Report at 71; Cutter Tr. at 57 ("the rules in place under the Spanish regime continued under the Mexican regime"), 232-34 (the repartimiento procedure did not change between the Spanish and Mexican regimes, except that the "standing of communities in the repartimiento process seems to have increased in the Mexican period").) Mexico ruled the area until it ceded the territory to the United States in 1848.

**Treaty of Guadalupe Hidalgo**

Mexico ceded the area to the United States in the Treaty of Guadalupe Hidalgo. 9 Stat. 922 (1848). "In the Treaty of Guadalupe Hidalgo, the United States agreed to protect rights recognized by prior sovereigns." *New Mexico v. Aamodt*, 537 F.2d 1102, 1109-10 (10th Cir. 1976); (*see also* Hall Tr. at 204 ("I concluded that the property rights of pueblos are no different than property rights of Mexicans. . . . The treaty did not treat [property rights of pueblos] specially, and it guaranteed the present protected rights of pueblos as Mexican citizens, as any other Mexican citizen."), 207 ("At that moment [--the Treaty of Guadalupe Hidalgo--] of the transfer of sovereignty, Mexican law protected primarily water that was then used by both the pueblos and the non-Indians from that common source."), 276 ("[T]here's no evidence that pueblo Indians . . . were given any special treatment with respect to . . . any of the terms of the Treaty of Guadalupe Hidalgo."), 279-80 (Indians were treated as Mexican citizens and "[t]he

9

treaty protected as presently perfected water rights, pueblo rights to water, that they actually used.").) The Treaty states in relevant portion:

### ARTICLE VIII.

Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, *retaining the property which they possess in the said territories*, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever.

Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States.

In the said territories, *property of every kind, now belonging to Mexicans not established there, shall be inviolably respected*. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States.

### ARTICLE IX.

Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time shall be maintained and *protected in the free enjoyment of their liberty and property*, and secured in the free exercise of their religion without restriction.

9 Stat. 922 (1848) (emphasis added).

### DISCUSSION

I note at the outset that, while Dr. Cutter and Professor Hall largely agree, they do have material differences of opinion. For example, as noted above, Professor Hall opined that Spanish

civil law unilaterally divested the Pueblos of their aboriginal water rights, whereas Dr. Cutter opined that Spain recognized the Pueblos' preconquest right to use water. For purposes of this recommendation, I assume that the US/Pueblos' expert, Dr. Cutter, is correct and have resolved all factual questions in favor of Dr. Cutter's opinion.

The first part of Issue No. 1 asks whether the Pueblos have ever possessed aboriginal water rights in connection with their grant or trust lands. Establishing aboriginal water rights requires proof that the Pueblos made actual, exclusive, and continuous use of water for a long time. *See Uintah Ute Indians*, 28 Fed Cl. at 784-85. Professor Cutter reported that the "Pueblos used and exploited those sources of water before the arrival of Juan de Oñate and his followers in 1598." (Cutter Report at 44.) Professor Hall testified that it was his understanding that the Pueblos of Jemez, Santa Ana, and Zia continuously used and occupied the lands within their pueblo leagues for a long period of time preceding European occupation in New Mexico. (Hall Tr. Apr. 1, 2014, at 353.) The parties have presented no evidence that other Indian groups besides the Pueblos of Jemez, Santa Ana, and Zia occupied the land and used the water. *See Uintah Ute Indians*, 28 Fed. Cl. at 784-85 (establishing aboriginal title requires proof that a tribe "used and occupied the land to the exclusion of other Indian groups;" "mixed use of a given parcel precludes the establishment of any aboriginal title unless the tribes occupy a defined area in joint and amicable possession"). I find that the Pueblos of Jemez, Santa Ana, and Zia actually and exclusively used water continuously for a long time before the Spanish occupation of New Mexico and conclude that the Pueblos possessed aboriginal water rights in connection with their grant or trust lands prior to the arrival of the Spanish.

The second part of Issue No. 1 asks whether those aboriginal water rights have been modified or extinguished in any way by any actions of Spain, Mexico, or the United States.

The US/Pueblos argue that extinguishing aboriginal title requires some affirmative act on the part of the sovereign, such as a repartimiento. (*See* Doc. 4362 at 20-21.) The US/Pueblos argue that if mere Spanish sovereignty extinguished aboriginal water rights, then the Pueblos would also have lost their aboriginal title to land, which did not happen. (*Id.*) Accordingly, claim the US/Pueblos, the lack of an affirmative act by the sovereign means that the Pueblos' aboriginal water rights were not extinguished by Spanish sovereignty. (*Id.*)

As support for this argument, the US/Pueblos assert that "*Santa Fe Pacific* confirmed that a tribe's aboriginal title can be extinguished *only* by an affirmative act of the sovereign," and include the following quotes from *Santa Fe Pacific*: "an extinguishment [of a tribe's aboriginal rights] cannot be lightly implied," "certainly it would take plain and unambiguous action to deprive" a tribe of such rights. (*Id.* at 12-13.) The US/Pueblos thus conclude that because there was never any repartimiento or other affirmative act limiting the Pueblos' use of water, the Spanish and Mexican sovereigns did not extinguish or modify the Pueblos' aboriginal rights.

I am not persuaded that the Pueblos' aboriginal water rights were not extinguished or modified because there was no repartimiento or other affirmative act limiting their use of water. *Santa Fe Pacific* indicates that Indian title can be extinguished in a number of ways including "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." 314 U.S. at 347. The Supreme Court more recently has indicated that "Congressional intent to authorize the extinguishment of Indian title must be 'plain and unambiguous,'—that is, it either 'must be expressed on the face of the Act *or be clear from the surrounding circumstances and legislative history*.'" *Mountain States Tel.*, 472 U.S. at 276 (emphasis added) (quoting *United States ex rel. Hualpai Indians v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 346 (1941) and *Mattz v. Arnett*, 412 U.S. 481, 505 (1973)).

Furthermore, the US/Pueblos' argument that if "the mere extension of Spanish sovereignty over New Mexico, without more, had extinguished aboriginal Indian rights to use water, the Pueblos' aboriginal title to land also would not have survived Spanish and Mexican rule" is not persuasive. (Doc. 4362 at 20-21.) According the US/Pueblos' expert, Dr. Cutter, under Spanish and Mexican law, rights to land were separate from rights to water, and the Spanish and Mexican governments held the power to determine rights to public waters. Thus, the Spanish government appears to have recognized aboriginal title to land, but did not recognize aboriginal title to the use of water.

I find that Spain imposed a legal system to administer the use of public waters and that regalía ended the Pueblos' exclusive use of the public waters and subjected the Pueblos' later use of public waters to potential repartimientos. Such a system is a plain and unambiguous indication that the Spanish crown extinguished the Pueblos' right to increase their use of public water without restriction and as such is an exercise of complete dominion adverse to the Pueblos' aboriginal right to use water.

**Sub-issues:   Did the Acts of 1866, 1870, and 1877; the Pueblo Lands Acts of 1924 and 1933; or the Indian Claims Commission Act have any effect on the Pueblos' water rights and, if so, what effect?**

Because I recommend that the Court conclude that the Spanish crown extinguished the Pueblos' aboriginal right to use water, the issues of whether the Acts of 1866, 1870, and 1877; the Pueblo Lands Acts of 1924 and 1933; and the Indian Claims Commission Act had any effect on those rights are moot.

**Issue No. 2:   Does the *Winans* doctrine apply to any of the Pueblos' grant or trust lands?**

"*Winans* rights essentially are recognized aboriginal rights." Waters and Water Rights § 37.02(a)(2) (Amy K. Kelley, ed., 3d ed. 2016). "[T]he scope of a *Winans* right is dependent on

actual use over an extended period of time, although it is not a function of the extent of land title. *Winans* rights preserve pre-existing uses, rather than establishing new uses." *Id.* Accordingly, the priority date for *Winans* rights dates from "time immemorial," that is, before white settlement. *Id.* "The quantity of *Winans* water rights reserved is not fixed on practicably irrigable acreage but is instead a 'needs-based' test." *Id.*

Because I recommend that the Court conclude that Spain extinguished the Pueblos' aboriginal water rights, there are no aboriginal water rights for the United States to recognize. Therefore, I recommend that the Court conclude that the *Winans* doctrine does not apply to any of the Pueblos' grant or trust lands.

## CONCLUSION

As explained above, I recommend that the Court find that the Pueblos of Jemez, Santa Ana, and Zia actually and exclusively used water continuously for a long time before the Spanish occupation of New Mexico, and thus conclude that the Pueblos possessed aboriginal water rights in connection with their grant or trust lands prior to the arrival of the Spanish. Further, I recommend that the Court find that Spain imposed a legal system to administer the use of public waters which extinguished the Pueblos' right to increase their use of public water without restriction, and that Spain's exercise of complete dominion over the use of public waters extinguished the Pueblos' aboriginal water rights. Finally, I recommend that the Court conclude that the *Winans* doctrine does not apply to any of the Pueblos' grant or trust lands.

## OBJECTIONS

The Parties are notified that within 28 days of the filing of this Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District

Court within the 28-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed. Responses are due within 28 days of service of objections. Replies are due within 14 days of service of responses.

_William P. Lynch_
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.